

FILED

2021 Mar-31  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, by and through Patrick Morrisey, Attorney General of the State of West Virginia; **STATE OF ALABAMA**, by and through Steve Marshall, Attorney General of the State of Alabama; **STATE OF ARKANSAS**, by and through Leslie Rutledge, Attorney General of the State of Arkansas; **STATE OF ALASKA**, by and through Treg R. Taylor, Attorney General of the State of Alaska; **STATE OF FLORIDA,** by and through Ashley Moody, Attorney General for the State of Florida; **STATE OF IOWA**; **STATE OF KANSAS,** by and through Derek Schmidt, Attorney General for the State of Kansas; **STATE OF MONTANA**, by and through Austin Knudsen, Attorney General of the State of Montana; **STATE OF NEW HAMPSHIRE**; **STATE OF OKLAHOMA**, by and through Mike Hunter, Attorney General of the State of Oklahoma; **STATE OF SOUTH CAROLINA**, by and through Alan Wilson, Attorney General of the State of South Carolina; **STATE OF SOUTH DAKOTA**, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and **STATE OF UTAH,** by and through Sean Reyes, Attorney General of the State of Utah, | Case No. _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

        Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF THE TREASURY;**

**JANET YELLEN**, in her official capacity as the Secretary of the United States Department of the Treasury; and

**RICHARD K. DELMAR**, in his official capacity as acting inspector general of the Department of the Treasury,

        Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, STATE OF WEST VIRGINIA, by and through Patrick Morrisey, Attorney General of the State of West Virginia; STATE OF ALABAMA, by and through Steve Marshall, Attorney General of the State of Alabama; STATE OF ARKANSAS, by and through Leslie Rutledge, Attorney General of the State of Arkansas; STATE OF ALASKA, by and through Treg R. Taylor, Attorney General of the State of Alaska; STATE OF FLORIDA, by and through Ashley Moody, Attorney General of the State of Florida; STATE OF IOWA; STATE OF KANSAS, by and through Derek Schmidt, Attorney General of the State of Kansas; STATE OF MONTANA, by and through Austin Knudsen, Attorney General of the State of Montana; STATE OF NEW HAMPSHIRE; STATE OF OKLAHOMA, by and through Mike Hunter, Attorney General of the State of Oklahoma; STATE OF SOUTH CAROLINA, by and through Alan Wilson, Attorney General of the State of South Carolina; STATE OF SOUTH DAKOTA, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and STATE OF UTAH, by and through Sean Reyes, Attorney General of the State of Utah, file this action against Defendants, and state:

**NATURE OF THE ACTION**

1.      In this action Plaintiff States ask the Court to protect them from one of the most egregious power grabs by the federal government in the history of the United States.

2.      The American Rescue Plan Act of 2021 ("ARPA"), signed by President Biden on March 11, 2021, includes a short—but incredibly impactful—provision,

which impermissibly seizes taxing authority from the States.  This provision, the Federal Tax Mandate, housed in § 9901 of ARPA, sets up an untenable choice for the Plaintiff States.  American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901 (2021) (adding § 602(c)(2) to the Social Security Act (42 U.S.C. § 801 *et seq.*)).  They must either relinquish control over a core function of their inherent sovereign powers, or else, in the midst of a deadly and destructive pandemic, forfeit massive and much-needed aid that represents approximately 25% of Plaintiff States' respective annual general budgets.

3.     Specifically, the Federal Tax Mandate disables States from decreasing taxes on their citizens for a period of over three years, while allowing them to increase taxes on their citizens and residents without restriction.  The Federal Tax Mandate thus usurps the ability of the Plaintiff States' citizens to reduce their tax burdens and creates an impermissible chilling effect on their elected officials' willingness to do the same—based on a threat that the federal government may claw back some or all of the States' share of critical ARPA funding.

4.     Never before has the federal government attempted such a complete take-over of state finances.  The Federal Tax Mandate steps well beyond the constitutional bounds set forth in Article I of the Constitution and the Tenth Amendment to the Constitution, and offends the dignity of co-sovereign States in our federal system.

5.     The Plaintiff States oppose the coercive and unprecedented use of Congress' spending power and seek relief from this Court to preserve their constitutional prerogative to enact tax policy in the best interests of their people.

## JURISDICTION AND VENUE

6.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.  The Court may grant injunctive and other relief under 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because no real property is involved, the district is situated in Alabama and the State of Alabama is a Plaintiff, and the Defendants are agencies of the United States or officers thereof acting in their official capacity.

8.      The Plaintiff States have standing to challenge the Federal Tax Mandate and to seek injunctive and declaratory relief.  The Federal Tax Mandate injures the Plaintiff States by unconstitutionally intruding on their sovereign authority, by interfering with their orderly management of their fiscal affairs, and by requiring them to forgo their constitutional taxing powers or risk an action to return much-needed federal funds based on an ambiguous and overbroad spending condition.  *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989); *Texas v. United States*, 809 F.3d 134, 155-57 (5th Cir.  2015); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).

9.      The Federal Tax Mandate directly harms the Plaintiff States' sovereign interests, including their ability to "exercise . . . sovereign power over individuals and entities within the relevant jurisdiction—[which] involves the power to create and enforce a legal code, both civil and criminal."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).  By diminishing the Plaintiff States'

power to tax their residents as they see fit, the Federal Tax Mandate necessarily and gravely injures their sovereign interests.

10.     The Federal Tax Mandate also harms the Plaintiff States' sovereign interest in "securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607-08.  The Federal Tax Mandate specifically attacks those terms and affects the Plaintiff States' sovereign power within the system.  They have the power to ensure their "residents are not excluded from the benefits that are to flow from participation in the federal system"— in this case, vital pandemic aid.  *Id.* at 608.

11.     This Court may remedy these harms to the Plaintiff States' sovereign interests by granting the relief requested in this lawsuit.  For just as the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law," that has also "been true . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (citations omitted).

## PARTIES

12.     The State of West Virginia, represented by and through its Attorney General Patrick Morrisey, is a sovereign State of the United States of America. Attorney General Morrisey has state constitutional and statutory authority to represent the State in federal court.  W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also* syl. pt. 4, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002).

13.    The State of Alabama, represented by and through its Attorney General Steve Marshall, is a sovereign State of the United States of America. Attorney General Marshall has state constitutional and statutory authority to represent the State in federal court.  Ala. Const. art. V § 137; Ala. Code § 36-15-1(2).

14.    The State of Arkansas, represented by and through its Attorney General Leslie Rutledge, is a sovereign State of the United States of America.  Attorney General Rutledge has state constitutional and statutory authority to represent the State in federal court.  Ark. Const. art. 6, § 22; Ark. Code Ann. § 25-16-703.

15.    The State of Alaska, represented by and through its Attorney General Treg R. Taylor, is a sovereign State of the United States of America.  Attorney General Taylor has state constitutional and statutory authority to represent the State in federal court.  Alaska Const. art. III, sec. 16; AS 44.23.020.

16.    The State of Florida, represented by and through its Attorney General Ashley Moody, is a sovereign State of the United States of America.  Attorney General Moody has state constitutional and statutory authority to represent the State in federal court.  Fla. Const. art. IV, § 4(b); Fla. Stat. § 16.01(5).

17.    The State of Iowa is a sovereign State of the United States of America.

18.    The State of Kansas, represented by and through its Attorney General Derek Schmidt, is a sovereign State of the United States of America.  Attorney General Schmidt has state constitutional and statutory authority to represent the State in federal court.  Kan. Const. art. 1, § 1; Kan. Stat. Ann. § 75-702.

19.    The State of Montana, represented by and through its Attorney General Austin Knudsen, is a sovereign State of the United States of America.  Attorney

General Knudsen has state constitutional and statutory authority to represent the State in federal court.  Mont. Const. art. VI, § 4(4); Mont. Code. Ann. § 2-15-501(1).

20.    The State of New Hampshire, represented by its Department of Justice, is a sovereign State of the United States of America.  The New Hampshire Department of Justice has statutory authority to represent the State of New Hampshire in all civil legal matters where the State is a party.  N.H. Rev. Stat. Ann. § 21-M:2, II(a).

21.    The State of Oklahoma, represented by and through its Attorney General Mike Hunter, is a sovereign State of the United States of America.  Attorney General Hunter has state statutory authority to represent the State in federal court.  Okla. Stat. tit. 74, § 18b.

22.    The State of South Carolina, represented by and through its Attorney General Alan Wilson, is a sovereign State of the United States of America.  Attorney General Wilson has state constitutional and statutory authority to represent the State in federal court.  S.C. Const. art. VI §7; S.C. Code Ann. § 1-7-40; *State ex rel. Condon v. Hodges*, 562 S.E.2d 623 (S.C. 2002).

23.    The State of South Dakota, represented by and through its Attorney General Jason Ravnsborg, is a sovereign State of the United States of America.  Attorney General Ravnsborg has state constitutional and statutory authority to represent the State in federal court.  S.D. Const. art IV, §7; SDCL § 1-11-1(4).

24.    The State of Utah, represented by and through its Attorney General Sean Reyes, is a sovereign State of the United States of America.  Attorney General

Reyes has state statutory authority to represent the State in federal court.  Utah Code Ann. § 67-5-1(2).

25.     The United States Department of the Treasury ("Treasury") is an agency of the United States, and is responsible for the administration and enforcement of ARPA.

26.     Janet Yellen is Secretary of the Treasury, and is named as a party in her official capacity (the "Secretary").  As the Secretary, Yellen is responsible for reserving funds and making payments, reviewing certifications, and accepting recoupment payments under ARPA, and she is empowered to issue regulations necessary to do so.

27.     Richard K. Delmar is the Acting Inspector General of the Treasury, and is named in his official capacity.  The Inspector General is responsible for monitoring and oversight of existing coronavirus relief funds to the States, and is generally responsible for informing the Secretary about programs administered by the Department and advising on the necessity for corrective action.

## BACKGROUND

### I.     The American Rescue Plan Act

28.     Starting in early 2020, the economy of the United States and the lives of millions of its citizens were severely impacted by the COVID-19 virus, which caused a world-wide pandemic.

29.     As of this week, there have been 30,038,363 cases in the United States. *See* CDC, COVID Data Tracker, "Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory," https://covid.cdc.gov/covid-data-

tracker/#trends_totalandratecasessevendayrate (last updated Mar. 28, 2021).  Sadly, 546,144 of those cases resulted in death.  *See* CDC, COVID Data Tracker, "United States Covid-10 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Mar. 28, 2021).

30.     In addition to the staggering human toll, the pandemic caused drastic economic harm to businesses, individuals, States, and local governments, and increased the financial needs of the States.  *See* Victoria Udalova, *Pandemic Impact on Mortality and Economy Varies Across Age Groups and Geographies*, U.S. CENSUS BUREAU (Mar. 08, 2021), https://www.census.gov/library/stories/2021/03/initial-impact-covid-19-on-united-states-economy-more-widespread-than-on-mortality. html.

31.     The Plaintiff States and their residents were no exception to this harm and increased financial needs.

32.     West Virginia, for example, experienced "staggering losses in jobs and income."  Kelly Allen *et al.*, THE IMPACT OF THE COVID-19 PANDEMIC IN WEST VIRGINIA IN 2020 22 (Feb. 17, 2021), https://wvpolicy.org/wp-content/uploads/2021/02/WVCBP-COVID-Impact-Report.pdf.  The State lost 93,900 jobs and its unemployment jumped from just under 5% to nearly 16% in two months—February to April 2020.  *Id.*  West Virginia began to recover once it received CARES Act funding but "as time passed since the stimulus payments were distributed . . . West Virginia's economy began to slow."  *Id.* at 23.  After briefly gaining jobs, West Virginia again lost jobs in September and November 2020.  *Id.*  Unsurprisingly, West Virginia households saw an 8.5% loss of income after stimulus payments stopped.  *Id.*

at 24.  West Virginia also saw a drastic need to, among other things, improve its broadband infrastructure in view of the extensive need for remote learning infrastructure in the K-12 and post-secondary education environments.

33.    Alabama's economy similarly struggled.  Alabama's Gross Domestic Product "plunged by about 2.7 percent" because of the economic shock of the COVID-19 pandemic. Samuel Addy *et al*., ALABAMA ECONOMIC OUTLOOK 7 (Jan. 2021), https://alabama.box.com/shared/static/hx734e495x8xyk0ncbfmyecc5npkfm9m.pdf. Employment declined by 3.4 percent.  *Id.* at 8.  The Alabama Business Confidence Index—a metric tracked by the Culverhouse College of Business at the University of Alabama—declined to its lowest level since 2013.  *Id.* at 10.

34.    Arkansas was likewise forced to make significant investments in educational technology to facilitate remote learning in its K-12 schools.

35.    Kansas's economy has also suffered.  Kansas experienced historic levels of unemployment early in the pandemic, and by the end of 2020, employment was still down 4.2% from the previous year.  Donna K. Ginther, Update on the Kansas Economy 18 (Mar. 5, 2021), https://ipsr.ku.edu/covid19/images/GintherTaxCouncil 20210305.pdf.  Kansas Gross State Product fell by over 8% in the second quarter of 2020 compared to the previous year and was down by 1.9% in the third quarter.  *Id.* at 13.  The number of small businesses open in Kansas has fallen by 32.4% since January 2020.  *Id.* at 34.

36.    The remaining Plaintiff States have all suffered similar negative economic impacts and challenges.

37.     In response to this nationwide economic turmoil and other harms, the States, as well as the federal government, took sweeping steps to try to prevent the spread of the virus and to assist all harmed parties.

38.     Part of the federal government's efforts focused on the historic and nationwide economic damage; the federal government recognized the need to provide financial and other assistance to States, localities, and individuals.

39.     To that end, Congress passed and, on March 11, 2021, President Biden signed ARPA.

40.     Congress' stated purposes for the funds to be disbursed under ARPA are to relieve certain households, small businesses, non-profits, and "impacted industries such as tourism, travel, and hospitality"; "to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers"; to make up for the reduction in state government revenue; and "to make necessary investments in water, sewer, or broadband infrastructure."  ARPA § 9901 (enacting 42 U.S.C. § 602(c)(1)(A-D)).

41.     ARPA allocates approximately $1.9 trillion for these purposes.

42.     From this total, ARPA distributes roughly $350 billion directly to States and localities, based on population and unemployment rates.

43.     Unlike the federal government, States have no power to raise this level of money this quickly, either by taxing or borrowing.

44.     Section 9901 of ARPA adds 42 U.S.C. § 802 to Title VI of the Social Security Act ("SSA") to provide these funds by designating the amounts and the uses of the relief.

45.     West Virginia anticipates that it will receive roughly $2.06 billion total from the federal government under ARPA.  Approximately $1.25 billion will go directly to the State.  The remainder, or approximately $800 million, will go to local governments and state capital projects.[1]

46.     West Virginia's annual revenue budget for fiscal year 2020-2021 is about $4.57 billion, not including any CARES Act funds or ARPA funds.  W. Va. State Budget Office, FY 2021 GENERAL REVENUE FUND ESTIMATES BY MONTH (July 1, 2020), https://budget.wv.gov/reportsandcharts/revenueestimates/Documents/FY%202021%20monthly%20General%20Revenue%20Estimates.pdf.

47.     Relief under ARPA thus represents over 25% of West Virginia's annual general revenue budget.

48.     Alabama anticipates that it will receive over $4 billion total from the federal government under ARPA.  Approximately $2.12 billion will go directly to the State, approximately $1.73 billion will go to local governments, and approximately $192 million will be provided to the State for capital projects.

49.     Alabama's annual revenue budget for fiscal year 2020, including its General Fund and Education Trust Fund budgets, was about $9.7 billion.  Alabama anticipates that its annual revenue budget for fiscal year 2021, including its General Fund and Education Trust Fund budgets, will also be about $9.7 billion.  *See* Alabama Department of Finance, Executive Budget Office, *State Receipts*, https://budget.alabama.gov/state-receipts/ (last visited Mar. 25, 2021).

---

[1] Projected ARPA funds for each State taken from House Committee on Oversight and Reform, *American Rescue Plan*, https://oversight.house.gov/budget-reconciliation (last visited Mar. 26, 2021).

50.     Relief under ARPA flowing directly to the State thus represents over 21% of Alabama's general revenue budget.

51.     Arkansas anticipates that it will receive approximately $2.81 billion total from the federal government under ARPA.  Approximately $1.65 billion will go directly to the State.  The remaining $1.156 billion will go to local governments.

52.     Arkansas's net available revenues for the 2021-2022 fiscal year are expected to reach $5.69 billion, a 1.1% decrease from fiscal year 2020-2021.

53.     Relief under ARPA thus represents well over 25% of Arkansas's projected available revenue.

54.     Kansas anticipates that it will receive approximately $2.72 billion total from the federal government under ARPA.  Approximately $1.59 billion will go directly to the State, approximately $1 billion will go to local governments, and approximately $143 million will be provided to the State for capital projects.

55.     Kansas's revenue for the 2021 fiscal year is estimated to be approximately $7.7 billion.

56.     Relief under ARPA thus represents over 20% of Kansas's projected available revenue.

57.     The other Plaintiff States anticipate receiving similar amounts, constituting similar percentages of their respective annual revenue budgets.

## II.     The Federal Tax Mandate

58.     While the historic national economic emergency the COVID-19 pandemic created merits a strong response, it cannot erase the constitutional bounds on federal power that limit Congress' hand.

59.     At least one provision of ARPA exceeds those limits.   In particular, Section 602(c)(2)(A)—the "Federal Tax Mandate"—co-opts States' power to tax and to control their own budgets.   It prohibits *any* changes in *any* laws, regulations, or interpretations that could reduce net state revenue from *any* taxes.   The Federal Tax Mandate does, however, allow States to *increase* taxes.

60.     The period covered by the Federal Tax Mandate's prohibition runs from March 3, 2021, to the last day of the last fiscal year in which the State receives funds under ARPA.   This could be as long as through December 31, 2024, the date through which the funds are available, or longer if Treasury is seeking recovery of funds.   *See* ARPA § 9901; enacting 42 U.S.C. § 602(a), (g)(1).

61.     Specifically, ARPA's Federal Tax Mandate states as follows:

(2) FURTHER RESTRICTION ON USE OF FUNDS.—

(A) IN GENERAL.—A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to *either directly or indirectly* offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

(B) PENSION FUNDS.—No State or territory may use funds made available under this section for deposit into any pension fund.

ARPA § 9901 (enacting 42 U.S.C. § 602(c)(2) (emphasis added)).

62.     ARPA does not define the ambiguous and amorphous term "directly or indirectly."

63.     Instead, interpretation of that term is open to speculation, post-distribution of funds rulemaking, recoupment demands by the Inspector General, or other enforcement actions.

14

64.     Nevertheless, ARPA requires the State to provide an initial certification, signed by a state official, to the Secretary.  This certification assures the Secretary that the funds will be used consistent with the requirements in ARPA and that the State is not violating the Federal Tax Mandate.

65.     ARPA also requires the States to periodically report all changes to their tax revenues.  This reporting process allows Treasury to monitor the States' tax revenues and related actions pursuant to their taxing powers.  ARPA also expressly provides for recoupment of funds from any State, territory, or Tribal government that has failed to comply with the permitted usage of funds or violates the statute's prohibitions on usage—including in the Federal Tax Mandate.

66.     Because the Federal Tax Mandate is open to interpretation by post-distribution rulemaking or other administrative or executive action, States have no *ex ante* assurance of what they must do to comply with the Federal Tax Mandate.

67.     A State may not know until months or even years after funds are received and spent that the federal government deems the State to have violated the Federal Tax Mandate, or an executive interpretation of it.

68.     Furthermore, the state official signing the initial certification could be penalized, or even held criminally liable, for an incorrect certification or reporting under the False Claims Act.  *See* 18 U.S.C. § 287; *see also* 31 U.S.C. §§ 3729-3733.

## III.   The Federal Tax Mandate's Sweeping And Uncertain Scope

69.     The power to tax and spend is a sovereign function of the States that predates the formation of the United States.  *See*, *e.g.*, *Lane County v. Oregon*, 74 U.S. 71, 76 (1868) ("[T]o the existence of the States, themselves necessary to the existence

of the United States, the power of taxation is indispensable."). The States have always retained their sovereign right to determine their own taxation and fiscal policies, which represents an important structural check on the federal government.

70. The States' taxing authority is also a critical element of the budgeting authority for the Plaintiff States' legislatures.

71. The Federal Tax Mandate's prohibition on using funds to offset a reduction in net tax revenue from any change in law or policy during the covered years is unprecedented.

72. Prohibiting both direct and indirect offsets either sweeps in an impermissibly broad range of state tax and other policy decisions, or depends on limits that are undefined and otherwise nonexistent in ARPA itself. The Federal Tax Mandate would be unconstitutional even if it did not contain the term "or indirectly" because forbidding States to exercise their sovereign power to set tax and fiscal policy is not a permissible condition that the federal government can set on its distribution of federal funds. But the term compounds the Federal Tax Mandate's unconstitutionality, for the Federal Tax Mandate is either impermissibly overbroad, impermissibly vague, or both.

73. Because "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), any ARPA funds the Plaintiff States receive could be viewed as indirectly offsetting any reduction in tax revenue from an otherwise separate change in state tax policy. This concern makes it impossible for the Plaintiff States to accurately determine in advance what they may and may not do with their taxing and budgeting authority without fearing loss of needed ARPA relief funds.

74.     Combined with ARPA's claw-back and other enforcement provisions, the broad and ambiguous scope of the Federal Tax Mandate has the likely and foreseeable effect of chilling almost any legislative action by the States that affect tax revenue.

75.     Further, because the Federal Tax Mandate is so broad, it extends beyond Congress' goal to ensure that federal aid is limited to COVID-19-related purposes.  It potentially affects *all* state legislative or executive actions that reduce net tax revenues, whether intended or unintended, and no matter how attenuated from COVID-19-related purposes. The breadth of this power grab means it is not germane to any discrete and permissible federal objective, an additional reason why it is unconstitutional.

76.     For example, the West Virginia Legislature is considering a bill to extend the Neighborhood Investment Tax Credit (a charitable program) and increase the annual tax credit cap from $3 million to $5 million.  These changes are projected to reduce West Virginia tax revenue by roughly $2 million per year in future years. It is unclear from the terms of the statute whether this freestanding legislation would violate the Federal Tax Mandate.  Another bill in West Virginia would expand a limited aircraft repair and maintenance sales tax exemption to all such activities. This change will result in a small reduction in sales tax collections.  It is similarly unclear whether this change would run afoul of the Federal Tax Mandate.

77.     Similarly, the Alabama Legislature is considering several bills that would likely affect tax revenue in a way that could subject Alabama to penalty under the Federal Tax Mandate.  For example, one bill would allow tax exemptions for organizations that provide care for the sick and terminally ill.  Another exempts an

organization that offers services for children who are victims of sexual or physical abuse.  Another would exempt from taxation a non-profit organization that furnishes new homes for victims of natural disasters.  And another would provide tax credits for hospitals and universities engaged in research and development beneficial to society.  It is not clear whether these changes would run afoul of the Federal Tax Mandate.

78.    The Arkansas General Assembly is also currently considering a number of tax and revenue bills that could be affected by the Federal Tax Mandate.  For example, one bill would significantly lower income tax for low-income Arkansans.  This change is projected to reduce Arkansas tax revenue by approximately $86 million per year for the next two fiscal years.  It is unclear whether the Federal Tax Mandate would prohibit this change.  Another bill would exempt school fundraising and parent-teacher organization purchases from sales tax.  Though this change would reduce revenue by only $125,000 per year, it is also unclear whether it would run afoul of the Federal Tax Mandate.

79.    The Iowa General Assembly enacted significant tax reductions in 2018 that are contingent on satisfaction of certain triggers based on the level and growth of net general fund revenues.  *See* 2018 Iowa Acts ch. 1161 § 99-134.  If those triggers are satisfied, the State of Iowa would be required to adopt changes to tax regulations that could take effect during the period covered by ARPA.  The Iowa General Assembly is also considering a number of other bills that could reduce tax revenue.  For example, the Iowa Senate unanimously passed a bill eliminating the state inheritance tax and removing the triggers for further tax cuts so that the reduction

would go into effect automatically in 2023. And the Iowa House of Representatives nearly unanimously passed a bill establishing child care tax credits. Given the ambiguous and broad nature of the Federal Tax Mandate, it is unclear whether any of these bills or previous enactments would subject Iowa to penalty under that statute.

80.   The Kansas Legislature is considering decoupling part of its income tax code from the federal tax code to end a state-level income tax increase caused by pass-through changes from prior federal tax law revisions. The Kansas Legislature is also considering giving property or income tax deferrals or credits to small businesses impacted by closure orders during the COVID-19 pandemic.

81.   The New Hampshire Legislature is currently considering a number of bills sponsored by legislators of both parties that could be affected by the Federal Tax Mandate as well. For example, New Hampshire Governor Christopher T. Sununu's proposed budget would reduce the State's Business Enterprise Tax from 0.6% to 0.55%, phase out the State's Interest and Dividends Tax over five years, and increase the minimum gross business receipts required for filing a Business Enterprise Tax return from $100,000 to $250,000. In addition, a bipartisan coalition of legislators is sponsoring, and the New Hampshire State Senate has passed on a 24-0 bipartisan vote, a bill that would increase the minimum gross business income required for filing a Business Profits Tax Return from $50,000 to $75,000. All of these proposals would reduce state tax revenues.

82.   The Oklahoma Legislature is also currently considering a number of tax and revenue bills that could be affected by the Federal Tax Mandate. For example,

one bill would make the state's Earned Income Tax Credit fully refundable. This change is projected to reduce Oklahoma tax revenue by approximately $25 million per year. The bill would also provide a broader income tax credit to all filers, with the bill as a whole having a fiscal impact of around $180 million in decreased tax revenue a year. It is unclear whether the Federal Tax Mandate would prohibit these changes. Another bill would provide a deduction that phases out the State's corporate income tax, which in FY 2023 would have otherwise provided $100 million in state revenue. It is also unclear whether this bill would run afoul of the Federal Tax Mandate.

83.     The remaining Plaintiff States are or are considering pursuing other tax cut policies—or else wish to preserve their ability to do so.

84.     The foregoing bills are examples of routine legislative action, with no connection to the States' receipt of COVID-19 relief funds.

85.     Another concern is that it is extremely difficult to know the causes of a given reduction in tax revenues. Indeed, state revenue projections are nearly always inaccurate. If there is a shortfall from projected net revenues, Treasury could claim that it was caused by a change in law, regulation, or practice, even if the State did not intend for that result.

## IV.   Lack Of Concrete Guidance From Treasury

86.     The problem with all of these examples is that there are no limiting principles within the text of the Federal Tax Mandate itself to distinguish permissible from impermissible changes in a State's net revenue—specifically, it is unclear what

would constitute a "direct" offset and there is no limit to what could be considered an "indirect" offset.

87.     This statutory defect limits Treasury's ability to provide the Plaintiff States with meaningful assurance or enforceable standards to guide state legislatures' decisions or the use of ARPA funds.

88.     Indeed, on March 16, 2021, 21 state Attorneys General sent a letter to the Secretary asking for clarification of the ambiguous Federal Tax Mandate by March 23, 2021.

89.     On March 23, 2021, Treasury responded as follows:

> Nothing in the Act prevents States from enacting a broad variety of tax cuts.  That is, the Act does not "deny States the ability to cut taxes in any manner whatsoever."  It simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law.  If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated.

90.     There is nothing "simpl[e]" about this prohibition. The Secretary's response did not give limits to the ambiguous and vague term "indirectly"—much less any limit drawn from the text of the statute.

91.     It remains undefined what it means for a State to "indirectly" offset a reduction in net tax revenue, particularly in light of the fungible nature of money. Any ARPA funds the Plaintiff States receive could still be viewed as necessarily offsetting, whether directly or indirectly, any reduction in net revenue from changes in state tax policy far afield from the ARPA's purposes.  Treasury's response in fact appears to confirm that the intent of the Federal Tax Mandate, and Treasury in implementing it, is to enforce a revenue-neutral tax policy across the board on every

State in the country.  The federal government lacks the authority to impose that policy on the States.

92.    Treasury's response also stated that Treasury would provide guidance on the specific questions posed by the 21-State letter before States will be required to submit a certification under Section 602(d)(1).  Treasury's letter did not, however, give any timeframe for this future guidance, or how the timing of any guidance will relate to when funds are made available.

93.    Moreover, any guidance would be only that—guidance.  It could not supersede the statute's terms.  It is difficult to foresee how any guidance could eliminate the constitutional infirmities baked into the term "directly or indirectly," especially where individual Senators—contrary to the Secretary's apparent belief— expressed their understanding of the Federal Tax Mandate's broad scope.

94.    Further, Treasury's response failed to respond to multiple specific tax modification proposals pending in various States.  Regardless, whether Treasury is unable or unwilling to answer these concerns, the response confirms fears that the Federal Tax Mandate is so ambiguous and vague that the Plaintiff States cannot have certainty what is or is not prohibited.

95.    Treasury's response further heightens concerns about the breadth of the Federal Tax Mandate's prohibition and the threat of enforcement actions under its amorphous language.

96.    And Treasury's promise of future guidance is cold comfort for the many States that have part-time legislatures.  Alabama's Legislature, for example, is part-time and is currently in session. It meets in one regular legislative session every year,

22

which includes no more than 30 legislative days within 105 calendar days.  Ala.

Const. art. IV, § 76.  This year, the regular legislative session will conclude no later

than May 30, 2021.  The Alabama Legislature, and those of many other States, must

complete their work soon with little knowledge regarding how their actions will affect

their States and constituents in light of the Federal Tax Mandate.

## V.   The Federal Tax Mandate Impermissibly Subverts State Sovereignty And Accountability.

97.    "State sovereignty is not just an end in itself: Rather, federalism secures

to citizens the liberties that derive from the diffusion of sovereign power."  *New York*

*v. United States*, 505 U.S. 144, 181 (1992) (quotation omitted).

98.    The meaningful and practical significance of state sovereignty includes

protecting the people of the several States from federal overreach and ensuring that

the States can govern and remain responsive to their people.

99.    State sovereignty also creates political accountability, especially in the

context of taxing and spending.

100.    The Federal Tax Mandate significantly undermines a key element of

this structure.  With the Federal Tax Mandate in place, politicians can deny the will

of the people for lower taxes or tax reform by arguing that the federal government

has created a roadblock that cannot be passed without putting billions of dollars in

needed aid at risk.  Thus, they will improperly be "insulated from the electoral

ramifications of their decision."  *New York*, 505 U.S. at 169.

23

## CAUSES OF ACTION

### COUNT ONE

**UNCONSTITUTIONAL EXERCISE OF FEDERAL POWER
AND VIOLATION OF THE TENTH AMENDMENT –VIOLATION OF THE
CONDITIONAL SPENDING DOCTRINE
(U.S. Const. art. I § 8, cl. 1. & amend. X)**

101.   Plaintiff States reallege, adopt, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

102.   Upon information and belief, ARPA was enacted based on Congress' spending power under Article I, Section 8, clause 1 of the United States Constitution.

103.   Federal laws imposing conditions on the use of funds provided to the States violate Congress' spending power if they do not meet all of the following conditions:  (1) the federal expenditure must benefit the general welfare; (2) any condition on the receipt of federal funds must be unambiguous; (3) any condition must be reasonably related to the purpose of the federal grant; (4) the grant and any conditions attached to it cannot violate an independent constitutional provision; and (5) the grant and its conditions cannot amount to coercion as opposed to encouragement.  *See South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).  The Federal Tax Mandate flunks at least elements 2, 3, and 5 of this test.

104.   The Plaintiff States recognize that the federal government has authority to attach certain spending requirements to funds it appropriates.  But the Federal Tax Mandate's boundless prohibition on using funds to "directly or indirectly offset a reduction in the net tax revenue" of States far exceeds constitutional legitimacy.  ARPA conditions the receipt of funds on compliance with the Federal Tax Mandate.  Yet the Federal Tax Mandate is ambiguous and overbroad by prohibiting using

24

federal funds to offset decreases in state tax revenue both "directly or indirectly." ARPA § 9901 (enacting 42 U.S.C. § 602(c)(2)(A)).  As the examples above illustrate, the statute does not provide any clear limiting principle that could make the "indirect[]" funding condition unambiguous.

105.   The Secretary admitted this ambiguity when she acknowledged that the fungibility of money makes defining what counts as a prohibited offset under the Federal Tax Mandate a "thorny" issue.[2]

106.   ARPA's conditioning the receipt of funds on this expansive prohibition also causes the funding condition to affect matters not reasonably related to the purpose of the federal grant.

107.   ARPA's ostensible purpose *was to provide relief* to States, local governments, businesses, and individuals hard hit by COVID-19.

108.   Broadly constricting States' taxing authority—no matter how indirect— possibly years after the impact of the pandemic has dissipated is not reasonably related to that purpose.  *See Dole*, 483 U.S. at 208.  Prohibiting tax relief does not provide relief to affected parties.  While a federal prohibition on tax increases, especially on hard hit businesses and individuals, would also likely be unconstitutional, it at least would be more germane to the purpose of providing relief under the "American *Rescue* Plan" than the means Congress employed here.

109.   Significantly, ARPA allows cities to use ARPA funds to reduce taxes. ARPA is expected to provide about $800 million directly to localities within West

---

[2] Testimony of Secretary Yellen before the Senate Banking Committee in response to Sen Mike Crapo (R-Idaho), at 1:11:47-1:12:12, *available at* https://www.banking. senate.gov/hearings/03/17/2021/the-quarterly-cares-act-report-to-congress.

Virginia; $1.89 billion to localities within Alabama; $1.57 billion to Arkansas localities; and similar amounts to localities in the other Plaintiff States. ARPA's directives and prohibitions for use of funds is the same for localities as it is for States, except that the Federal Tax Mandate does not apply to the localities. *See* ARPA § 9901 (enacting 42 U.S.C.§ 603(c)).

110.   ARPA's Federal Tax Mandate also exempts Tribal governments from the prohibition on reducing taxes.

111.   Congress' decision to allow cities, localities, and Tribal governments to use funds without the Federal Tax Mandate's prohibition further undermines any connection between COVID-19 relief and Congress' unprecedented intrusion into state taxing power.

112.   The pension provision in Section 602(c)(2)(b) also shows that the Federal Tax Mandate is mere pretext for controlling certain *disfavored* exercises of state taxing and revenue-allocation powers, rather than reflection of an evenhanded concern that funds be used for specifically enumerated purposes only: ARPA prohibits "deposit[ing]" funds "into any pension fund," but does not prohibit backfilling pension funds *indirectly*. ARPA § 9901; enacting 42 U.S.C. § 602(c)(2)(b).

113.   Moreover, Congress itself cuts taxes under ARPA, demonstrating that cutting taxes is not just a valid but important form of COVID-19 relief. *See*, *e.g.*, ARPA §§ 9621 (expanding earned income tax credit), 9673 (exempting small business revitalization funds).

114.   Finally, ARPA's conditioning the receipt of funds on compliance with the Federal Tax Mandate amounts to coercion as opposed to encouragement. The

unprecedented need for assistance arising from the COVID-19 pandemic combined with the dramatic financial carrot of ARPA funds (which only the federal government has means to provide) makes it impractical for the Plaintiff States to refuse funding to which they are entitled under ARPA.

115.    For example, the State of West Virginia anticipates receiving $1.25 billion from ARPA, which is approximately 25% of West Virginia's total anticipated tax revenues for fiscal year 2021.

116.    Alabama anticipates receiving $2.09 billion from ARPA, which is approximately 21% of Alabama's total anticipated tax revenues for fiscal year 2021.

117.    Arkansas anticipates that it will receive approximately $2.81 billion total from the federal government under ARPA, which is approximately 29% of Arkansas's anticipated revenue for fiscal year 2021.

118.    Kansas anticipates receiving $1.59 billion from ARPA, which is approximately 20.6% of Kansas's anticipated revenue for fiscal year 2021.

119.    The other Plaintiff States also anticipate similar amounts with similar percentages of their total budgets.

120.    In the context of Medicaid expansion, the Supreme Court held that "[t]he threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 582 (2012).   APRA funding represents in many cases much more than 10% of Plaintiff States' annual budgets, thus surpassing the standard *NFIB* draws for impermissible coercion.

121.   *NFIB* also held that the change to the subject program was a "shift in kind, not merely degree." *Id.* at 583.  By purporting to restrict the Plaintiff States' ability to decide whether and how to tax their residents, the Federal Tax Mandate represents a similar "shift in kind, not merely degree."

122.   By imposing unconstitutional and impermissible conditions, ARPA's Federal Tax Mandate exceeds Congress' powers under Article I of the Constitution of the United States, and cannot be upheld under the Commerce Clause, Const. art. I, § 8; the Taxing and Spending Clause; or any other provision of the Constitution.

## COUNT TWO

### VIOLATION OF THE ANTI-COMMANDEERING DOCTRINE
### (U.S. Const. amend. X)

123.   Plaintiff States reallege, adopt, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

124.   The anti-commandeering doctrine generally precludes Congress from forcing States to implement its laws and policies.  *See Printz v. United States*, 521 U.S. 898, 925 (1997).  The Constitution confers on Congress not plenary legislative power but only certain enumerated powers.  Therefore, all other legislative power is reserved to the States, as the Tenth Amendment confirms.

125.   Absent from the list of powers the Constitution entrusts to Congress is the power to issue direct orders to the governments of the States.  Indeed, "a law for abrogating or preventing the collection of a tax laid by the authority of the State . . . would not be the supreme law of the land, but a usurpation of power not granted by the Constitution."  The Federalist No. 33 (A. Hamilton).

126.   The anti-commandeering doctrine serves multiple purposes.  It divides authority between federal and state governments, which reduces the risk of tyranny and abuse from either front.  It supports "political accountability," because "if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018).

127.   The Federal Tax Mandate implements a mandatory state tax policy preference of Congress.  It allows tax increases but forbids tax reductions on the part of the States—but not localities or Tribal governments.  And it imposes this as a condition of accepting funds that the States as a practical matter cannot refuse.  This forced "choice" commands States to pursue tax policy regimes in the interests of Congress, not of their constituents.

128.   The Federal Tax Mandate violates the Tenth Amendment of the Constitution of the United States, and runs afoul of the Constitution's principle of federalism, by destroying or at least blurring the political accountability necessary to have an effective dual sovereignty governmental structure and by commandeering the Plaintiff States' sovereign power to tax and spend and determine their own fiscal policies.  *Lane*, 74 U.S. at 76.

## COUNT THREE

### DECLARATORY JUDGMENT
### (28 U.S.C. § 2201)

129.   Plaintiff States reallege, adopt, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

130.    There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of the Plaintiff States and their legal relations with the Defendants to warrant relief under 28 U.S.C. § 2201.

131.    The harm to the Plaintiffs as a direct result of ARPA is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal duties of the parties.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff States respectfully request that the Court:

A.    Declare ARPA's Federal Tax Mandate to be in violation of Article I of and the Tenth Amendment to the Constitution of the United States;

B.    Declare Defendants to have violated the Plaintiff States' rights as sovereigns;

C.    Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing ARPA's Federal Tax Mandate provision against the Plaintiff States, their citizens and residents, and any of their agencies or officials or employees, and to take such actions as are necessary and proper to remedy violations deriving from any such actual or attempted enforcement;

D.    Award Plaintiff States their reasonable attorney's fees and costs; and

E.    Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Edmund G. LaCour Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAG.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov

**Counsel for State of Alabama**


/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See*
  *West Virginia Solicitor General*
David C. Tryon*
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing
  under supervision of West Virginia
  attorneys)
Jessica A. Lee*
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov

**Counsel for State of West Virginia**

/s/ Bryan M. Taylor
Bryan M. Taylor
Bachus Brom & Taylor LLC
300 Vestavia Parkway, Suite 3700
Birmingham, AL 35216
Tel: (334) 595-9650
btaylor@bachusbrom.com


/s/ Nicholas Bronni
LESLIE RUTLEDGE
  *Arkansas Attorney General*
Nicholas J. Bronni*
  *Arkansas Solicitor General*
Vincent M. Wagner*
  *Deputy Solicitor General*
Dylan L. Jacobs*
  *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov

**Counsel for State of Arkansas**


/s/ John M. Ptacin
TREG R. TAYLOR
  *Attorney General of Alaska*
John M. Ptacin*
  *Chief Assistant Attorney General*
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Facsimile: (907) 276-3697
John.ptacin@alaska.gov

**Counsel for State of Alaska**

/s/ Jason Hilborn
ASHLEY MOODY
  *Florida Attorney General*
John Guard*
  *Chief Deputy Attorney General*
James H. Percival*
  *Chief Deputy Solicitor General*
Jason H. Hilborn*
  *Assistant Solicitor General*
Office of the Florida
Attorney General
Office of the Attorney General
State of Florida
PL-01 The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Jason.Hilborn@myfloridalegal.com

**Counsel for State of Florida**

/s/ Jeffrey S. Thompson
THOMAS J. MILLER
 *Attorney General of Iowa*
Jeffrey S. Thompson*
  *Solicitor General*
1305 East Walnut Street
Des Moines, IA 50319
Tel: 515-281-5164
jeffrey.thompson@ag.iowa.gov

**Counsel for State of Iowa**

/s/ Dwight R. Carswell
DEREK SCHMIDT
  *Kansas Attorney General*
Dwight R. Carswell*
  *Assistant Solicitor General*
Office of the Kansas
Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8410
dwight.carswell@ag.ks.gov

**Counsel for State of Kansas**

/s/ David M.S. Dewhirst
AUSTIN KNUDSEN
  *Attorney General of Montana*
David M.S. Dewhirst*
  *Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-4145
David.Dewhirst@mt.gov

**Counsel for the State of Montana**

/s/ Daniel E. Will
Daniel E. Will*
  *New Hampshire Solicitor General*
Office of the New Hampshire
Attorney General
33 Capitol Street
Concord, NH 03301-6397
Tel: (603) 271-1119
Daniel.E.Will@doj.nh.gov

**Counsel for the State of
New Hampshire**

/s/ Mithun Mansinghani
MIKE HUNTER
  *Oklahoma Attorney General*
Mithun Mansinghani*
  *Solicitor General*
Oklahoma Office Of The
Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
mithun.mansinghani@oag.ok.gov

**Counsel for the State of Oklahoma**

/s/ J. Emory Smith, Jr.
ALAN WILSON
  *South Carolina Attorney General*
J. Emory Smith, Jr.*
  *Deputy Solicitor General*
Office of the South Carolina
Attorney General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
esmith@scag.gov

**Counsel for State of South
Carolina**

/s/ Jeffery J. Tronvold
JASON RAVNSBORG
  *South Dakota Attorney General*
Jeffery J. Tronvold*
  *Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Tel:  (605) 773-3215
Jeffery.tronvold@state.sd.us

**Counsel for State of South Dakota**

/s/ Melissa A. Holyoak
SEAN REYES
  *Utah Attorney General*
Melissa A. Holyoak*
  *Utah Solicitor General*
Office of the Utah Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Tel: (801) 366-0260

**Counsel for State of Utah**

*Pro Hac Vice Application
Forthcoming

33