FILED
2021 Apr-13  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

**STATE OF WEST VIRGINIA**, by and through Patrick Morrisey, Attorney General of the State of West Virginia; **STATE OF ALABAMA**, by and through Steve Marshall, Attorney General of the State of Alabama; **STATE OF ARKANSAS**, by and through Leslie Rutledge, Attorney General of the State of Arkansas; **STATE OF ALASKA**, by and through Treg R. Taylor, Attorney General of the State of Alaska; **STATE OF FLORIDA,** by and through Ashley Moody, Attorney General of the State of Florida; **STATE OF IOWA**; **STATE OF KANSAS,** by and through Derek Schmidt, Attorney General of the State of Kansas; **STATE OF MONTANA**, by and through Austin Knudsen, Attorney General of the State of Montana; **STATE OF NEW HAMPSHIRE; STATE OF OKLAHOMA**, by and through Mike Hunter, Attorney General of the State of Oklahoma; **STATE OF SOUTH CAROLINA**, by and through Alan Wilson, Attorney General of the State of South Carolina; **STATE OF SOUTH DAKOTA**, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and **STATE OF UTAH,** by and through Sean Reyes, Attorney General of the State of Utah,

     Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF THE TREASURY**;

**JANET YELLEN**, in her official capacity as the Secretary of the United States Department of the Treasury; and

**RICHARD K. DELMAR**, in his official capacity as acting inspector general of the Department of the Treasury,

     Defendants.

Case No. 7:21-cv-00465-GMB

**COMBINED OPPOSED MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF THE MOTION**

## <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

The "Federal Tax Mandate" in the American Rescue Plan Act of 2021, *see* Pub. L. No. 117-2, § 9901, 135 Stat. 4 (enacting § 602(c)(2)(A) to the Social Security Act (42 U.S.C. § 801 *et seq*.)), unconstitutionally infringes on the Plaintiff States' sovereignty under the Tenth Amendment and exceeds Congress' authority under the Spending Clause in Article I, section 8.  *See* U.S. Const. art. I, § 8, cl.1.  Plaintiff States therefore move under Federal Rule of Civil Procedure 65 for an order preliminarily enjoining the Defendants from enforcing the Federal Tax Mandate.

Respectfully submitted:

/s/ Edmund G. LaCour Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAg.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov

***Counsel for State of Alabama***

/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See (*pro hac vice*)
  *West Virginia Solicitor General*
David C. Tryon (*pro hac vice*)
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing under
  supervision of W. Va. attorneys)
Jessica A. Lee (*pro hac vice*)
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov

***Counsel for State of West Virginia***

<u>/s/ Nicholas Bronni</u>
LESLIE RUTLEDGE
 *Arkansas Attorney General*
Nicholas J. Bronni (*pro hac vice*)
 *Arkansas Solicitor General*
Vincent M. Wagner (*pro hac vice*)
 *Deputy Solicitor General*
Dylan L. Jacobs (*pro hac vice*)
 *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov

**Counsel for State of Arkansas**

*[Additional counsel listed at end]*

# TABLE OF CONTENTS

STATEMENT.................................................................................................3

LEGAL STANDARD...................................................................................8

ARGUMENT.................................................................................................8

    I.     The Plaintiff States Are Likely To Succeed On The Merits Because
           The Federal Tax Mandate Is Unconstitutional....................................8

           A.     The Federal Tax Mandate Violates the Conditional
                   Spending Doctrine......................................................................8

           B.     The Federal Tax Mandate Violates the
                   Anticommandeering Doctrine...................................................21

    II.    The Plaintiff States Will Suffer Irreparable Injury Absent
           An Injunction.......................................................................................28

    III.   Threatened Injury to the Plaintiff States Outweighs the Nonexistent
           Harm To The Defendants And Promotes The Public Interest.............30

CONCLUSION...........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)..........................................................................28

*Am. Civil Liberties Union of Ky. v. McCreary Cnty.*,
    354 F.3d 438 (6th Cir. 2003) .................................................................28

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) ........................................11, 14, 19, 21

*Cate v. Oldham*,
    707 F.2d 1176 (11th Cir. 1983) ............................................................28

*Coal. to Defend Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) ................................................................30

*Cunningham v. Adams*,
    808 F.2d 815 (11th Cir. 1987) ..............................................................28

*Farrell v. Dep't Of Interior*,
    314 F.3d 584 (Fed. Cir. 2002) ..............................................................15

*Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010).................................................................................2

*Friedenberg v. Sch. Bd. of Palm Beach Cnty.*,
    911 F.3d 1084 (11th Cir. 2018) ..............................................................8

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985).................................................................................1

*Georgia v. Pruitt*,
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) .................................................28

*Graham Cnty. Soil & Water Conservation Dist. v. United States*,
    545 U.S. 409 (2005)........................................................................11, 14

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................ 12

*Ivanhoe Irrigation Dist. v. McCracken*,
   357 U.S. 275 (1958) ........................................................................... 15

*Jones v. Gov. of Fla.*,
   950 F.3d 795 (11th Cir. 2020) ............................................................ 28

*Kansas v. United States*,
   249 F.3d 1213 (10th Cir. 2001) .......................................................... 28

*Lane Cnty. v. Oregon*,
   74 U.S. 71 (1868) ............................................................................... 23

*Maryland v. King*,
   567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................... 29

*Massachusetts v. United States*,
   435 U.S. 444 (1978) ........................................................................... 20

*Midrash Sephardi, Inc. v. Town of Surfside*,
   366 F.3d 1214 (11th Cir. 2004) .......................................................... 21

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ........................................................ 1, 21, 22, 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ................................... 2, 8, 9, 10, 11, 22, 26, 27

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of
   Jacksonville, Fla.*,
   896 F.2d 1283 (11th Cir. 1990) .......................................................... 28

*New York v. United States*,
   505 U.S. 144 (1992) ................................... 1, 2, 11, 16, 23, 24, 25, 26

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Printz v. United States,*
   521 U.S. 898 (1997)......................................................................21, 24

*Shelby Cnty. v. Holder,*
   570 U.S. 529 (2013).......................................................................22, 23

*South Dakota v. Dole,*
   483 U.S. 203 (1987).......................................................9, 15, 19, 20

*State v. Dep't of Justice,*
   951 F.3d 84 (2d Cir. 2020) .........................................................2, 26

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ...............................................................28

*Thomson v. Pac. R.R. Co.,*
   76 U.S. 579 (1869).............................................................................23

*Util. Air Reg. Grp. v. EPA,*
   573 U.S. 302 (2014)............................................................................15

*Winter v. Nat'l Res. Def. Council,*
   555 U.S. 7 (2008).................................................................................8

## Constitutional Provisions

U.S. Const. art. I., § 8, cl. 1 ...............................................................2

U.S. Const. amend. X..........................................................................1

## Statutes

42 U.S.C. § 601 .................................................................................13

42 U.S.C. § 602(c) ................................................. 2, 5, 6, 12, 16, 18, 19

42 U.S.C. § 603(c) ...........................................................................6, 16

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

Ala. Code § 40-2B-1 ................................................................................24

Ala. Code § 40-2B-2 ................................................................................24

America Rescue Plan of 2021,
     Pub. L. No. 117-2 § 9621, 135 Stat. 4 ..........................................6, 17

America Rescue Plan of 2021,
     Pub. L. No. 117-2 § 9673, 135 Stat. 4 ...............................................6

America Rescue Plan of 2021,
     Pub. L. No. 117-2 § 9901, 135 Stat. 4 ................................. 2, 5, 6, 12, 13, 16, 19

Coronavirus Aid, Relief, and Economic Security Act,
     Pub. L. No. 116-136, 134 Stat. 281 ....................................................3

## Other Authorities

COVID Data Tracker, "Trends in Number of COVID-19 Cases and
     Deaths in the US Reported to CDC, by State/Territory," CDC .........................3

 "The American Rescue Plan Act of 2021 (H.R. 1319)," HOUSE
     BUDGET COMMITTEE DEMOCRATIC CAUCUS........................................4

Kelly Allen et al., THE IMPACT OF THE COVID-19 PANDEMIC
     IN WEST VIRGINIA IN 2020 23 (Feb. 17, 2021)................................4

Lewis B. Kaden, *Politics, Money, and State Sovereignty: The Judicial
     Role*, 79 Colum. L. Rev. 847, 896 (1979)...........................................20

"State Actions to Close Budget Shortfalls in Response to COVID-19,"
     NATIONAL CONFERENCE OF STATE LEGISLATURES  ...........................3

*Testimony of Janet L. Yellen, Secretary, U.S. Department of the
     Treasury Before the Committee on Banking, Housing, and Urban
     Affairs United States Senate*, 117th, Cong. 2 (Mar. 24, 2021)..........................18

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

"Testimony of Secretary Yellen before the Senate Banking Committee
    in response to Sen. Mike Crapo," at 1:11:47-1:12:12, UNITED
    STATES COMMITTEE ON BANKING, HOUSING, AND
    URBAN AFFAIRS (Mar. 24, 2021, 10:00 a.m.), .............................................12

"Statement on State Fiscal Recovery Funds and Tax Conformity,"
    U.S. DEPARTMENT OF TREASURY (Apr. 7, 2021).................................................15

The Briefing Room, "Bill Signing: H.R. 1319," THE WHITE HOUSE
    (Mar. 11, 2021) .......................................................................................................4

## MEMORANDUM IN SUPPORT OF THE MOTION

Congress cannot coerce the States into not exercising one of their core constitutional functions. It is an elementary precept of American civics that "[t]he Constitution . . . did not abolish the sovereign powers of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). The Tenth Amendment expressly reserves for the States all "powers not delegated to the United States by the Constitution, nor prohibited by it." U.S. Const. amend. X. Thus, States "unquestionably" retain "a significant measure of sovereign authority," subject only to the express and limited carve outs they ceded to the federal government. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985) (quotation omitted).

One power the Constitution did not grant to the federal government is "the power to issue direct orders to the governments of the States." *Murphy*, 138 S. Ct. at 1476. Indeed, the Framers disavowed an alternate structure that would have allowed Congress to do so. *New York v. United States*, 505 U.S. 144, 163 (1992) (quotation omitted). So there is no doubt that "Congress may not . . . commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* at 161 (quotation omitted).

The prohibition against state tax reductions in the American Rescue Plan Act of 2021 ("ARPA") is a historic attempt by Congress to do just that. ARPA conditions pandemic relief funds on a State's willingness to cede its sovereign power

to adopt any "change in law, regulation, or administrative interpretation" that reduces income to the State—"either directly or indirectly"—for a period of over three years. ARPA, Pub. L. No. 117-2 § 9901, 135 Stat. 4 (enacting 42 U.S.C. § 602(c)(2)). In other words, this "Federal Tax Mandate" seizes taxing authority by forbidding States from reducing taxes *at all* for multiple years. The "lack of historical precedent" for a new assertion of federal power is "[p]erhaps the most telling indication" of a "severe constitutional problem." *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotation marks omitted). ARPA's novel prohibition proves this rule.

Improperly blurring "the constitutional line between federal and state power" can be both direct and indirect. *New York*, 505 U.S. at 155. One example is where Congress transforms its authority under the Spending Clause to "provide for the . . . general welfare," U.S. Const. art. I., § 8, cl. 1, into an assertion of "power akin to undue influence." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (op. of Roberts, C.J.) (quotation omitted). Just as Congress cannot "commandeer[] . . . reserved State power" outright, it also cannot more subtly infringe on state sovereignty by packaging its dictates in a spending program. *State v. Dep't of Justice*, 951 F.3d 84, 115 (2d Cir. 2020). Viewed as a violation of either the conditional spending doctrine or anticommandeering principles, the Federal Tax Mandate falls on the wrong side of the enumerated powers line.

## STATEMENT

**1.**  The COVID-19 pandemic continues to exact a global toll in both human and economic terms.  Between just the filing of the Complaint and of this motion, the number of cases in the United States has increased by nearly 1,000,000 and the number of deaths by 13,000.[1]  And the pandemic has caused drastic and ongoing economic harm to individuals, businesses, States, and local governments.  Over the past year the Plaintiff States have weathered significant jumps in unemployment and loss of income; some have been required to draw on state-budget reserve funds to make up for resulting shortfalls, and others have made difficult decisions to cut budgets for even critical programs like education and departments of corrections.[2]

To ease the financial strain on States and their residents, in 2020 Congress provided $150 billion in direct assistance for state, local, and Tribal governments under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  *See* Pub. L. No. 116-136, 134 Stat. 281.  The relief funds boosted state economies—but the effects did not always last.  For example, "as time passed since the stimulus

---

[1] *See* COVID Data Tracker, "Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory," CDC, https://covid.cdc.gov/covid-data-tracker/#trends_totalandratecasessevendayrate (last updated Apr. 11, 2021).

[2] *See* "State Actions to Close Budget Shortfalls in Response to COVID-19," NATIONAL CONFERENCE OF STATE LEGISLATURES, https://app.powerbi.com/view?r=eyJrIjoiZjhmODk1MjctOTc3Ni00MDE3LTgyNGUtZjNkYTk3NTQ1OTU5IiwidCI6IjM4MmZiOGIwLTRkYzMtNDEwNy04MGJkLTM1OTViMjQzMmZhZSIsImMiOj9 (last accessed April 13, 2021).

payments were distributed . . . West Virginia's economy began to slow" and the State saw more lost jobs in fall 2020.[3]  Other States had similar experiences.  *See* Compl. ¶¶ 32-36.

**2.**  On March 11, 2021, President Biden signed ARPA, appropriating further significant economic funding, tax relief, and other forms of pandemic-related aid. Pub. L. No. 117-2, 135 Stat. 4.  The House Budget Committee Democratic Caucus explained that ARPA "is the next step forward for delivering crucial relief to the American people."[4]  The White House likewise described its purpose as "provid[ing] additional relief to address the continued impact of the COVID-19 pandemic on the economy, public health, state and local governments, individuals, and businesses."[5]

ARPA allocates approximately $1.9 trillion for these purposes.  Roughly $219.8 billion is tapped for the States.  These funds represent an average of about 25% of the Plaintiff States' annual budgets.  Compl. ¶¶ 45-57.  The precise amount varies for each of the Plaintiff States, but most are over 20%.  Compl. ¶ 118.

---

[3] Kelly Allen et al., THE IMPACT OF THE COVID-19 PANDEMIC IN WEST VIRGINIA IN 2020 23 (Feb. 17, 2021), *available at* https://wvpolicy.org/wp-content/uploads/2021/02/WVCBP-COVID-Impact-Report.pdf.

[4] "The American Rescue Plan Act of 2021 (H.R. 1319)," HOUSE BUDGET COMMITTEE DEMOCRATIC CAUCUS, https://budget.house.gov/american-rescue-plan-act-2021-hr-1319 (last accessed Apr. 13, 2021).

[5] The Briefing Room, "Bill Signing: H.R. 1319," THE WHITE HOUSE (Mar. 11, 2021), https://www.whitehouse.gov/briefing-room/legislation/2021/03/11/bill-signing-h-r-1319/#:~:text=signed%20into%20law%3A-,H.R.,governments%2C%20individuals%2C%20and%20businesses (last accessed Apr. 13, 2021).

Congress specified that States must use ARPA funds to respond to the negative economic impacts of COVID-19 in one of four specific ways: (1) providing assistance to "households, small businesses, and nonprofits" and "impacted industries such as tourism, travel, and hospitality"; (2) responding "to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers"; (3) making up for pandemic-related reductions in state government revenue; and (4) paying for "necessary investments in water, sewer, or broadband infrastructure."  ARPA § 9901 (enacting 42 U.S.C. § 602(c)(1)(A-D)).

In addition to specifying affirmative uses for the funds, Congress also prohibited some uses.  Relevant here, Section 602(c)(2)(A)—the Federal Tax Mandate—provides:

> (2) FURTHER RESTRICTION ON USE OF FUNDS.—
>
> (A) IN GENERAL.—A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.
>
> (B) PENSION FUNDS.—No State or territory may use funds made available under this section for deposit into any pension fund.

ARPA § 9901 (enacting 42 U.S.C. § 602(c)(2)).  The phrase "directly or indirectly offset" is not defined.  Nor did Congress extend this prohibition to cities, localities,

or Tribal governments.  *Id.* (enacting 42 U.S.C. § 603(c)).  And in other sections of ARPA, Congress enacted federal tax relief.  *See*, *e.g.*, ARPA §§ 9621 (expanding earned income tax credit), 9673 (exempting small business revitalization funds).

The Federal Tax Mandate's statutory coverage period runs from March 3, 2021, to the last day of the last fiscal year in which a State receives funds under ARPA.  This could be as late as December 31, 2024, the date through which funds are available, or even longer if the Department of the Treasury ("Treasury") seeks recovery of funds.  *See* ARPA § 9901 (enacting 42 U.S.C. § 602(g)(1)).

ARPA also requires States to periodically report to Treasury any reductions in their tax receipts.  Treasury can recoup funds that it interprets were used in violation of the Federal Tax Mandate.  *See* ARPA § 9901 (enacting 42 U.S.C. § 602(g)(1)).

**3.**  Most, if not all, of the Plaintiff States are or were actively considering various forms of tax relief for individuals and small businesses, whether directly related to state pandemic-relief efforts or through unrelated policy measures. Compl. ¶¶ 76-83.  The Federal Tax Mandate has cast significant uncertainty over these efforts as it is unclear whether States can pass any tax relief measures throughout the covered period without running afoul of the Federal Tax Mandate.

On March 16, 2021, twenty-one state Attorneys General sent a letter to Treasury Secretary Janet Yellen ("Secretary") seeking clarification on the application of the Federal Tax Mandate.  Ex. A.  The Attorneys General expressed

concern about the mandate's ambiguity and apparently broad scope, and asked whether several specific examples of current tax proposals across the country were permissible under the Federal Tax Mandate.  Ex. A at 2-4.

The Secretary responded on March 23, 2021.  Ex. B.  She denied that ARPA "prevents States from enacting a broad variety of tax cuts," and argued instead that "[i]t simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law."  Ex. B at 1.  "If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated."  *Id.*

The Secretary's response did not explain what Treasury would deem sufficient to make up "lost revenue through other means."  Nor did it define or set meaningful limits for the term "directly or indirectly offset," much less explain how Treasury would derive those boundaries from the statutory text.  And it did not respond to the States' questions regarding the multiple specific tax modification proposals pending in various States.  The Secretary noted that Treasury would provide additional guidance in the future.

The Secretary's response did not resolve the Plaintiff States' questions about the Federal Tax Mandate's meaning and limits, nor resolve their concerns about its significant infringement into their sovereign taxing powers.  This suit followed.  And

7

in light of the critical need for ARPA funding now—not months in the future when additional guidance may (or more likely, may not) resolve the Plaintiff States' concerns—they now seek a preliminary injunction to bar enforcement of the Federal Tax Mandate.

## LEGAL STANDARD

"A preliminary injunction may be entered when a plaintiff establishes four elements:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1084, 1090 (11th Cir. 2018) (quotation omitted); *see also Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008).  The Court should preliminarily enjoin the Federal Tax Mandate for, at minimum, the Plaintiff States, as they satisfy each element here.

## ARGUMENT

I.    **The Plaintiff States Are Likely To Succeed On The Merits Because The Federal Tax Mandate Is Unconstitutional.**

       A. **The Federal Tax Mandate Violates The Conditional Spending Doctrine.**

Congress' spending powers permit it to place *some* restrictions on the States as conditions for receiving federal funds that Congress may not otherwise impose on the States. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 576 (2012) (op. of Roberts, C.J.).  But this power is far from unlimited.  Stipulations on

8

the use of federal funds exceed Congress' spending power unless they meet all of the following conditions: (1) the expenditure must benefit the general welfare; (2) any condition must be unambiguous; (3) any condition must be reasonably related to the grant's purpose; (4) the grant and any conditions attached to it cannot violate an independent constitutional provision; and (5) the grant cannot amount to coercion as opposed to encouragement. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). Though ARPA may advance the general welfare, the Federal Tax Mandate is unconstitutional because it violates every other *Dole* factor.

### 1. The Federal Tax Mandate Is Unconstitutionally Coercive.

To begin, the Federal Tax Mandate must fall because the amount of funding is so large a percentage of the Plaintiff States' budgets that they have no real choice but to accept its restriction on their sovereign powers.

"When a heavy federal tax is levied to support a federal program that offers large grants to the States, States may, as a practical matter, be unable to refuse to participate in the federal program and to substitute a state alternative." *NFIB*, 567 U.S. at 680 (Scalia, J., with Kennedy, Thomas, and Alito, JJ., dissenting). As a plurality of the Court explained in *NFIB*, this is constitutionally impermissible coercion. *NFIB* flowed from Congress' decision to condition Medicaid funding on the State's willingness to expand Medicaid coverage—a "threatened loss of over 10 percent of a State's overall budget." *Id.* at 581-82 (plurality op.). This amount meant

9

the funding was not "relatively mild encouragement," but "a gun to the head." *Id.* at 581.  Thus the Court found the legislation markedly different from the law *Dole* approved, where if States refused to raise the drinking age to 21, they were threatened with loss of less than half of one percent of their budgets.  *Id.*

When it comes to conditional funding, the Federal Tax Mandate—as in *NFIB*—is a "shift in kind, not merely degree."  *See* 567 U.S. at 583.  It uses the financial needs of the Plaintiff States and their citizens stemming from an ongoing global pandemic to compel them to abrogate sovereign tax authority for potentially more than three years.  Only the federal government can quickly borrow the massive sums of money allocated through ARPA.  And the sums are massive.  In Arkansas, for instance, anticipated ARPA funding represents 29% of the State's annual budget. Compl.  ¶ 117.  For many other Plaintiff States it constitutes roughly a quarter of their annual budgets.  Compl. ¶ 117-19.  Thus, the only choices for the States are to accept the money with strings attached or let their citizens continue to suffer.  While that may be a choice "in theory," it is not one "in fact." *NFIB*, 567 U.S. at 581 (plurality op.).

The Supreme Court in *NFIB* did not set a bright line for the constitutionality of spending programs, but "wherever that line may be," the Federal Tax Mandate "is surely beyond it."  567 U.S. at 585 (plurality op.).  If conditioning 10% of a State's budget on compliance with federal conditions is coercion, *id.* at 581-82, it is much

more so here.   The "financial inducement" from ARPA's mammoth funding provisions, offered during a once-in-a-century pandemic, leaves States with no meaningful way to "defend their prerogatives" through a "legitimate choice" to say "no thanks."   *Id.* at 577-79.   Put simply, "Congress has 'crossed the line distinguishing encouragement from coercion,'" *Id.* at 579 (quoting *New York v. United States*, 505 U.S. 144, 175 (1992)), and any argument to the contrary "ignores reality." *Id.* at 680 (Scalia, J., with Kennedy, Thomas, and Alito, JJ., dissenting).

### 2.  The Federal Tax Mandate Is Unconstitutionally Ambiguous.

Congress must "speak with a clear voice" "[i]f [it] intends to impose a condition on the grant of federal moneys"—that is, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).   This requirement means that Congress must "define those conditions clearly enough for the states to make an informed choice." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) (citing *Penhurst*, 451 U.S. at 25).  Congress neglects this duty when a provision's "text, literally read, admits of two plausible interpretations." *Graham Cnty. Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 419 n.2 (2005).  The Federal Tax Mandate is an example of such neglect.

In recent testimony before Congress, the Secretary acknowledged this ambiguity when asked how Treasury would "approach the question of what indirectly or directly offsets a tax cut?"  She admitted this is a "thorny" issue, and

"[g]iven the fungibility of money, it's a hard question to answer."[6] Her logic is not hard to follow. Congress did not define what it means to "directly or indirectly" offset tax cuts, but gave the Secretary authority to claw back funds Treasury suspects were used as a direct or indirect offset. *See* ARPA § 9901 (enacting 42 U.S.C. § 602(e)). Yet because "[m]oney is fungible," *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), *any* ARPA funds the Plaintiff States receive could be viewed as indirectly offsetting *any* reduction in tax revenue from a change in state law or policy. After all, a decrease in one part of a State's revenue is necessarily offset somehow to achieve a balanced budget.

The Secretary tried to assure the Plaintiff States that satisfying the Federal Tax Mandate is as "simpl[e]" as asking whether a State replaced lost revenue with ARPA funds or through other means. *See* Ex. B at 2. But how can the Plaintiff States know whether the Secretary will point to ARPA funds as those "other means" to account for any revenue shortfall during the covered period—especially given ARPA's insistence that *indirect* offsets are just as verboten as more obvious, direct action? The Plaintiff States have no assurance the Secretary will accept their representation

---

[6] "Testimony of Secretary Yellen before the Senate Banking Committee in response to Sen. Mike Crapo," at 1:11:47-1:12:12, UNITED STATES COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS (Mar. 24, 2021, 10:00 a.m.), *available at* https://www.banking.senate.gov /hearings/03/17/2021/the-quarterly-cares-act-report-to-congress.

that they offset revenue loss with another source of funding, for instance, or that they

decided not to replace a reduction because the State ran a surplus the year before.

Consider the following scenario:

- A State applies for and receives $50,000,000 to pay for broadband infrastructure improvements consistent with ARPA's purpose to fund "necessary investments in water, sewer, or broadband infrastructure." ARPA § 9901 (enacting 42 U.S.C. § 601(c)(1)(D)).
- The State also passes several tax credits, including for foster parents, entities that invest in community improvement projects, and businesses that bought new equipment to provide safe and efficient customer service during the pandemic. Together, these credits result in a revenue decrease of approximately $55,000,000.

Did the State use ARPA funds for broadband infrastructure, or to offset tax credits?

Investment in broadband is indisputably a covered purpose, but the similar

dollar amounts could suggest that the State only "afforded" the tax credits because

ARPA funding paid for another pressing state need. Would it matter if the decrease

in tax revenue were only $10,000,000? The Secretary might demand $10,000,000

back from the State's ARPA allocation on the theory that it indirectly offset the tax

credits, but the quite different dollar amounts could also indicate that the expenditure

and tax credits are separate. Or does the analysis depend on whether the tax cuts

took effect before the State received its ARPA check? If before, tax cuts may have

reflected a policy decision that returning money to taxpayers was the State's most

urgent economic need, even at the expense of delaying broadband investment. If the

State later received and used the ARPA infrastructure grant, did the State offset its

earlier tax cuts, or seize an unexpected chance to advance both goals at once instead of waiting potentially years for the second?  In these and many other iterations, the text yields "two plausible interpretations."  *Graham*, 545 U.S. at 419 n.2.

Importantly, these are not just hypotheticals.  The States' letter to Treasury outlined several proposals for tax relief that legislatures are considering this year— and it is unclear whether any or all might run afoul of the Federal Tax Mandate.  Ex. A at 2-4; *see also* Compl. ¶¶ 76-83.  Further complicating the situation, budget projections are never foolproof.  A State could find itself subject to a recoupment action even if it never intended or expected revenues to decrease as the result of a change in law, regulation, or practice.

It is thus impossible for the Plaintiff States to "make an informed choice" how to exercise their taxing authority without putting ARPA funding at risk.  *Benning*, 391 F.3d at 1306.  If the best interpretation is that the Federal Tax Mandate covers *every* change that leads to decreased revenue, then Congress passed a statute with startling breadth and the constitutional concerns are all the more severe.  And if that is not what Congress intended, how can States know where the line actually lies?  Nothing in the statutory text answers when "indirect" dwindles to "nonexistent."

Nor can guidance from Treasury salvage an unconstitutionally vague law.  At most, the forthcoming guidance may try to graft extra-textual limits onto the Federal

14

Tax Mandate.[7]  But that guidance may or may not bind Treasury in an enforcement action, *see*, *e.g.*, *Farrell v. Dep't Of Interior*, 314 F.3d 584, 590 (Fed. Cir. 2002), and Treasury could always reverse its position.  Moreover, the Constitution requires *Congress* to be the one speaking with a clear voice where traditional state powers are at stake.  *Pennhurst*, 451 U.S. at 17.  In areas of "vast economic and political significance"—like restricting taxing powers for every State in the nation—Congress must "speak clearly" when delegating to an implementing agency.  *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted).  The "thorny issue" Congress created in ARPA is the opposite of that clarity.

### 3.  The Federal Tax Mandate Is Not Reasonably Related To ARPA's Purpose.

The Federal Tax Mandate also coerces state participation without being reasonably related to the purpose ARPA serves.  *Dole*'s requirement that spending conditions be germane to the purposes of the grant, 483 U.S. at 208, demands relevance "to federal interest in the project and to the over-all objectives." *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295 (1958).  "[O]therwise, of course,

---

[7] Treasury recently indicated an intent to adopt a construction of ARPA under which a State can make changes to its tax policy to mirror certain features of federal tax policy. *See* "Statement on State Fiscal Recovery Funds and Tax Conformity," U.S. DEPARTMENT OF TREASURY (Apr. 7, 2021), https://home.treasury.gov/news/press-releases/jy0113.  Treasury did not identify any textual hook for its guidance, and the narrow concession to the States is cold comfort.  Indeed, a *State* being told it is "free" to adopt *federal* policy preferences underscores ARPA's constitutional flaws.

the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

ARPA's purpose is in its name: the "American *Rescue* Plan Act." It was created and promoted as a plan to assist in the rebound from the pandemic's economic devastation. This purpose plays out in the four categories where Congress affirmatively authorized state spending—on financially impacted households and businesses, essential worker compensation, lost state government revenue, and infrastructure investment. ARPA § 9901 (enacting 42 U.S.C. § 602(c)(1)(A-D)).

Prohibiting tax reductions does not advance ARPA's goal of providing meaningful relief to individuals and entities affected by the pandemic. Congress left state tax *increases* perfectly acceptable, after all, and while a federal prohibition on raising taxes would likely be unconstitutional too, it would at least be germane to the purpose of providing needed economic relief. Broadly constricting States' taxing authority in the opposite direction—both directly and indirectly, and for multiple years to come—is not.

*First*, the Court need not look further than Congress' own actions *in ARPA* to see that the Federal Tax Mandate is not reasonably related to the statute's purposes. Congress does not bar localities and Tribal governments from using ARPA funds to offset tax relief, *see* ARPA § 9901 (enacting 42 U.S.C. § 603(c)), which casts doubt on the premise that prohibiting tax relief serves ARPA's overall goals. Further,

Congress itself cut taxes under ARPA.  *See*, *e.g.*, ARPA §§ 9621 (expanding earned income tax credit), 9673 (exempting small business revitalization funds).  In doing so, it necessarily agreed that tax cuts can also provide "rescue" as an effective and important form of COVID-19 relief.  Far from being germane to ARPA's purposes, disabling States from doing the same thus undercuts Congress' own goals.

*Second*, the Federal Tax Mandate is wildly over-inclusive.  By dictating what States can do not only with ARPA funding but also *other state funds*, the mandate affects all state legislative or executive actions that reduce net tax revenues, regardless of their purpose.  This scope exceeds any rational purpose Congress may have had in mind.  Indeed, it is not difficult to envision tax cuts that comprise part of a State's deliberate and comprehensive pandemic recovery plan.  A State might spend all of its allocated ARPA funds on the statute's four spending categories, for instance, and also enact a slate of long-term plans designed to address increased unemployment and stagnant business growth in a post-COVID-19 economic landscape.  This plan could include tax credits for companies relocating to the State, as well as significantly reduced income taxes for small businesses with revenues below a certain threshold or that are located in federally designated Qualified Opportunity Zones.  Nothing in this plan would undermine ARPA's purpose.  Quite the opposite.  Yet the Federal Tax Mandate's "indirect" prohibition could trigger a claw back of ARPA funds if the State's revenues decrease in the short term.

Examples from economically identical scenarios further demonstrate the tenuous (at best) connection between a state tax-cut freeze and the goal of providing critical relief to Americans suffering economic harm from the pandemic:

- Suppose two States each decide to use ARPA funds, as the statute permits, "to provide assistance to households, small businesses, [and] non-profits." § 601(c)(1)(A).
- The first State sends $1000 checks to every household and small business in the State, which recipients can use as they wish.
- The second State determines that mailing individual checks is not efficient,[8] and instead grants every household and business in the State a one-time $1000 tax credit.

The result of each scenario is the same—households and small businesses receive the type of meaningful financial relief Congress envisioned, and the State used ARPA funds to make it happen.  In the second scenario, however, the State's revenues decrease and ARPA funds make up the difference.  That feature is the difference between using funds as Congress expressly provided and subjecting the State to a demand to reimburse the federal government for the entire cost of the program—although the Federal Tax Mandate's boundaries are ambiguous, this type of program appears to fall squarely within its reach.  Prohibiting States from choosing between functionally identical economic relief policies makes the Federal

---

[8] In her prepared remarks during her testimony to Congress, the Secretary emphasized the importance of "making sure that assistance flows as efficiently as possible."  *Testimony of Janet L. Yellen, Secretary, U.S. Department of the Treasury Before the Committee on Banking, Housing, and Urban Affairs United States Senate*, 117th Cong. 2 (Mar. 24, 2021), *available at* https://www.banking.senate.gov/imo/media/doc/Yellen%20Testimony%203-24-21.pdf.

Tax Mandate look more like an exercise in commandeering for commandeering's sake, rather than a reasonable condition to safeguard ARPA's purposes.

*Third*, the Federal Tax Mandate is also under-inclusive—again highlighting its tension with ARPA's purposes.  As noted, although ARPA authorizes funding for States, territories, Tribal governments, and localities, the Federal Tax Mandate applies to States and territories only.  If tax relief threatens ARPA's purposes when enacted by a State, why is the same not true for a city?  Similarly, the pension provision bars direct "deposit[s] into any pension fund," but evinces no concern about States using ARPA funds to shore up their pension funds *indirectly*.  ARPA § 9901 (enacting 42 U.S.C. § 602(c)(2)(B)).  Yet the concern that indirect tax offsets could thwart Congress' purpose of focused COVID-19 relief should apply to other (expensive) state-budget offsets too.  The pension provision immediately follows the Federal Tax Mandate, and the juxtaposition of their phrasings show that the latter is not reasonably related to the purpose of the funds.  *See Dole*, 483 U.S. at 207.  If anything, it appears to be a pretext for placing off limits certain *disfavored* exercises of state taxing and revenue-allocation powers, rather than reflecting an evenhanded concern that funds be used for the specific purposes Congress chose.

*Finally*, Congress' decision to infringe a traditional state power—and area where Congress does not have a "substantial interest," *Benning*, 391 F.3d at 1307— shortens any leeway it might otherwise have when setting funding conditions.  *See*

*id.* (rejecting rational relation argument where federal government has "a substantial interest" in ensuring that federally funded prisons protect civil rights).  This is because where Congress tries to interfere with "state autonomy," courts "may properly oblige Congress to demonstrate that the requirement is related to the achievement of an important governmental objective."  Lewis B. Kaden, *Politics, Money, and State Sovereignty: The Judicial Role*, 79 Colum. L. Rev. 847, 896 (1979); *cf. Massachusetts v. United States*, 435 U.S. 444, 461-62 (1978) (noting that the condition "effects no greater interference with state sovereignty than do the restrictions which this Court has approved").  Thus, if there is any doubt whether the Federal Tax Mandate is germane to ARPA's purposes, the novelty and highly invasiveness of this condition supports resolving the question in favor of the Plaintiff States.

### 4.  The Federal Tax Mandate Violates The Tenth Amendment.

Finally, the Federal Tax Mandate fails the last *Dole* factor by violating an independent constitutional provision, 483 U.S. at 207-08—here, the Tenth Amendment's reservation of powers to the States.  The Tenth Amendment stands as an "independent bar" to the Federal Tax Mandate, *id.* at 208, because as discussed in Part I.B. below, the Federal Tax Mandate impermissibly commandeers the States' taxing authority to serve the federal government's ends.  No constitutional provision gives Congress power to interfere with state sovereignty in this way.  *Cf. Midrash*

*Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1242 (11th Cir. 2004) ("RLUIPA does not violate principles of federalism if it is otherwise grounded in the Constitution."); *Benning*, 391 F.3d at 1308 (same).

*   *   *

In sum, while Congress exercised its spending power for the public welfare through ARPA, adding the Federal Tax Mandate makes it flunk every other factor of *Dole.*   The Plaintiff States are thus likely to succeed on the merits of their challenge on Count I.  Compl. ¶¶ 101-22.

### B.   The Federal Tax Mandate Violates The Anticommandeering Doctrine.

Although the "anticommandeering doctrine may sound arcane," it serves the important function of safeguarding "a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475.  The federal government, after all, "may act only where the Constitution authorizes it to do so."  *Printz v. United States*, 521 U.S. 898, 937 (1997) (citation omitted).

Further, "[s]tate sovereignty is not just an end in itself"; honoring "federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *NFIB*, 567 U.S. at 536 (citation omitted); *see also* The Federalist No. 45 (J. Madison) (explaining that federalism helps ensure that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by

21

locally accountable leaders).  The Constitution's division of federal-state powers, including the anticommandeering doctrine, thus ultimately exists "for the protection of individuals." *Murphy*, 138 S. Ct. at 1477 (citations omitted).

Anticommandeering applies to both affirmative and negative commands: Directives *not* to act are still "direct orders to state legislatures." *See*, *e.g.*, *Murphy*, 138 S. Ct. at 1478.  And federal orders to the States—like the Federal Tax Mandate—are unconstitutional under the anticommandeering doctrine where they implicate either of two concerns.  First, because the doctrine serves as "one of the Constitution's structural protections of liberty," it applies where federal action threatens the "healthy balance of power between the States and the Federal Government." *Id.* at 1477.  Second, it "promotes political accountability" by keeping decisions that affect the States in the hands of state leaders. *Id.* (citations omitted).  The Federal Tax Mandate upsets both interests.

### 1.  The Federal Tax Mandate Violates State Sovereignty.

To begin, the Federal Tax Mandate unconstitutionally commandeers one of the most "sensitive areas of state . . . policymaking." *Shelby Cnty. v. Holder*, 570 U.S. 529, 545 (2013).  *Shelby* dealt with the power "to regulate elections" which "the Framers of the Constitution intended the States to keep for themselves." *Id.* at 530. So too for the States' power to tax and spend—or as here, not to do so.

Taxation is an "indispensable" power of the states. *Lane Cnty. v. Oregon*, 74 U.S. 71, 76 (1868). The States have always retained their "original" sovereign right to determine their own taxation and fiscal policies, which represents an important structural check on the federal government. *Thomson v. Pac. R.R. Co.*, 76 U.S. 579, 591 (1869). Taxing authority is, of course, critical to the budgeting function for the Plaintiff States' legislatures. Everything a State does depends on the ability to tax, or not tax; every service a State's residents receive from the State depends on it; and those residents are keenly interested in the amount of taxes they will pay. The Framers thus recognized that "a law for abrogating or preventing the collection of a tax laid by the authority of the State . . . would not be the supreme law of the land, but a usurpation of power not granted by the Constitution." The Federalist No. 33 (A. Hamilton).

Congress thus does not have power to "compel States" to pass or refrain from passing tax policies according to its views. *New York*, 505 U.S. at 162. This is why the Federal Tax Mandate represents an extraordinary shift in the state-federal power balance. It is not an ordinary funding condition, but an attempt to gain *the States'* power to enact local tax policy by coercing them to release it for the sake of needed pandemic relief funds.[9] This encroachment is "fundamentally incompatible with our

---

[9] Moreover, Congress' intrusion goes beyond state legislatures to also prohibit any "administrative interpretation" that decreases tax revenue. This too would pose far-reaching consequences. For example, the Alabama Tax Tribunal is a state agency that "resolve[s] disputes between the

constitutional system of dual sovereignty." *Printz*, 521 U.S. at 935.  It breaks the constitutional line between enumerated and reserved powers, and as such, the Federal Tax Mandate violates the first principle of the anticommandeering doctrine.

### 2.  The Federal Tax Mandate Blurs Political Accountability.

When Congress passes laws that regulate or tax the American people directly, it is clear that Congress bears the responsibility for their benefits and burdens. Voters who like or dislike congressional actions "know who to credit or blame." *Murphy*, 138 S. Ct. at 1477.  So too for ordinary state legislation; voters know which leaders are responsible for policies they like (or not), and can make that preference known at the polls.  By contrast, if a *State* imposes taxes or regulations only because it has been commanded to do so *by Congress,* responsibility is blurred.  *See New York*, 505 U.S. at 168-69.

The Federal Tax Mandate creates this trap for the Plaintiff States by setting up a Catch-22.  It effectively mandates, as federal policy, the *minimum* taxes that States may impose on their people for the next three years.  If the States refuse their allocated ARPA funds in order to continue to control their taxing authority, the taxpayers do not receive the significant benefits from the federal law—and the States' leaders will be blamed.  Taxpayers in every State will ultimately be on the

---

Department of Revenue and taxpayers."  Ala. Code §§ 40-2B-1, 40-2B-2(a).  By ARPA's plain language, the Alabama Tax Tribunal would be restricted from interpreting Alabama law in a way that results in a tax decrease for an Alabama taxpayer.

hook for the billions in federal ARPA funds, and if a State declines its share of the $219.8 billion ARPA designates to return to the States, its taxpayers will still foot ARPA's bill for years to come. But if a State elects to receive ARPA funds in light of these and other concerns, they are required to give up the ability to enact tax policy that can give their residents needed economic relief in *other* forms through tax-relief policies. Yet the political actor actually responsible for this outcome, Congress, is insulated from accountability, and again state leaders find themselves in the crosshairs.

The result is that "elected state officials cannot regulate in accordance with the views of the local electorate." *New York*, 505 U.S. at 169. Because of this confused situation, political accountability becomes distorted even beyond what the Supreme Court imagined in *Murphy*. Accordingly, the Federal Tax Mandate violates this structural principle and is an example of unconstitutional commandeering.

### 3. The Spending Clause Is Not A Bypass For The Anticommandeering Doctrine.

Finally, Congress' choice to house the Federal Tax Mandate in a spending provision cannot paper over its constitutional flaws. To be sure, Congress is permitted to impose certain conditions on federal funding programs, provided it abides by the standards set forth in *Dole*. Yet the conditional spending doctrine is not divorced from principles of anticommandeering as Congress can still impermissibly commandeer the States through its spending authority. As the

Supreme Court in *New York* explained, the Spending Clause is one permissible "method" Congress uses to "urge a State to adopt a legislative program consistent with federal interests"; commandeering is an impermissible one.  505 U.S. at 166.

As a result, "where Congress places conditions on a State's receipt of federal funds—whether directly, or by delegation of clarifying authority to an executive agency—there is no commandeering of reserved State power *so long as* the State has 'a legitimate choice whether to accept the federal conditions in exchange for federal funds.'"  *State v. Dep't of Justice*, 951 F.3d 84, 115 (2d Cir. 2020) (quoting *NFIB*, 567 U.S. at 578).  This rule makes sense: If Congress can conscript States to do its fiscal bidding by spending billions of dollars, then the anticommandeering doctrine would no longer be the stalwart, structural wall the Constitution demands.  Put simply, allowing Congress to bypass the anticommandeering doctrine under its spending power would turn that doctrine into mere constitutional theory.

Justice Scalia's opinion in *NFIB* illustrated this point:

> Suppose, for example, that Congress enacted legislation offering each State a grant equal to the State's entire annual expenditures for primary and secondary education.  Suppose also that this funding came with conditions governing such things as school curriculum, the hiring and tenure of teachers, the drawing of school districts, the length and  hours of the school day, the school calendar, a dress code for students, and rules for student discipline.  As a matter of law, a State could turn down that offer, but if it did so, its residents would not only be required to pay the federal taxes needed to support this expensive new program, but they would also be forced to pay an equivalent amount in state taxes.  And if the State gave in to the federal law, the State and its subdivisions would surrender their traditional authority in the field of education.

*NFIB*, 567 U.S. at 680-81 (Scalia, J., with Kennedy, Thomas, and Alito, JJ., dissenting).  Administering education policy, of course, is not the only core duty of the States.  Taxing and budgetary powers are, too.  And like the hypothetical grant equal to States' annual education expenses conditioned on adopting federal educational policies, ARPA offers States the impossible choice of accepting a quarter of their *overall* annual budgets conditioned on adopting federal tax preferences.  If the Constitution allowed this type of funding-fueled commandeering, the federal government would have the extraordinary power to take over any aspect of state government under the guise of spending for the general welfare—it would not be long until there was no longer a need for States at all.

This is why the Spending Clause is no bypass of anticommandeering principles.  Congress' command to the States in the Federal Tax Mandate is not compatible with principles of liberty or political accountability, and it offends the States' status as co-sovereigns.  The Plaintiff States are therefore likely to succeed on the merits of their challenge on Count II as well.  Compl. ¶¶ 123-28.

## II.    The Plaintiff States Will Suffer Irreparable Injury Absent An Injunction.

Harm is irreparable "if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).  This applies most clearly where there is an injury to a fundamental right.  *See*, *e.g.*, *Jones v. Gov. of*

*Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (right to vote); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (right to privacy); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (right to free speech). And courts outside the Eleventh Circuit often presume irreparable injury in cases where a "constitutional right is being threatened or impaired." *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom*. 545 U.S. 844 (2005).

The Federal Tax Mandate is precisely this type of irreparable harm because, by invading the Plaintiff States' sovereign and constitutional authority to tax, it intrudes on the "sovereign interests" of the Plaintiff States. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *accord Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018). Indeed, federal action *always* causes irreparable injury when it improperly interferes with a State's freedom to order its own affairs and act responsive to its people's needs. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *accord Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers).

And that is just the long-term harm: Without fast relief, the Plaintiff States will also suffer more immediate irreparable injury. ARPA requires the Plaintiff States to certify compliance with the Federal Tax Mandate, but certification under this ambiguous and overbroad provision could subject the Plaintiff States to

unknown penalties based on an unknown set of state legislative or administrative actions. Yet Plaintiff States that refuse to certify compliance (in the absence of a court ruling establishing ARPA's proper constitutional limits) may not receive the critical COVID-19 relief to which they are entitled and that their people need—now, not months in the future.

Hand-in-hand with this concern is the pressing need for the Plaintiff States' legislatures to know whether and how they can reduce taxes consistent with their responsibility to their constituents. Unlike Congress, many of the Plaintiff States' legislatures do not meet year around. Some have legislative sessions fast coming to a close, and others have limits on when special sessions can be called to respond to changed circumstances. There is thus a strong probability that delayed clarity on how accepting COVID-19 relief could affect their taxation powers would eliminate the opportunity for many of the Plaintiff States to pass tax legislation until next year or later. There is no remedy to recoup this lost legislative time. The Court should enjoin enforcement of the Federal Tax Mandate to avoid these irreparable harms.

## III.   Threatened Injury To The Plaintiff States Outweighs The Nonexistent Harm To The Defendants And Promotes The Public Interest.

Both the public interest and the balance of equities between the parties favor an injunction. Enjoining an unconstitutional provision would make clear that the Plaintiff States' legislatures can fulfill their sovereign responsibilities on behalf of The People. After all, "the public interest lies in a correct application of the" law,

and "upon the will of the people . . . being effected in accordance with [the] law." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

In contrast, enjoining the Federal Tax Mandate will not harm Defendants—or anyone else for that matter. The Plaintiff States ask this Court to enjoin the Federal Tax Mandate alone, while keeping the rest of ARPA firmly in place. Injunctive relief does not delay or threaten distribution of ARPA funds, nor interfere with any individual's or entity's use of that relief. Rather, it will help facilitate the expenditure of funds by giving the Plaintiff States assurance that they can act without fear of violating the Federal Tax Mandate.

## CONCLUSION

The Court should enjoin enforcement of the Federal Tax Mandate.

Respectfully submitted,

/s/ Edmund G. LaCour, Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour, Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAg.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov
**Counsel for State of Alabama**

/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See (*pro hac vice*)
  *West Virginia Solicitor General*
David C. Tryon (*pro hac vice*)
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing
  under supervision of West Virginia
  attorneys)
Jessica A. Lee (*pro hac vice*)
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov
**Counsel for State of West Virginia**

/s/ Bryan M. Taylor
Bryan M. Taylor
Bachus Brom & Taylor LLC
300 Vestavia Parkway, Suite 3700
Birmingham, AL 35216
Tel: (334) 595-9650
btaylor@bachusbrom.com

/s/ Nicholas Bronni
LESLIE RUTLEDGE
  *Arkansas Attorney General*
Nicholas J. Bronni (*pro hac vice*)
  *Arkansas Solicitor General*
Vincent M. Wagner (*pro hac vice*)
  *Deputy Solicitor General*
Dylan L. Jacobs (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov
**Counsel for State of Arkansas**

/s/ John M. Ptacin
TREG R. TAYLOR
  *Attorney General of Alaska*
John M. Ptacin*
  *Chief Assistant Attorney General*
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Facsimile: (907) 276-3697
John.ptacin@alaska.gov
**Counsel for State of Alaska**

31

/s/ Jason Hilborn
ASHLEY MOODY
  *Florida Attorney General*
Jason H. Hilborn (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Florida
Attorney General
Office of the Attorney General
State of Florida
PL-01 The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Jason.Hilborn@myfloridalegal.com
**Counsel for State of Florida**

/s/ David M.S. Dewhirst
AUSTIN KNUDSEN
  *Attorney General of Montana*
David M.S. Dewhirst**
  *Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-4145
David.Dewhirst@mt.gov
**Counsel for the State of Montana**

/s/ Jeffrey S. Thompson
THOMAS J. MILLER
 *Attorney General of Iowa*
Jeffrey S. Thompson**
  *Solicitor General*
1305 East Walnut Street
Des Moines, IA 50319
Tel: 515-281-5164
jeffrey.thompson@ag.iowa.gov
**Counsel for State of Iowa**

/s/ Daniel E. Will
Daniel E. Will**
  *New Hampshire Solicitor General*
Office of the New Hampshire
Attorney General
33 Capitol Street
Concord, NH 03301-6397
Tel: (603) 271-1119
Daniel.E.Will@doj.nh.gov
**Counsel for the State of
New Hampshire**

/s/ Dwight R. Carswell
DEREK SCHMIDT
  *Kansas Attorney General*
Dwight R. Carswell (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Kansas
Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8410
dwight.carswell@ag.ks.gov
**Counsel for State of Kansas**

/s/ Mithun Mansinghani
MIKE HUNTER
  *Oklahoma Attorney General*
Mithun Mansinghani**
  *Solicitor General*
Oklahoma Office Of The
Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
mithun.mansinghani@oag.ok.gov
**Counsel for the State of Oklahoma**

/s/ J. Emory Smith, Jr.
ALAN WILSON
  *South Carolina Attorney General*
J. Emory Smith, Jr. (*pro hac vice*)
  *Deputy Solicitor General*
Office of the South Carolina
Attorney General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
esmith@scag.gov
**Counsel for State of South Carolina**

/s/ Melissa A. Holyoak
SEAN REYES
  *Utah Attorney General*
Melissa A. Holyoak (*pro hac vice*)
  *Utah Solicitor General*
Office of the Utah Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Tel: (801) 366-0260
**Counsel for State of Utah**

/s/ Jeffery J. Tronvold
JASON RAVNSBORG
  *South Dakota Attorney General*
Jeffery J. Tronvold*
  *Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Tel:  (605) 773-3215
Jeffery.tronvold@state.sd.us
**Counsel for State of South Dakota**

*Pro hac vice application pending
**Pro hac vice application
forthcoming

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2021, I electronically filed this document using the Court's CM/ECF system. I further certify that I have on this date mailed a copy of the foregoing to the following parties:

Janet Yellen
Secretary of U.S. Department of
Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001

Richard K. Delmar
Inspector General
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Prim Escalona
Civil Division, Process Clerk
United States Attorney's Office
1801 4th Avenue North
Birmingham, AL 35203

U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

I further certify that I served a copy of this document by e-mail upon:

Stephen Ehrlich
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Stephen.Ehrlich@usdoj.gov

Lane Woodke
Assistant United States Attorney
Civil Chief
United States Attorney's Office for the Northern District of Alabama
Lane.Woodke@usdoj.gov

/s *Edmund G. LaCour Jr.*
Counsel for State of Alabama