# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, by and through Patrick Morrisey, Attorney General of the State of West Virginia; **STATE OF ALABAMA**, by and through Steve Marshall, Attorney General of the State of Alabama; **STATE OF ARKANSAS**, by and through Leslie Rutledge, Attorney General of the State of Arkansas; **STATE OF ALASKA**, by and through Treg R. Taylor, Attorney General of the State of Alaska; **STATE OF FLORIDA,** by and through Ashley Moody, Attorney General for the State of Florida; **STATE OF IOWA**; **STATE OF KANSAS,** by and through Derek Schmidt, Attorney General for the State of Kansas; **STATE OF MONTANA**, by and through Austin Knudsen, Attorney General of the State of Montana; **STATE OF NEW HAMPSHIRE**; **STATE OF OKLAHOMA**, by and through Mike Hunter, Attorney General of the State of Oklahoma; **STATE OF SOUTH CAROLINA**, by and through Alan Wilson, Attorney General of the State of South Carolina; **STATE OF SOUTH DAKOTA**, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and **STATE OF UTAH,** by and through Sean Reyes, Attorney General of the State of Utah,  Plaintiffs,  v.  **UNITED STATES DEPARTMENT OF THE TREASURY;**  **JANET YELLEN**, in her official capacity as the Secretary of the United States Department of the Treasury; and  **RICHARD K. DELMAR**, in his official capacity as acting inspector general of the Department of the Treasury,  Defendants. | Case No. 7:21-cv-00465-GMB  **Evidentiary Materials In Support of Preliminary Injunction** |

# **PLAINTIFF STATES' EVIDENTIARY MATERIALS IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs' Exhibit A, Letter from 21 State Attorneys General to Secretary Yellen

Plaintiffs' Exhibit B, Response to Attorneys General from Secretary Yellen

# EXHIBIT A

    

| Office of the Attorney General<br>State of Georgia | Office of the Attorney General<br>State of Arizona | Office of the Attorney General<br>State of West Virginia |
|---|---|---|

March 16, 2021

**VIA EMAIL & U.S. MAIL**

The Honorable Janet L. Yellen
Secretary
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
(202) 622-1100
correspondence@treasury.gov

Re: **Treasury Action to Prevent Unconstitutional Restriction on State's Fiscal Policy through American Rescue Plan Act of 2021**

Dear Secretary Yellen:

The undersigned State Attorneys General request that the Department of the Treasury take immediate action to confirm that certain provisions of the American Rescue Plan Act (the "Act") do not attempt to strip States of their core sovereign authority to enact and implement basic tax policy. Those provisions, found in section 9901 of the Act,[1] forbid States from using COVID-19 relief funds to "directly or indirectly offset a reduction in … net tax revenue" resulting from state laws or regulations that reduce tax burdens—whether by cutting rates or by giving rebates, deductions, credits, "or otherwise[.]"[2] This language could be read to deny States the ability to cut taxes in any manner whatsoever—even if they would have provided such tax relief with or without the prospect of COVID-19 relief funds. Absent a more sensible interpretation from your department, this provision would amount to an unprecedented and unconstitutional intrusion on the separate sovereignty of the States through federal usurpation of essentially *one half* of the State's fiscal ledgers (*i.e.*, the revenue half). Indeed, such federal usurpation of state tax policy would represent the greatest attempted invasion of state sovereignty by Congress in the history of our Republic.

---

[1] https://www.congress.gov/117/bills/hr1319/BILLS-117hr1319enr.pdf.

[2] *Id.* at pp. 1319-223.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 2

Section 9901 of the American Rescue Plan Act, which amends sections 602 and 603 of the Social Security Act, explains what States may and may not use COVID-19 recovery funds for. Most pertinent here, subsection 602(c)(2)(A) (the "Tax Cut Prohibition") prohibits the States from "us[ing] the funds provided under this section … to either *directly or indirectly* offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."[3] States must certify that they will use any COVID-19 relief funds provided under the Act "in compliance with subsection (c) of this section[,]" and if a State fails to comply, the Act requires the State to repay the funds in "an amount equal to the amount of funds used in violation of such subsection[.]"[4]

The import of the Act's prohibition against "offsetting" reductions in state tax revenue is unclear, but potentially breathtaking. This provision might have been intended merely to prohibit States from *expressly* taking COVID-19 relief funds and rolling them directly into a tax cut of a similar amount. But its prohibition on "indirectly" offsetting reductions in tax revenue, combined with the list of prohibited kinds of tax reductions (rate cuts, rebates, deductions, credits, or "otherwise"), could also be read to prohibit tax cuts or relief of any stripe, even if wholly unrelated to and independent of the availability of relief funds. After all, money is fungible, and States must balance their budgets. So, in a sense, *any* tax relief enacted by a state legislature after the State has received relief funds could be viewed as "using" those funds as an "offset" that allows the State to provide that tax relief.

Several real and hypothetical examples of state tax policy sharpen this troubling point:

- Arizona voters at the 2020 election voted for a large tax increase related to education that has nothing to do with COVID-19 and the Arizona Legislature may seek to provide an alternative tax structure for small businesses—again having nothing to do with COVID-19 or the federal funds.

- Arizona is phasing out law-enforcement fees on vehicle registration renewals.

---

[3] "Covered period" is defined in Section 602(g)(1) as the period that begins on March 3, 2021, and "ends on the last day of the fiscal year of such State … in which all funds received by the State … from a payment made under this section or a transfer made under section 603(c)(4) have been expended or returned to, or recovered by, the Secretary."

[4] It further provides that "in the case of a violation of subsection (c)(2)(A), the amount the State … shall be required to repay shall be the lesser of—(1) the amount of the applicable reduction to net tax revenue attributable to such violation; and (2) the amount of funds received by such State … pursuant to a payment made under this section or a transfer made under section 603(c)(4)."

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 3

- During the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill, now under consideration by its Senate, that would extend a tax credit for families who adopt a child out of foster care.

- Also during the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill that raises the standard deduction, which would provide Georgians with an estimated $140 million in state income tax relief that largely benefits those of lower to middle incomes.

- The West Virginia Legislature is considering a bill to extend the Neighborhood Investment Tax Credit (a charitable program) and increase the annual tax credit cap from $3 million to $5 million. These changes are projected to reduce West Virginia tax revenue by roughly $2 million per year in future years.

- Another bill in West Virginia would expand a limited aircraft repair and maintenance sales tax exemption to all such activities. This change will result in a small reduction in sales tax collections.

- Alabama legislators are currently considering legislation that would allow tax exemptions for organizations that provide care for the sick and terminally ill, offer services for children who are victims of sexual or physical abuse, furnish new homes for victims of natural disasters, and respond to emergencies and provide life-saving, rescue, and first-aid services; tax deductions that would benefit people with special needs and enable citizens to purchase storm shelters to protect their families from tornadoes; and tax credits for hospitals and universities engaged in research and development beneficial to society.

- The Indiana General Assembly is considering a tax credit for donations to public school foundations as well as a tax credit for donations to qualified foster care organizations. It is also considering various sales tax exemptions for purchases such as public safety equipment.

- Kansas is considering decoupling part of its income tax code from the federal tax code, to end a state-level income tax increase caused by pass-through changes from prior federal tax law revisions.

- Kansas is considering giving property or income tax deferrals or credits to small businesses impacted by closure orders during the COVID-19 pandemic.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 4

- Under bipartisan legislation proposed in Kentucky, homeowners in a proposed tax increment financing district meant to revitalize a predominantly minority area of Louisville hurt by decades of disinvestment would pay property taxes for the next three decades based on their property's assessed value this year. And a housing developer would be able to defer 80% of its annual property taxes, up to $7.64 million, to offset construction costs.

- Montana's Legislature is considering a very slight income tax cut for most income earners.

- Montana's Legislature is also considering increasing its current education tax credit for families.

- In Oklahoma, a bill has passed the House that would, among other things, restore the refundability of the state's Earned Income Tax Credit.

- Suppose a property decreases in value resulting in a decrease of legally assessed value, and the state keeps the assessed tax *rate* consistent—which results in a decrease in assessed *tax amount*.

- Similarly, suppose a property increases in value, but the State decreases the assessed rate such that the amount of tax assessed remains unchanged.

- Assume that projected state revenue is set to increase 10%, and a state legislature adopts measures such that the state's revenue collection "only" increases 8%.

Not one of these common changes to state tax policy has any real or direct connection to the State's potential receipt of COVID-19 relief funds, yet each of them could be deemed a tax "rebate," "deduction," "credit," or "otherwise" that could result in a "reduction in the net tax revenue" of the State. Thus, each of these otherwise lawful enactments could be construed as violations of the Act's prohibition on "offsetting" tax cuts.

Put aside the gross federal overreach inherent in trying to take state tax policy hostage in this way. If this expansive view of this provision were adopted, it would represent an unprecedented and unconstitutional infringement on the separate sovereignty of the States. When Congress attaches conditions to a States' receipt and use of federal funds, those conditions must (1) be placed "'unambiguously[,]'" (2) relate to "'the federal interest'" for which the spending program was established, (3) not violate other constitutional provisions, and (4) not contain a financial inducement "so coercive as to pass the point at which 'pressure turns into compulsion.'" *See generally South Dakota v.*

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 5

*Dole*, 483 U.S. 203, 207-208, 211 (1987); *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). Spending conditions imposed on States that do not meet these requirements are not "necessary and proper" for exercising Congress' spending power and also infringe on powers "reserved to" the States. U.S. Const. Art. I, Section 8, Clause 18; U.S. Const. Amd. X. The Act's Tax Cut Prohibition violates these requirements.

First, if the Tax Cut Prohibition were interpreted to place any limits on how States could enact tax relief not directly connected to the relief funds provided by the Act, it would impose a hopelessly ambiguous condition on federal funding. The examples listed above make the point: how is a State to know, when accepting the relief funds, whether any of these kinds of commonplace and sensible tax relief measures are "indirectly" offset by COVID-19 relief funds? Is it enough that the funds help balance a state budget that *also* contains tax relief measures? What if the presence of relief funds in 2021's budget effectively frees up funds to offer tax relief in 2022? Absent a clear and narrowing construction by Treasury regulation, States cannot possibly know the bargain they are striking in accepting the relief funds. Yet the "legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

Second, for similar reasons, a maximalist construction of the Tax Cut Prohibition would result in federal conditions that do not relate to the federal interest for which the spending program was established: relief from the economic harms caused by COVID-19. It is one thing to require that coronavirus-stimulus-related money be spent on coronavirus-related stimulus. It is quite another, and beyond Congress's Spending Power, to forbid States from providing tax relief *of any kind*, *for any reason*, merely to ensure that federal funds are spent for their intended purpose.

Third, a broad construction of the Tax Cut Prohibition would violate separation of powers and fundamental democratic principles, and would effectively commandeer half of the State's fiscal ledgers, compelling States to adopt the one-way revenue ratchet of the current Congress for the next three years. For example, if citizens wish to lower their overall tax burden in the next two election cycles, they cannot elect a candidate for state office that could actually carry out such a policy. Similarly, elected officials who wish to spend more public funds would now have a ready excuse for why state surpluses cannot be used to cut taxes: Congress forbids that, so we "have" to spend it instead. Such a system would eliminate the democratic accountability that federalism serves to protect. *See*, *e.g.*, *New York v. United States*, 505 U.S. 144, 169 (1992) ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate[.]"). The upshot is that, for purposes of setting tax policy, there would now be a single sovereign in the United States: Congress.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 6

But fundamental to our Constitution is separate federal and state sovereigns, who can each set their own taxing policies based on their own independent legislatures.

In addition, a governor could—by mere stroke of a pen—accept the stimulus funds and thereby bind both (1) the legislature of that state and (2) his or her successor as governor from cutting any tax or tax assessment. Congress has no such power to intrude upon the democratic structures of the States, whose republican forms of government are guaranteed by Article IV. Notably, the 117th Congress cannot even bind the 118th Congress from enacting legislation contrary to its legislation. Yet a broad construction of the Tax Cut Prohibition would let the governors of the States in 2021 prohibit future state governors and legislatures from enacting revenue-reducing measures in 2024.

Fourth, the expansive view of the Tax Cut Prohibition is unconstitutionally coercive. No one could dispute that Congress cannot force States to pursue certain tax policies at the state level. *Cf. Sebelius*, 567 U.S. at 577 (plurality) ("'[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.' Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." (quoting *New York*, 505 U.S. at162)). Congress may not micromanage a State's fiscal policies in violation of anti-commandeering principles nor coerce a State into forfeiting one of its core constitutional functions in exchange for a large check from the federal government. Such "economic dragooning" of the States cannot withstand constitutional scrutiny. *Id*. at 582.

Yet the Act arguably compels that result. The COVID-19 pandemic has wreaked economic havoc across much of the Nation, leaving many citizens in need of short-term financial support, and Congress determined that some of that support would flow through the States. Although some States have weathered the crisis better than others, it is difficult to envision many, if any, turning down this support for their citizens. For example, Arizona has an annual budget of around $12.4 billion from its general fund, and the moneys from the State Recovery Fund are anticipated to be $4.8 billion—40 percent of one year's general fund budget. As another example, West Virginia's share represents over 25% of one year's budget. Many States put to the Hobson's choice of taking this financial support or maintaining their sovereign independence to set their own tax policy will be hard pressed to decline the federal funds.

Given the foregoing, we ask that you confirm that the American Rescue Plan Act does not prohibit States from generally providing tax relief through the kinds of measures listed and discussed above and other, similar measures, but at most precludes *express* use of the funds provided under the Act for direct tax cuts rather than for the purposes specified by the Act. In the absence of such an assurance by March 23, we will take appropriate additional action to ensure that our States have the clarity and assurance

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 7

necessary to provide for our citizens' welfare through enacting and implementing sensible tax policies, including tax relief.  We look forward to hearing from you promptly.  Please direct your response to joe.kanefield@azag.gov, and we will forward.[5]

Sincerely,

| | | |
|---|---|---|
| Mark Brnovich<br>Attorney General of Arizona | Christopher M. Carr<br>Attorney General of Georgia | Patrick Morrisey<br>Attorney General of West Virginia |
| Steve Marshall<br>Attorney General of Alabama | Leslie Rutledge<br>Attorney General of Arkansas | Ashley Moody<br>Attorney General of Florida |
| Lawrence G. Wasden<br>Attorney General of Idaho | Theodore E. Rokita<br>Attorney General of Indiana | Derek Schmidt<br>Attorney General of Kansas |
| Daniel Cameron<br>Attorney General of Kentucky | Jeff Landry<br>Attorney General of Louisiana | Lynn Fitch<br>Attorney General of Mississippi |
| Eric S. Schmitt<br>Attorney General of Missouri | Austin Knudsen<br>Attorney General of Montana | Douglas J. Peterson<br>Attorney General of Nebraska |
| Mike Hunter<br>Attorney General of Oklahoma | Alan Wilson<br>Attorney General of South Carolina | Jason R. Ravnsborg<br>Attorney General of South Dakota |
| Ken Paxton<br>Attorney General of Texas | Sean D. Reyes<br>Attorney General of Utah | Bridget Hill<br>Attorney General of Wyoming |

---

[5] Please note this letter is not intended to be and is not in any way a waiver of any legal rights, claims, defenses, or immunities possessed by the States regarding this matter.

# EXHIBIT B



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

SECRETARY OF THE TREASURY

March 23, 2021

The Honorable Mark Brnovich
Attorney General
State of Arizona
2005 N Central Avenue
Phoenix, AZ 85004

Dear Attorney General Brnovich:

I write in reply to your March 16, 2021 letter regarding Treasury's implementation of section 9901 of the American Rescue Plan Act (the "Act"), which provides funds to States, territories, Tribal governments, and localities to help them manage the economic consequences of COVID-19.

In the Act, Congress has provided funding to help States manage the public health and economic consequences of COVID-19 and it has given States considerable flexibility to use that money to address the diverse needs of their communities. At the same time, Congress placed limitations to ensure that the money is used to achieve those purposes – including provisions stating that this funding may not be used to offset a reduction in net tax revenue resulting from certain changes in state law.

It is well established that Congress may place such reasonable conditions on how States may use federal funding. Congress includes those sorts of reasonable funding conditions in legislation routinely, including with respect to funding for Medicaid, education, and highways. Here, the Act provides a broad outlay of federal funds, and accordingly includes restrictions to ensure that those funds are properly applied. Earlier COVID-19 relief measures providing state funding also included restrictions that barred States from spending those funds on certain ineligible expenditures.

Nothing in the Act prevents States from enacting a broad variety of tax cuts. That is, the Act does not "deny States the ability to cut taxes in any manner whatsoever." It simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law. If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated.

It is also important to note that States choosing to use the federal funds to offset a reduction in net tax revenue do not thereby forfeit their entire allocation of funds appropriated under this

statute. The limitation affects States' ability to retain only those federal funds used to offset a reduction in net tax revenue resulting from certain changes in state law.

Treasury is crafting further guidance—including guidance to address more specifically the issues raised by your letter and the procedures Treasury will use for any future recoupment—that will provide additional information about how this provision will be administered. We will provide this guidance before a State must submit a certification under § 602(d)(1). We also expect to engage in an ongoing dialogue throughout the program.

These funds will provide transformative relief to States, territories, and Tribal governments, and our communities should be able to use the funds to recover from the economic fallout due to the pandemic, which is what Congress intended. I hope to work with your State, as well as others across the country, to ensure these funds can be used in ways that align with the goals of the statute without undue restrictions.

Sincerely,

*Janet L. Yellen*

Janet L. Yellen

cc: The Honorable Christopher M. Carr
The Honorable Patrick Morrisey
The Honorable Steve Marshall
The Honorable Leslie Rutledge
The Honorable Ashley Moody
The Honorable Lawrence G. Wasden
The Honorable Theodore E. Rokita
The Honorable Derek Schmidt
The Honorable Daniel Cameron
The Honorable Jeff Landry
The Honorable Lynn Fitch
The Honorable Eric S. Schmitt
The Honorable Austin Knudsen
The Honorable Douglas J. Peterson
The Honorable Mike Hunter
The Honorable Alan Wilson
The Honorable Jason R. Ravnsborg
The Honorable Ken Paxton
The Honorable Sean D. Reyes
The Honorable Bridget Hill