# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, by and through Patrick Morrisey, Attorney General of the State of West Virginia; **STATE OF ALABAMA**, by and through Steve Marshall, Attorney General of the State of Alabama; **STATE OF ARKANSAS**, by and through Leslie Rutledge, Attorney General of the State of Arkansas; **STATE OF ALASKA**, by and through Treg R. Taylor, Attorney General of the State of Alaska; **STATE OF FLORIDA**, by and through Ashley Moody, Attorney General for the State of Florida; **STATE OF IOWA**; **STATE OF KANSAS**, by and through Derek Schmidt, Attorney General for the State of Kansas; **STATE OF MONTANA**, by and through Austin Knudsen, Attorney General of the State of Montana; **STATE OF NEW HAMPSHIRE**; **STATE OF OKLAHOMA**, by and through Mike Hunter, Attorney General of the State of Oklahoma; **STATE OF SOUTH CAROLINA**, by and through Alan Wilson, Attorney General of the State of South Carolina; **STATE OF SOUTH DAKOTA**, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and **STATE OF UTAH**, by and through Sean Reyes, Attorney General of the State of Utah, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Case No. 7:21-cv-465-LSC ) |
| **U.S. DEPARTMENT OF THE TREASURY**; **JANET YELLEN**, in her official capacity as Secretary of the United States Department of the Treasury; and **RICHARD K. DELMAR**, in his official capacity as acting inspector general of the Department of Treasury, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

### *AMICI CURIAE* BRIEF OF SEVENTY-EIGHT (78) MEMBERS OF THE U.S. SENATE AND U.S. HOUSE OF REPRESENTATIVES AND THE AMERICAN CENTER FOR LAW AND JUSTICE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MICHAEL L. JACKSON*
Wallace, Jordan, Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, AL  35253
Telephone: (205) 870-0555
Facsimile: (205) 874-0315
Email: mjackson@wallacejordan.com
*Local Counsel for Amici Curiae*

JAY ALAN SEKULOW**
    *Counsel of Record*
STUART J. ROTH**
ANDREW J. EKONOMOU**
JORDAN SEKULOW**
BENJAMIN P. SISNEY**
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
Tel.: 202-546-8890
Email: sekulow@aclj.org
            bsisney@aclj.org
*Counsel for Amici Curiae*

April 30, 2021

*Admitted to practice before this Court
** Not admitted to practice before this Court*

**CORPORATE DISCLOSURE STATEMENT**

The American Center for Law and Justice (ACLJ) is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ has no parent corporation and issues no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT………………………….................i

TABLE OF CONTENTS………………………………………………..............ii

TABLE OF AUTHORITIES………………………………………...........iii

INTEREST OF *AMICI*……………………………………………….....……….1

SUMMARY OF THE ARGUMENT…………………………………….......4

ARGUMENT..………………………………………………………………..4

I.    Congress Possesses Conditioning Authority Under the Spending Clause, but It is Limited.……………………………………………………7

II.   Congress's Tax Mandate Crosses the Line from Lawful Condition to Unconstitutional Compulsion …………………………………………9

III.  The Tax Mandate Is Unconstitutional Either as an Invalidly Ambiguous Condition or as an Unambiguous Compulsory Encroachment upon the States' Sovereignty ……………………………….........................11

CONCLUSION.…………………………………………………..............17

CERTIFICATE OF SERVICE ……………………………………………..19

# TABLE OF AUTHORITIES

**Cases:**                                                                                                        *Page(s)*

*Alden v. Maine*, 527 U.S. 706 (1999) .............................................................. 10

*Ark Encounter, LLC v. Parkinson*, 152 F. Supp. 3d 880 (E.D. Ky. 2016) ...... 5

*Barnes v. Gorman*, 536 U.S. 181 (2002) ...................................................... 9

*Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) ........................ 7, 12, 13

*Bond v. United States*, 564 U.S. 211 (2011) ................................................ 10

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
   527 U.S. 666 (1999) ............................................................................. 8–9

*Edelman v. Jordan*, 415 U.S. 651 (1974) ..................................................... 12

*Emps. of the Dep't of Pub. Health & Welfare v.
   Dep't of Pub. Health & Welfare*, 411 U.S. 279 (1973) ........................... 12

*FERC v. Mississippi*, 456 U.S. 742 (1982) .................................................... 8

*Hawk v. Comm'r*, 924 F.3d 821 (6th Cir. 2019) ............................................. 5

*Hodel v. Va. Surface Mining & Reclamation Assn.*,
   452 U.S. 264 (1981) ................................................................................. 8

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ............................. 4–5

*In re ACF Basin Water Litig.*, 467 F. Supp. 3d 1323 (N.D. Ga. 2020) ........ 15

*Lindley v. FDIC*, 733 F.3d 1043 (11th Cir. 2013) ........................................ 15

*Lowe v. Bowers (In re Nicole Gas Prod.)*, 916 F.3d 566 (6th Cir. 2019) ..... 15

*Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) .............................. 7

*Medical Transp. Mgmt. Corp. v. Comm'r*,
    506 F.3d 1364 (11th Cir. 2007) ................................................................15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..........................................................8, 9, 10, 12, 14

*New York v. United States*, 505 U.S. 144 (1992) ..................................8, 9, 10

*Ohio Cas. Ins. Co. v. Holcim (US), Inc.*,
    744 F. Supp. 2d 1251 (S.D. Ala. 2010) .................................................16

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .................................................................9, 11, 12, 16

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011) ...................................5

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...........................................11, 12

*Steward Machine Co. v. Davis*, 301 U.S. 548 (1937) ............................10, 14

*Tennessee v. United States Dep't of State*,
    329 F. Supp. 3d 597 (6th Cir. 2018) ........................................................7

*United States v. Near*, 708 Fed. Appx. 590 (11th Cir. 2017) ........................5

**Unpublished Opinions:**

*United States v. Langston*, 2007 U.S. Dist. LEXIS 111279
    (N.D. Ala. Aug. 21, 2007) (unpublished) ................................................5

**Other Authorities:**

U.S. Const. art. I, §8, cl. 1 ........................................................................4, 8

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, § 9901 (2021) ........................................................4, 5

Black's Law Dictionary (11th ed. 2019) .....................................................14

Joey Garrison, *Stimulus Tax Cut Language Rankles Republicans As Ohio AG Files Suit Against Biden Administration*, USA TODAY (Mar. 17, 2021), https://www.usatoday.com/story/news/politics/2021/03/18/ohio-attorney-general-sues-biden-administration-over-covid-19-stimulus/4746166001/ ....................................................................................................................6

## INTERESTS OF *AMICI*[1]

*Amici* are seventy-eight (78) elected Members of the U.S. Senate and U.S. House of Representatives.

*Amici* Members of the U.S. Senate submitting this Brief are Senators Mike Crapo, Tim Scott, John Barrasso, Marsha Blackburn, John Boozman, Mike Braun, Shelley Moore Capito, John Cornyn, Kevin Cramer, Ted Cruz, Steve Daines, Bill Hagerty, James Inhofe, James Lankford, Roger Marshall, Rob Portman, James E. Risch, Ben Sasse, Rick Scott, and Todd Young.

*Amici* Members of the U.S. House of Representatives submitting this Brief are Representatives Jim Banks, Kevin Brady, Robert Aderholt, Rick W. Allen, Andy Biggs, Gus M. Bilirakis, Dan Bishop, Lauren Boebert, Mo Brooks, Vern Buchanan, Ted Budd, Earl L. "Buddy" Carter, Ben Cline, James Comer, Warren Davidson, Jeff Duncan, Ron Estes, A. Drew Ferguson, IV, Scott Fitzgerald, Mike Garcia, Louie Gohmert, Bob Good, Lance Gooden, Paul A. Gosar, D.D.S., Glenn Grothman, Michael Guest, Diana Harshbarger, Vicky Hartzler, Kevin Hern, Yvette Herrell, Ashley Hinson, Ronny L. Jackson, Mike Kelly, Darin LaHood, Kevin McCarthy, Tom McClintock, Carol D. Miller, Barry Moore, Devin Nunes, Scott Perry, Tom

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than the *amici*, their members, or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

Reed, Guy Reschenthaler, Tom Rice, Mike Rogers, David Rouzer, David Schweikert, Pete Sessions, Adrian Smith, Jason Smith, Lloyd Smucker, Michelle Steel, W. Gregory Steube, Claudia Tenney, Ann Wagner, Jackie Walorski, Michael Waltz, Randy Weber, and Brad Wenstrup.

*Amici* are involved in a wide variety of matters relating to the crisis imposed by the COVID-19 pandemic, including but not limited to communication with and assistance to constituents, the prioritization and utilization of funds, and securing the public welfare. The COVID-19 pandemic and the government's response thereto are major considerations in the lives of *amici* and their constituents. As such, *amici* have an interest in the issues raised in this case. The Court's disposition of the issues will affect the ability of *amici*'s constituents to access critical services, but also the ability of various States' executive offices to respond as effectively and efficiently as possible to the pandemic. *Amici* Seventy-Eight (78) Members of the U.S. Senate and U.S. House of Representatives are aware of the implications of Congress's usage of terms and have a perspective to offer this Court which is inherently different than that of the parties.

*Amicus curiae*, the American Center for Law and Justice (ACLJ), is an organization dedicated to the defense of constitutional liberties secured by law and to the importance of federalism. ACLJ attorneys have argued before the Supreme Court of the United States and other federal and State courts in numerous cases

involving constitutional issues. *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). The ACLJ has also participated as *amicus curiae* in numerous cases involving constitutional issues before the Supreme Court and lower federal courts. *E.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016); *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007); *Van Orden v. Perry*, 545 U.S. 677 (2005).

The ACLJ is devoted to the rule of law and defending individual rights and liberties, including those enumerated by the Founders in the Declaration of Independence and the United States Constitution – and those protected by the federalism established by the Founders.

*Amici curiae* Seventy-Eight (78) Members of the U.S. Senate and U.S. House of Representatives and *amicus curiae* the ACLJ on behalf of its members, submit this Brief in support of the Plaintiffs and their Motion for a Preliminary Injunction [Doc. # 21].

This brief is filed pursuant to and consistent with the Court's Order [Doc. # 30] entered April 23, 2021, that *amicus* briefs in support of Plaintiffs may be filed, and must be filed by April 30, 2021. Further, the parties consented to the filing of amicus briefs. [Doc. # 28]. *Amici* understand this Order and the parties' consent to mean that a motion for leave is unnecessary.

## SUMMARY OF THE ARGUMENT

The "Tax Mandate" in the American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901 (adding § 602(c)(2)(A) to the Social Security Act (42 U.S.C. § 801 *et seq.*)) (ARPA), exceeds Congress's power under the Spending Clause, U.S. Const. art. I, §8, cl. 1. The conditions, *i.e.*, the "Tax Mandate," purportedly set by Congress controlling State recipients of the ARPA funds and prohibiting such States from lowering their taxes, exceed the conditioning power recognized by the Supreme Court. If the Tax Mandate is unambiguous, it amounts to an impermissible assault on the States' sovereignty. If it is ambiguous, it fails to pass one of the Supreme Court's clear limitations on Congress's conditioning authority. As a result, the *ultra vires* Tax Mandate is unconstitutional. For this reason, as well as those set forth in the States' Motion for a Preliminary Injunction [Doc. # 21], any enforcement of the Tax Mandate must be enjoined.

## ARGUMENT

Acceptance of ARPA funds is conditioned on a prohibition that bars recipient States from "directly or indirectly" offsetting revenue loss from tax reductions. This means that if the Plaintiff States accept the funds, they are prohibited by Congress from reducing their respective State taxes. The reason is clear: money is fungible. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 37 (2010) ("Money is fungible, and when foreign terrorist organizations that have a dual structure raise funds, they

highlight the civilian and humanitarian ends to which such moneys could be put." (internal citation, quotations and alterations omitted)); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 79 (2011) (explaining that money is fungible where funds used to purchase a vehicle were funds not used to pay down credit card debt); *United States v. Near*, 708 Fed. Appx. 590, 603 (11th Cir. 2017) ("Money is fungible."); *United States v. Langston*, 2007 U.S. Dist. LEXIS 111279, *10 (N.D. Ala. Aug. 21, 2007) (unpublished) ("Money is fungible."); *see Hawk v. Comm'r*, 924 F.3d 821, 826 (6th Cir. 2019) ("Money is fungible. So is air."); *Ark Encounter, LLC v. Parkinson*, 152 F. Supp. 3d 880, 904 (E.D. Ky. 2016) ("Because money is fungible, such benefits will to some extent have the incidental effect of allowing the institution's other funds to be used to advance their religious purposes if they wish. Indeed, any reimbursement, aid, or tax exemption necessarily frees up other funds for other purposes.").

Any funds received by the States via ARPA will necessarily offset, either directly *or indirectly*, every tax reduction that a State pursues. This condition comes with teeth: "Treasury can recoup funds that it interprets were used in violation of the Federal Tax Mandate." [Plaintiffs' Motion, Doc. # 21, p. 15 (citing ARPA § 9901 (enacting 42 U.S.C. § 602(g)(1)))]. This condition is not a choice. It is coercion.

As *amici* ACLJ and Members of Congress know full well, such an attempt at coercion violates the Spending Clause of the United States Constitution and the well-established limitations on Congress's conditioning authority.

The Biden Administration has indicated that, at bottom, and in a manner that matters for purposes of this case, it views the Tax Mandate just as the States do:

> Treasury spokeswoman Alexandra LaManna . . . defended the provision, saying it does not prevent states from making tax cuts *but simply says pandemic relief funds can't pay for those cuts.* 'It is well established that Congress may establish reasonable conditions on how states should use federal funding that the states are provided,' she said. 'Those sorts of reasonable funding conditions are used all the time – and they are constitutional.'"[2]

Indeed, the "Biden [Administration] has promised 'fastidious' oversight over the use of funds in the relief package."[3] And,

> White House press secretary Jen Psaki on Monday said the original purpose of the state and local funding provision was 'to keep cops, firefighters, other essential employees at work and employed, and it wasn't intended to cut taxes. So I think he certainly hopes that that's how the funding is used,' she said of the president.[4]

There is a tension here: on one hand, the Treasury Department told the press that the Tax Mandate does not prevent States from cutting taxes; on the other, it also told the press that ARPA funds cannot be used to pay for those cuts. Defendants

---

[2] Joey Garrison, *Stimulus Tax Cut Language Rankles Republicans As Ohio AG Files Suit Against Biden Administration*, USA TODAY (Mar. 17, 2021), https://www.usatoday.com/story/news/politics/2021/03/18/ohio-attorney-general-sues-biden-administration-over-covid-19-stimulus/4746166001/ (emphasis added).
[3] *Id.*
[4] *Id.*

cannot have it both ways. Again, since money is fungible, these are conflicting admissions by the Treasury Department. The States have identified a congressional conditioning action that the Biden Administration intends to enforce and that the condition plainly can be used to prevent recipient states from reducing their taxes.

Certainly Congress enjoys the ability to condition funding to States. This authority is clear and settled. Just as clear and settled, though, is the fact that the conditioning authority is limited.

## I.    Congress Possesses Conditioning Authority Under the Spending Clause, but It is Limited.

The United States Court of Appeals for the Eleventh Circuit has embraced and followed the Supreme Court's requirement that, while "Congress may condition the expenditures of federal funds on the furtherance of federal objectives," "when the recipient of those funds is a state the conditions imposed by Congress must be unambiguous." *Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004) (concluding RLUIPA conditions were unambiguous); *see id.* at 1307 ("Congress must, however, make the existence of the condition itself–in exchange for the receipt of federal funds–explicitly obvious." (quoting *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002))); *Tennessee v. United States Dep't of State*, 329 F. Supp. 3d 597, 622–23 (6th Cir. 2018) ("[C]onditions on the receipt of federal funds must be unambiguous.").

And as for the anticommandeering doctrine, even while vested with the authority to spend funds on the general welfare, "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Va. Surface Mining & Reclamation Assn.*, 452 U.S. 264, 288 (1981)). The Supreme Court "observed that 'this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations.'" *Id.* (quoting *FERC v. Mississippi*, 456 U.S. 742, 761–62 (1982)). As a result, Congress does not possess *direct* authority to "require the States to govern according to Congress'[s]" preferred tax regime. *New York*, 505 U.S. at 162. And while the Spending Clause of the U.S. Constitution empowers Congress to "provide for . . . the general Welfare," Congress may not use conditions imposed under the Spending Clause to coerce the States to adopt Congress's tax policy preferences. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–78 (2012) [hereinafter *NFIB*] (op. of Roberts, C.J.).

"The Spending Clause grants Congress the power 'to pay the Debts and provide for the . . . general Welfare of the United States.'" *Id.* at 576 (quoting U.S. Const., Art. I, § 8, cl. 1). As Chief Justice Roberts explained, the Court "ha[s] long recognized that Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States' 'taking certain actions that Congress

could not require them to take.'" *Id.* (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999)).

As the Supreme Court has recognized, "[s]uch measures 'encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices.'" *Id.* (quoting *New York*, 505 U.S. at 166) (second and third alterations original). Logically, "[t]he conditions imposed by Congress ensure that the funds are used by the States to 'provide for the . . . general Welfare' in the manner Congress intended." *Id.* Neither *amici* nor the States take issue with Congress's conditioning authority. Instead, *amici* support the States in calling to this Court's attention that the conditioning authority has limits – the condition must be unambiguous and may not commandeer the States' sovereign prerogatives – and that those limits have been breached here.

## II.  Congress's Tax Mandate Crosses the Line from Lawful Condition to Unconstitutional Compulsion.

As the Chief Justice put it, "[a]t the same time, our cases have recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." *Id.*

> "We have repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract.'["] *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). The legitimacy of Congress's exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'["] *Id.* at 17. Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system "rests on

what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'["] *Bond* [*v. United States*], 564 U.S. [211,] 220-221 [(2011)] (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). For this reason, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York, supra*, at 162. Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer.

*Id.* at 576–77.

The Supreme Court has certainly policed Congress in its attempts to coerce States to do its will. Among those cases, and critical to this Court's consideration of the States' lawsuit, the Supreme Court has "scrutinize[d] Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence.'" *Id.* at 577 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). "Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* at 577–78 (internal citation omitted) (quoting *Steward Mach.*, 301 U.S. at 590).

It is certainly true that "[t]he Constitution simply does not give Congress the authority to require the States to regulate." *Id.* at 578 (quoting *New York*, 505 U.S. at 178). But as the Chief Justice made clear, *this is just as* "true whether Congress directly commands a State to regulate or *indirectly coerces a State* to adopt a federal regulatory system as its own." *Id.* (emphasis added).

The case before this Court is not like *South Dakota v. Dole*, where the Supreme Court held that Congress's conditioning of funds on a certain minimum drinking age, incentivized by *a mere 5% reduction* if South Dakota were to choose a lower drinking age, was not so coercive so as to cross the line from pressure into compulsion. 483 U.S. 203, 205–06, 211 (1987). According to the Court,

> [w]hen we consider, for a moment, that all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs, the argument as to coercion is shown to be more rhetoric than fact.

*Id.* at 211. No, the States' case here is one where a State could face the loss of *all* ARPA COVID-19 relief funds – up to the total the Defendants determine (with no clear or meaningful standards of review) "indirectly" offset State tax cuts – if a State does not bend its knee to Congress's tax policy demands. That is hardly the "mild encouragement," allowed in *South Dakota v. Dole*. *Id.* No, *Dole* teaches that congressional *encouragement* to States is permissible. Sovereignty-melting *compulsion* is not.

## III.    The Tax Mandate Is Unconstitutional Either as an Invalidly Ambiguous Condition or as an Unambiguous, Compulsory Encroachment Upon the States' Sovereignty.

The Supreme Court "ha[s] required that if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their

participation.'" *South Dakota v. Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch.*

*& Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

> There can, of course, be no knowing acceptance if a State is unaware
> of the conditions or is unable to ascertain what is expected of it.
> Accordingly, if Congress intends to impose a condition on the grant of
> federal moneys, it must do so unambiguously.

*Pennhurst*, 451 U.S. at 17 (emphasis added); *see Benning*, 391 F.3d at 1305–1307.

When Congress places conditions upon States receiving federal funds, the States'

duty, the thing it gives up in exchange for the money, must be clear. *See Edelman v.*

*Jordan*, 415 U.S. 651, 673–74 (1974); *Emps. of the Dep't of Pub. Health & Welfare*

*v. Dep't of Pub. Health & Welfare*, 411 U.S. 279 (1973). There is a reason that the

Chief Justice immediately followed his analysis by likening conditions on funds to

contracts, where both parties must know and ascertain that to which they agree, with

this:

> Respecting this limitation is critical to ensuring that Spending Clause
> legislation does not undermine the status of the States as independent
> sovereigns in our federal system. That system "rests on what might at
> first seem a counterintuitive insight, that 'freedom is enhanced by the
> creation of two governments, not one.'["] For this reason, "the
> Constitution has never been understood to confer upon Congress the
> ability to require the States to govern according to Congress'[s]
> instructions. Otherwise the two-government system established by the
> Framers would give way to a system that vests power in one central
> government, and individual liberty would suffer.

*NFIB*, 567 U.S. at 577 (internal citations and quotations omitted). States *must* be

recognized as the sovereign governments that they are. Congress's use of an

amorphous term like "indirectly" – and the Defendants' apparent desire to exploit States reeling from the pandemic and to micromanage their tax policies – disrespects States' sovereignty, mocks federalism, and injures each Plaintiff State.

As explained below, since "the conditions imposed by Congress must be unambiguous," *Benning*, 391 F.3d at 1305, the Tax Mandate is unconstitutional, for if the Defendants contend it is unambiguous, then it concedes the provision commandeers the States' sovereignty.

To surmount the obstacle of unambiguity, Defendants must contend and show that the Tax Mandate is unambiguous – that is, that what the States are agreeing to give up in exchange for the ARPA funds is clear. If Defendants argue that it is, in fact, clear, then they concede that Congress purported to grant the National Government the authority to prevent a recipient State, like Oklahoma, for example, from lowering its State taxes. This would include an admission that the "directly, or indirectly" clause does, in fact, clearly incorporate the "money is fungible" principle, and as such, a recipient State's action to lower its State taxes would be viewed as being indirectly offset by ARPA funds, and hence, prohibited by the Tax Mandate.

The addition of "indirectly" to the Tax Mandate prohibition certainly does, as the States contend, appear broad in scope – broad enough to sweep in seemingly any

connection that is not direct.[5] In this scenario, receiving the ARPA funds would impose upon a State the National Government's tax policy preferences for that State – which is apparently that taxes should not be lowered. If a State reduced its State taxes in a manner that reduced that State's revenue in an amount up to the sum of ARPA funds received by that State, the National Government's position could be that the State offset those reductions with the ARPA funds, and would view that as a violation of the Tax Mandate. It could even move to seize those ARPA funds back from the State. The ARPA's Tax Mandate is certainly ambiguous enough to allow that action by Defendants. If Defendants do not forswear this interpretation, then Defendants concede the very injurious usurpation of State sovereignty of which the States complains If Defendants claim the Tax Mandate is unambiguous, and gives Defendants the power to prohibit recipient states from lowering their own taxes, this is not just "a 'power akin to undue influence.'" *NFIB*, 567 U.S. at 578 (quoting *Steward Mach. Co.*, 301 U.S. at 590), this would be *actual* undue influence.

On the other hand, if Defendants argue that ARPA's Tax Mandate does *not* prohibit recipient States, like Oklahoma, from lowering taxes, then Defendants must identify language in the Tax Mandate that forecloses this possibility. Otherwise, this Court is left with the ambiguity created by two inconsistent interpretations of

---

[5] Black's Law Dictionary defines "indirect" like this: "A term almost always used in law in opposition to 'direct.'" Indirect, *Black's Law Dictionary* (11th ed. 2019). Thus, if a thing is indirect, it is anything that is not direct.

"indirectly," one that accords with common usage ("indirectly" means anything that is not direct and encompasses fungibility) and one that proposes an arbitrary limit on meaning ("indirectly" does not encompass fungibility). Two such conflicting views of the inherently ambiguous term "indirectly," and indeed, the very existence of this lawsuit, and the other lawsuits brought elsewhere by Ohio, Kentucky and Tennessee, Missouri, and Arizona, bear witness to the ambiguity of the Tax Mandate.

Even assuming the Department of Treasury's interpretation is reasonable (which is questionable), this would not help. As the Eleventh Circuit has recognized, "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation." *Lindley v. FDIC*, 733 F.3d 1043, 1055 (11th Cir. 2013) (quoting *Medical Transp. Mgmt. Corp. v. Comm'r*, 506 F.3d 1364, 1368 (11th Cir. 2007); *see Lowe v. Bowers (In re Nicole Gas Prod.)*, 916 F.3d 566, 574 (6th Cir. 2019); *In re ACF Basin Water Litig.*, 467 F. Supp. 3d 1323, 1331 (N.D. Ga. 2020) (finding statute "is ambiguous, as it is susceptible to more than one reasonable interpretation"). Likewise, as this Court has recognized, "[a] contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *Madison Cty. v. Evanston Ins. Co.*, 340 F. Supp. 3d 1232, 1271 (N.D. Ala. 2018) (internal citation and quotations omitted). Further, it is axiomatic that ambiguous terms in contracts – which is the relevant context against which to assess congressional conditioning of funds – are

typically construed against the drafter. *See Ohio Cas. Ins. Co. v. Holcim (US), Inc.*, 744 F. Supp. 2d 1251, 1260 (S.D. Ala. 2010) (Under Alabama law, where a contract is the not the product of arms-length negotiations between parties represented by counsel, "any ambiguity must be construed against the drafter of the contract.").

Moreover, adopting an interpretive rule that "indirectly" does not include fungibility itself opens up further ambiguity: what precisely marks the boundaries of "fungibility"? If a State allots a portion of ARPA funds to a program that previously derived most of its funding from tax revenues, and those gross revenues have dropped because of state tax cuts, is the tax cut still protected, or is this a forbidden use of ARPA funds for tax cuts? And if allotting ARPA funds to areas where shortfalls in part derive from tax cuts is permissible, then does the Tax Mandate do anything other than forbid distribution of ARPA funds as tax refunds?

From the States' and *amici*'s viewpoint, what does the addition of "indirectly" encompass if not fungibility, an economics and accounting principle as old as money itself. But, if the Defendants contend that "indirectly" does not include fungibility, then what does "indirectly" mean? The ambiguity would be undeniable. Truly, a State "is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17. An ambiguous condition violates the conditioning doctrine, as the Supreme Court and the Eleventh Circuit have recognized.

In either event, regardless of which path Defendants choose to take, the Tax Mandate is invalid as either (1) coercion and compulsion destroying the States' sovereign right to decide their own tax policy in violation of the anticommandeering doctrine, or (2) an impermissibly ambiguous rule in violation of the conditioning doctrine. In either event, the Tax Mandate is unconstitutional.

## CONCLUSION

To be sure, Congress enjoys a wide lane to spend and effectuate policy for the National Government – and even to set certain limited conditions on the States' acceptance of funds. But here, Congress went too far. For these reasons, and others outlined by the States in their Motion [Doc. # 21] and Complaint [Doc. # 1], *amici* ACLJ and Seventy-Eight (78) Members of Congress urge this Court to grant the States' motion and enjoin enforcement of ARPA's Tax Mandate.

April 30, 2021.                              Respectfully submitted,

s/ *Michael L. Jackson*
MICHAEL L. JACKSON*                    JAY ALAN SEKULOW**
Wallace, Jordan, Ratliff & Brandt, LLC     *Counsel of Record*
P.O. Box 530910                              STUART J. ROTH**
Birmingham, AL  35253                    ANDREW J. EKONOMOU**
Telephone: (205) 870-0555               JORDAN SEKULOW**
Facsimile: (205) 871-7534                BENJAMIN P. SISNEY**
Email: mjackson@wallacejordan.com   AMERICAN CENTER FOR LAW & JUSTICE
*Local Counsel for Amici Curiae*          201 Maryland Avenue, NE
                                             Washington, DC 20002
                                             Tel.: 202-546-8890
                                             Email: sekulow@aclj.org
                                                      bsisney@aclj.org
                                             *Counsel for Amici Curiae*

*Admitted to practice before this Court
** Not admitted to practice before this Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of April, 2021, the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing and was transmitted to those individuals receiving Notice of Electronic Filings in this matter.

/s/ *Michael L. Jackson*
MICHAEL L. JACKSON
Wallace, Jordan, Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, AL  35253
Telephone: (205) 870-0555
Facsimile: (205) 871-7534
Email: mjackson@wallacejordan.com
*Local Counsel for Amici Curiae*