FILED

2021 May-07  PM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

STATE OF WEST VIRGINIA, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF THE
TREASURY, *et al.*,

        Defendants.

Case No. 7:21-cv-00465-LSC

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND...................................................................................5

    A.    Statutory Background ..............................................5

    B.    Factual and Procedural Background.......................8

LEGAL STANDARDS................................................................8

ARGUMENT....................................................................9

I.     Plaintiffs Lack Article III Standing.....................................9

II.    Plaintiffs are Not Likely To Succeed on the Merits.........................15

    A.    Congress validly exercised its Spending Clause authority to restrict the use of Rescue Plan funds...................16

    B.    The Rescue Plan is not coercive ..............................21

    C.    The Rescue Plan provides clear notice of the funding condition.............................................26

III.   The Balance Of Harms And The Public Interest Preclude a Preliminary Injunction.........................................29

IV.   Any Injunctive Relief Should Be Limited to Plaintiffs. ....................32

CONCLUSION ........................................................................33

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ...............................................................14

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ...........................................................13

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ..............................................11

*ACLU of Ky. v. McCreary Cnty.*,
   354 F.3d 438 (6th Cir. 2003) ..................................................30

*Alaska v. U.S. Dep't of Transp.*,
   868 F.2d 441 (D.C. Cir. 1989) ................................................13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982) ...............................................................13

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ...............................................................27

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ...............................................................13

*Babbitt v. Farm Workers*,
   442 U.S. 289 (1979) ..........................................................9, 11

*Bennett v. Kentucky Department of Education*,
   470 U.S. 656 (1985) ..............................................19, 25, 27, 28

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004) ........................................19, 28

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019) ...........................................................16

*Charles v. Verhagen,*
   348 F.3d 601 (7th Cir. 2003) ...........................................................28

*Citizens Bank of Md. v. Strumpf,*
   516 U.S. 16 (1995)...........................................................................17

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019).........................................................26

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
   527 U.S. 666 (1999) ...............................................................15, 25

*Cunningham v. Adams,*
   808 F.2d 815 (11th Cir. 1987)..........................................................31

*Cutter v. Wilkinson,*
   423 F.3d 579 (6th Cir. 2005) ...........................................................28

*Daimler Chrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) .........................................................................33

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999) .........................................................................28

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .........................................................15, 19, 23, 25

*Fac. Senate of Fla. Int'l Univ. v. Winn,*
   616 F.3d 1206 (11th Cir. 2010).........................................................14

*Georgia v. Pruitt,*
   326 F. Supp. 3d 1356 (S.D. Ga. 2018)..............................................13

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018)......................................................................33

*Greater Birmingham Ministries v. Alabama,*
   161 F. Supp. 3d 1104 (N.D. Ala. 2016)..............................................9

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*
   959 F.3d 178 (5th Cir. 2020) ...........................................................23

*Hobson v. Fischbeck,*
   758 F.2d 579 (11th Cir. 1985)................................................................30

*J.R. v. Hansen,*
   803 F.3d 1315 (11th Cir. 2015)............................................................16

*Jackson v. Birmingham Bd. of Educ.,*
   544 U.S. 167 (2005) ...........................................................................28

*Kansas v. United States,*
   214 F.3d 1196 (10th Cir. 2000)............................................................21

*Kansas v. United States,*
   249 F.3d 1213 (10th Cir. 2001)............................................................13

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 9, 13

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ...........................................................................33

*Marks v. United States,*
   430 U.S. 188 (1977) ...........................................................................23

*Maryland v. King,*
   567 U.S. 1301 (2012) ..............................................................4, 7, 13, 32

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ...........................................................................13

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) .......................................................................12, 13

*Mayhew v. Burwell,*
   772 F.3d 80 (1st Cir. 2014)...............................................................20, 23

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002).............................................................28

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ...........................................................................29

*Miss. Comm'n on Env't Quality v. EPA*,
  790 F.3d 138 (D.C. Cir. 2015) ...............................................................23

*Munaf v. Geren*,
  553 U.S. 674 (2008) ...................................................................................9

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ....................................................................... *passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) .................................................................................14

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990).............................................................29

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) ...............................................................................32

*New York v. United States*,
  505 U.S. 144 (1992) ...........................................................19, 23, 25, 26

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................9

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
  330 U.S. 127 (1947) .................................................................................18

*Pennhurst State School & Hospital v. Halderman*,
  451 U.S. 1 (1981)...............................................................................26, 28

*Pub. Serv. Comm'n of Utah v. Wycoff Cnty.*,
  344 U.S. 237 (1952) .................................................................................15

*Rimini St., Inc. v. Oracle USA, Inc.*,
  139 S. Ct. 873 (2019) ...............................................................................17

*Rosen v. Cascade Int'l, Inc.*,
  21 F.3d 1520 (11th Cir. 1994)..................................................4, 29, 30, 32

*S.C. Dep't of Educ. v. Duncan*,
  714 F.3d 249 (4th Cir. 2013) .................................................................21

v

*Sabri v. United States*,
   541 U.S. 600 (2004) ........................................................................18, 22

*Sampson v. Murray*,
   415 U.S. 61 (1974) .................................................................................31

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000)..................................................4, 29, 30, 31

*Steward Mach. Co. v. Davis*,
   301 U.S. 548 (1937) ......................................................... 22, 23, 25

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .......................................................................... 9, 11

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020).............................................................8, 9

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020)...............................................................9

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................13

*Trump v. New York*,
   141 S. Ct. 530 (2020) ............................................................................14

*U.S. Nutraceuticals, LLC v. Cyanotech Corp.*,
   769 F.3d 1308 (11th Cir. 2014)...............................................................10

*United States v. Morrison*,
   529 U.S. 598 (2000) ..............................................................................16

*United States v. Oakland Cannabis Buyers' Coop.*,
   532 U.S. 483 (2001) ................................................................................4

*United States v. Rivera*,
   613 F.3d 1046 (11th Cir. 2010)...............................................................14

*Van Wyhe v. Reisch*,
   581 F.3d 639 (8th Cir. 2009) ..................................................................28

*Voisine v. United States*,
  136 S. Ct. 2272 (2016)................................................................17

*Walters v. Nat'l Ass'n of Radiation Survivors*,
  468 U.S. 1323 (1984) ...............................................................32

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................29

**STATUTES**

20 U.S.C. § 241e .........................................................................20

42 U.S.C. § 801............................................................................5

42 U.S.C. § 802.............................................................. *passim*

42 U.S.C. § 803............................................................................5

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-137, 134 Stat. 281 (2020) (codified at 42 U.S.C. § 801).......5

American Rescue Plan Act,
  Pub. L. No. 117-2, 135 Stat. 4 (2021) ....................................1, 5

**U.S. CONSTITUTION**

U.S. Const. art. I, § 8 ...............................................................15

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ...................................17

Office of Information and Regulatory Affairs, Office of Management &
  Budget, Regulatory Review Status,
  https://www.reginfo.gov/public/do/eoDetails?rrid=166315............7, 8

Treasury Statement on State Fiscal Recovery Funds and Tax
    Conformity (Apr. 7, 2021),
    https://go.usa.gov/xHW6R ..................................................................7

Yellen Ltr. to State Attorneys General (Mar. 23, 2021),
    https://go.usa.gov/xHW65 ..................................................................7

## INTRODUCTION

As part of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. Congress gave States considerable flexibility to use these new federal funds, which may be directed to a broad variety of state efforts to respond to the public health emergency created by the COVID-19 pandemic and to its economic effects, including by funding state-level government services and by providing assistance to households, small businesses, and industries. *Id*. § 802(c). To ensure that the new federal funds would be used for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *Id*. § 802(c)(2)(A) (the "offset provision"). That is a straightforward exercise of Congress's well-settled Spending Clause authority to attach conditions that "preserve its control over the use of federal funds." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) [hereinafter "NFIB"] (plurality opinion).

In seeking a preliminary injunction, the 13 Plaintiff States argue that this provision is unconstitutionally "coercive" because it "abrogate[s]" the States' "sovereign tax authority." Mem. in Supp. of Prelim. Inj. ("PI Mot.") 10, ECF No. 21. Plaintiffs' motion, however, suffers from multiple jurisdictional defects and rests on a fundamental misunderstanding of both the challenged statute and the governing law.

First, the challenged statute. By its plain text, the offset provision addresses only a reduction in a State's "*net* tax revenues." 42 U.S.C. § 802(c)(2)(A) (emphasis added). A State is thus free to change its tax law as it believes appropriate, cutting some taxes and increasing others. And even

if a State chooses to make changes that result in a reduction in net tax revenue, the Act bars a State only from using Rescue Plan funds — as opposed to other means — to offset that reduction. *Id.* The Act also makes clear that if a State chooses to use Rescue Plan funds to offset a reduction in net tax revenue resulting from changes in state law, the only consequence would be a loss of monies commensurate with the amount of federal funding used for that offset. *See id.* § 802(e).

Second, the law. As an initial matter, Plaintiffs lack Article III standing because they have not enacted *any* tax cut, let alone alleged that any hypothetical tax cut under consideration will decrease net tax revenue or that Plaintiffs plan or intend to use Rescue Plan funds to offset that theoretical reduction. Because Plaintiffs have not alleged any intention to use the federal funds in a way not permitted under the Act, they lack standing to challenge the offset provision. Relatedly, the States' challenge is not ripe. The only consequence of Plaintiffs using Rescue Plan funds to pay for a reduction in net tax revenue would be potential recoupment of the amount of Rescue Plan funds used for an impermissible offset. Because Plaintiffs have not alleged conduct that could result in recoupment, and the Treasury Department has not indicated any imminent plans to recoup from the Plaintiff States, their claims are not ripe. Particularly given the extraordinary nature of Plaintiffs' request for pre-enforcement injunctive relief based on the purported unconstitutionality of a federal statute, it is especially critical to ensure that they have satisfied the jurisdictional prerequisites for this suit.

Nor are Plaintiffs likely to succeed on the merits. Federal statutes that place conditions on how a State can use federal funds are commonplace and present no constitutional concern. Such provisions reflect the common-sense proposition that when Congress gives money to States for a particular

purpose, it may place conditions on a State's acceptance of the funds to ensure that the funds are in fact used for the intended purpose. The Rescue Plan allows States to deploy the considerable funds provided for a broad array of purposes related to the COVID-19 pandemic and its effects. Congress acted well within constitutional bounds by conditioning the receipt of Rescue Plan funds on the State's agreement to use funds for those purposes and not to offset a reduction in net tax revenue resulting from changes in state law.

The Supreme Court's decision in *NFIB* underscores Plaintiffs' misunderstanding of the governing law. In the controlling opinion of *NFIB*, the Chief Justice concluded that Congress could not require a State to extend Medicaid coverage to a new population on penalty of losing its whole allotment of *preexisting* Medicaid funding. *See* 567 U.S. at 585. By contrast, the Chief Justice made clear that it was entirely permissible for Congress to make the *new* federal funds provided by the Affordable Care Act—totaling $100 billion per year, *see id.* at 576—contingent on a State's expansion of coverage to categories of people never previously covered by its plan, *see id.* at 585.

Unlike the condition held invalid in *NFIB*, the Rescue Plan does not threaten States with the loss of preexisting funds if they fail to undertake new services. The condition here governs only the State's use of the *new* funds provided by the Act, and there is no threat to preexisting funds if States decline the Rescue Plan's generous outlay of federal money. Indeed, the Rescue Plan's offset provision is far less restrictive than the ACA provision that *NFIB* indicated was permissible. In addition to placing only new conditions on new funds, the Rescue plan—unlike the provision at issue in *NFIB*—does not put States to an all-or-nothing choice. If a State receiving funds under the Act chooses to reduce its net tax revenue and offset that

reduction with Rescue Plan funds, its federal grant would be reduced only to the extent it uses Rescue Plan funds to offset that reduction.

Plaintiffs also cannot demonstrate likely irreparable harm, a showing that is indispensable for a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000) (en banc). Even if Plaintiffs were able to establish a cognizable injury for purposes of standing, they do not come close to demonstrating irreparable harm. Indeed, their motion describes the bulk of their alleged harm as "long-term," not imminent. PI Mot. 28. And if Plaintiffs were to accept the conditioned funding, use that funding to offset a reduction in net tax revenue, and face potential recoupment by the Secretary, any such recoupment proceedings would present an "adequate remedy at law" where they could fully present defenses and objections. *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994). Even if Plaintiffs were unable to succeed in such hypothetical future proceedings, the result would simply be repaying money—the quintessential example of harm that is *not* irreparable—demonstrating beyond doubt that the States are not entitled to the extraordinary remedy of injunction at this stage. *See id.*

By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasizing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation") (quotation marks omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)). Plaintiffs' motion should be denied.

## BACKGROUND

### A.    Statutory Background

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  *See* Pub. L. No. 116-137, § 5001, 134 Stat. 281, 501 (2020) (codified at 42 U.S.C. § 801).  The CARES Act established a $150 billion "Coronavirus Relief Fund" for States, tribal governments, and localities for 2020.  *See* 42 U.S.C. § 801(a).  That fund covers costs that are "necessary expenditures incurred due to the public health emergency" that "were not accounted for in the budget[s]" of those governments.  *Id.* § 801(d). If recipients do not use the funds for the permitted purposes, the Act permits the Treasury Department to recoup the amount of any misused funds.  *Id.* § 801(e).

On March 11, 2021, Congress enacted the American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805).  The Rescue Plan establishes an additional "Coronavirus State Fiscal Recovery Fund," allocating another $220 billion to broadly "mitigate the fiscal effects" of the pandemic on States, territories, and Tribal governments through 2024.  42 U.S.C. § 802(a)(1); *see id.* § 803(a) (additional $130 billion for localities). Nearly $200 billion is allocated for the States and the District of Columbia. *Id.* § 802(b)(2)(A).

The Rescue Plan provides States with considerable latitude, in scope and duration, to use the funds for pandemic-related purposes.  Through 2024, a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1).  While CARES Act funds were limited to covering previously unbudgeted costs of necessary expenditures incurred due to the public health emergency, the Rescue Plan allows States to use the funds for "government services" to the extent the pandemic has resulted in a "reduction in revenue." *Id.* § 802(c)(1)(C).  The Rescue Plan also permits recipients to use the funds to respond broadly to the public-health emergency and its negative economic effects, to support essential workers during the pandemic, and to invest in certain infrastructure areas.  *Id.* § 802(c)(1)(A), (B), (D).

The Rescue Plan includes two "further restrictions" to ensure that the broad outlay of funds is used for the identified purposes while funds are available.  42 U.S.C. § 802(c)(2).  One limitation (not challenged here) provides that a State may not "deposit" Rescue Plan funds "into any pension fund."  *Id.* § 802(c)(2)(B).  The other limitation (at issue here) provides in relevant part that a State:

shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of

6

such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).[1]

By its terms, this funding condition applies only to reductions in "net" tax revenue. *Id.* This limitation on the use of federal funds is not implicated at all by a State's choice to modify its tax code—including by cutting taxes—if the changes, taken together, do not result in a reduction of *net* tax revenue. If a State chooses to reduce its net tax revenue, it may not use the Rescue Plan funds to "offset" that reduction. If a State chooses to do so, the State will be required to repay only the amount of funds used to offset the "reduction to net tax revenue" or "the amount of funds received," whichever is less. 42 U.S.C. § 802(e).

The Rescue Plan further authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). Although the Secretary has provided some initial guidance, the Treasury Department has not yet issued its implementing regulations. *See* Yellen Ltr. to State Attorneys General (Mar. 23, 2021), https://go.usa.gov/xHW65; Treasury Statement on State Fiscal Recovery Funds and Tax Conformity (Apr. 7, 2021), https://go.usa.gov/xHW6R. And the Secretary will provide further guidance imminently through an interim final rule. *See* Office of Information and Regulatory Affairs, Office of Management & Budget, Regulatory Review Status (last visited April 30,

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1).

2021), https://www.reginfo.gov/public/do/eoDetails?rrid=166315.  Once the Treasury Department issues the regulations, a State may receive federal funds after providing a certification (in a form the agency will provide) indicating that it needs the funds to carry out the activities specified in § 802(c) and that it will use the funds in compliance with that provision.  42 U.S.C. § 802(d)(1).  States that receive funds must then provide periodic reports and other information as the Secretary may require to administer the Act.  *Id.* § 802(d)(2).

### B.    Factual and Procedural Background

On March 31, 2021, 13 States brought this suit alleging that the offset provision of § 802(c)(2)(A) is unconstitutional.  Compl. ¶¶ 1–5, ECF No. 1. West Virginia, Alabama, Arkansas, and Kansas expect to receive between $1 billion and $2.5 billion under the Rescue Plan.  *Id.* ¶¶ 45–56.  There is little information about the remaining nine state Plaintiffs, except that they "anticipate receiving similar amounts."  *Id.* ¶ 57.  Plaintiffs nowhere allege that they have enacted changes in state law during the covered period that would reduce net tax revenue, or that they intend to use Rescue Plan funds to offset any hypothetical reduction in net tax revenue.  *See generally id.* ¶¶ 1–131. Plaintiffs nonetheless request immediate relief to enjoin "enforcement of" the offset provision. *See* PI Mot. 30.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020) (citations omitted).  "In order to obtain one," Plaintiffs "must establish four separate requirements": (1) they have "a substantial likelihood of success on the merits"; (2) "irreparable injury will be suffered unless the injunction issues"; (3) "the threatened injury to the movant[s] outweighs whatever damage the

proposed injunction may cause the opposing party"; and (4) "if issued, the injunction would not be adverse to the public interest." *Id.* (citation omitted). Where, as here, "the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain*, 958 F.3d at 1091 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And Plaintiffs can only obtain the "extraordinary and drastic remedy" of a preliminary injunction if they "clearly carr[y] the burden of persuasion" on all the prerequisites. *Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104, 1113 (N.D. Ala. 2016) (Coogler, J.) (citations omitted).

## ARGUMENT

### I.   PLAINTIFFS LACK ARTICLE III STANDING.

In assessing the Plaintiff States' request for preliminary relief, this Court must determine whether they have established jurisdiction, including Article III standing. *Munaf v. Geren*, 553 U.S. 674, 691 (2008). To satisfy the "irreducible constitutional minimum" of standing, the States must first demonstrate "a concrete and particularized" injury in fact that is "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation omitted). When a plaintiff seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see id.* at 161–67 (analyzing the three elements separately). In other words, the prospect of enforcement must be "sufficiently imminent" to create a concrete injury. *Id.* at 159.

Plaintiffs cannot meet that standard because their asserted injuries are hypothetical and speculative.  The complaint and preliminary-injunction motion are silent as to how the States intend to use Rescue Plan funds, nowhere even suggesting that they plan to use them in a manner inconsistent with the offset provision.  Under that provision, a State may not use the new federal funds to offset a reduction in net tax revenue that results from changes in state law.  42 U.S.C. § 802(c)(2)(A).  But the Plaintiffs do not allege that any State has enacted any tax cuts, let alone tax cuts that would (taken together with any tax increases) reduce net tax revenue.  Although the States list a number of tax changes that are under consideration, Compl. ¶¶ 76–83, they do not allege or even hint that any State intends to use Rescue Plan funds to offset any reductions in its net tax revenue that might result from any changes a State ultimately chooses to adopt.  The States are "the proverbial master of [their] complaint" and must take responsibility for the allegations included — or not included — therein.  *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1314 (11th Cir. 2014) (holding that a complaint cannot be "rewritten to include allegations [that plaintiffs] did not mention").

Indeed, the States' allegations about injury demonstrate the hypothetical and speculative nature of their suit.  *See, e.g.*, PI Mot. 14 ("*If* the best interpretation is that the [offset provision] covers *every* change . . . then Congress passed a statute with startling breadth . . . ." (emphasis added)); PI Mot. 29 (describing potential state tax law changes as "unknown" at this time); Compl. ¶¶ 63, 66 (arguing that the statute is "open to speculation" or "interpretation"); *id.* ¶¶ 67–68 ("A State *may* not know" offset provision's impact for some time and eventually "*could* be penalized." (emphases added)); *id.* ¶¶ 75, 77, 86, 91 (relying on similar uncertainties, rather than any impending harm); PI Mot. 6 (same).  "The allegation of standing requires

specification, not imagination," so Plaintiffs' mere theories of possible harm do not suffice. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1197 (11th Cir. 2009).

The State legislatures' various tax-reduction proposals do not strengthen the Plaintiffs' position. *See* PI Mot. 6. The States do not even contend either that those tax-law propsals will decrease net tax revenue or that any State intends to use Rescue Plan funds to offset such hypothetical reductions. *See, e.g.*, Compl. ¶ 77 ("It is not clear whether these changes would run afoul of the [offset provision].").[2] Merely proposing a tax cut is *not* itself the "course of conduct arguably affected with a constitutional interest" and "proscribed by a statute" required for pre-enforcement standing. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). Nor is adopting a tax cut on its own. The offset provision restricts only a State's using Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law; it does not prohibit the proposal or adoption of any tax change on its own.

Unable to demonstrate that the Rescue Plan restricts any conduct that the Plaintiff States intend to undertake, let alone that any recoupment is imminent, the States assert a general intrusion on their "sovereign interests." Compl. ¶ 9; *see* PI Mot. 27–29. In doing so, Plaintiffs fundamentally misunderstand the Rescue Plan. The Act provides States with a broad outlay of

---

[2] Nor would the 2018 Iowa tax law, as described in the complaint, violate the offset provision. *See* Compl. ¶ 79. Any reduction in net tax revenue resulting from the changes "required" if "certain triggers based on the level and growth of net general fund revenues" from the 2018 law are met, *id.*, would be "resulting from a change in law" *before* the offset provision's "covered period," not "*during* the covered period." 42 U.S.C. § 802(c)(2)(A); *see supra* Note 1 (covered period begins March 3, 2021). And any amendment to the 2018 tax law during the covered period has not occurred, may not reduce net tax revenue, and may never be offset by Rescue Plan funds.

federal funds and considerable flexibility in how to use those funds to ad-
dress needs related to the pandemic and its effects.  But to ensure that the
new federal funds are used for those purposes and not others Congress
chose not to support, the Act requires a State to agree that it will not use the
federal funds to offset a reduction in net tax revenue resulting from changes
in state law.  The Rescue Plan does not prohibit a State from cutting taxes; it
merely restricts a State's ability to use *federal funds* distributed under the Res-
cue Plan to offset a reduction in net tax revenue.  No State has a sovereign
interest in using federal funds for that purpose.  And each State, of course,
remains free to decline the funds.

Plaintiffs' reliance on their sovereign taxation authority also cannot be
reconciled with the Supreme Court's decision in *Massachusetts v. Mellon*,
which made clear that Article III jurisdiction is not satisfied by raising "ab-
stract questions . . . of sovereignty."  262 U.S. 447, 485 (1923).  There, Con-
gress had enacted through the Spending Clause a maternity program that
permitted States to accept funding to protect the health of mothers and in-
fants and provided that violating the program's conditions could result in
the withholding of funds.  *Id.* at 478–79, 484-85.  Massachusetts brought suit,
alleging that the statute "imposed upon the [S]tates an illegal and unconsti-
tutional option either to yield to the federal government a part of their re-
served rights or lose their share of the moneys appropriated."  *Id.* at 482.  The
Supreme Court held that the State's "naked contention that Congress has
usurped the reserved powers of the several [S]tates by the mere enactment
of the statute" was insufficient to establish an Article III case or controversy.
*Id.* at 483.  Instead, the Court held that Massachusetts was required to allege
that a sovereign interest was "actually invaded or threatened" by "the actual
or threatened operation of the statute," *id.* at 485 — precisely what Plaintiffs

have failed to demonstrate here.  The States relatedly claim injury to their "'power to create and enforce a legal code'" and "secur[e] observance of the terms under which [they] participate[] in the federal system."  Compl. ¶¶ 9–10 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601, 608 (1982)); *see* PI Mot. 27–28 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)).  But, as noted, Plaintiffs have not alleged any plan to use Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law, and even then, only federal money — not state power — would be at stake.

The other authorities that the States cite to establish a cognizable injury only underscore its absence here.  *See* PI Mot. 27.  Several decisions addressed concrete injuries, not present here, to state interests. *See Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) ("financial loss"); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (territorial interests); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (territorial interests). Other decisions addressed whether a defined state statute had been preempted by federal law, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989), or standing premised on a "procedural right" not alleged here, *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).  As discussed, no similar potential invasion of a state legislative prerogative is implicated here. *See Lujan*, 504 U.S. at 566 ("Standing is not an ingenious academic exercise in the conceivable," but rather requires "a factual showing of perceptible harm." (citation omitted)).

For similar reasons, even if the Plaintiff States had Article III standing, their challenge to the offset provision would not be ripe.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)).

Plaintiffs' claimed harm here rests on the potential recoupment of some Rescue Plan funds from the States. *See* PI Mot. 12, 17. Their motion even describes the bulk of their alleged harms as "long-term." PI Mot. 28. But "this kind of uncertain sanction is not ripe for [] judicial review." *United States v. Rivera*, 613 F.3d 1046, 1050 (11th Cir. 2010); *accord Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam). Congress has authorized the Treasury Department "to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). Once the agency issues those regulations, the States would need to submit certifications that they plan to accept Rescue Plan funds, receive those funds from the Treasury Department, and enact changes in state tax laws that might implicate the offset provision. Even then, only if a State's net tax revenues fell, and only if that State decided to use Rescue Plan funds to offset that reduction, would recoupment even be possible.

There must be some "concrete action applying [Treasury's] regulation to [a State's] situation in a fashion that harms or threatens to harm [it]" before prematurely adjudicating its challenge. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *see Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1209 n.8 (11th Cir. 2010) ("[A] final conclusion on that issue can await a post-enforcement, as-applied challenge on a less speculative record than exists here."). Particu-

larly given the extraordinary nature of the Plaintiffs' request for a pre-enforcement preliminary injunction based on the purported unconstitutionality of a federal statute, it is especially critical to ensure that the jurisdictional prerequisites for this suit are satisfied. *See Pub. Serv. Comm'n of Utah v. Wycoff Cnty.*, 344 U.S. 237 (1952).

## II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

On the merits, Plaintiffs have not come close to demonstrating that Congress exceeded the bounds of its Spending Clause authority. The Constitution empowers Congress to raise and spend revenue to "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress "may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686–87 (1999); *NFIB*, 567 U.S. at 576; *Dole*, 483 U.S. at 207.

Congress's Spending Clause authority is subject to certain limitations. Congress must use this power in pursuit of "the general welfare" and ensure that its "conditions on the receipt of federal funds" are related to the federal interest. *Dole*, 483 U.S. at 207. Spending Clause conditions also must not violate "other constitutional provisions" or, in certain circumstances, be "coercive." *Id.* at 208, 211. Finally, Congress's "desire[] to condition the States' receipt of federal funds" must be unambiguous. *Id.* at 207.

In this case, Plaintiffs contend that the offset provision exceeds these limitations and therefore is not a valid exercise of Congress's Spending Clause authority and violates the Tenth Amendment. PI Mot. 8–28. As noted above, Plaintiffs do not claim that any particular state enactment will

lead to recoupment; Plaintiffs instead challenge the condition as a facial matter. The States therefore bear a significant burden to demonstrate that the offset provision is "unconstitutional in all its applications": they "must show that there is no set of circumstances under which the law would be valid." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *J.R. v. Hansen*, 803 F.3d 1315, 1320 (11th Cir. 2015) (citation omitted); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). And in evaluating the Act's facial constitutionality, "[d]ue respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). Here, Congress has validly exercised its Spending Clause authority, and Plaintiffs' contentions have no merit.

### A. Congress validly exercised its Spending Clause authority to restrict the use of Rescue Plan funds.

The Rescue Plan is a lawful exercise of Congress's Spending Clause authority. Designed to assist in the Nation's economic recovery during and following a pandemic, the Rescue Plan appropriates nearly $200 billion in new federal funding for States and the District of Columbia. 42 U.S.C. § 802(b)(2)(A), (c)(1). With that funding, States have considerable flexibility to "mitigate the fiscal effects" of the COVID-19 pandemic as they see fit within the broad parameters specified by Congress. *Id.* § 802(a)(1), (c)(1). Unsurprisingly, Congress sought to ensure that its monetary outlay would be used as intended. To that end, it included a guardrail that prohibits States that choose to accept the federal money from using those funds to "directly or indirectly offset a reduction" in "net tax revenue" resulting from changes in state law. *Id.* § 802(c)(2)(A).

The offset provision is, by any measure, a modest restriction on an otherwise generous outlay of federal funds.  By its plain terms, the offset provision applies only when a State uses Rescue Plan funds to "offset" a reduction in "net" tax revenue resulting from changes in state law.  *Id.*  That restriction is not implicated if reductions in some taxes are balanced with increases in others because no "net" tax revenue reduction would then occur.  A State also does not transgress the limitation if it does not "use" Rescue Plan funds to "offset" a reduction in net tax revenue.  *Id.*  The term "use" connotes "volitional" "active employment" of federal funds.  *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016).  And the term "offset" means "[t]o balance" or "compensate for."  Offset, Black's Law Dictionary (11th ed. 2019).  Contrary to Plaintiffs' suggestion, PI Mot. 12–13, the Act's reference to States "directly or indirectly" offsetting a reduction in net tax revenue does not alter the statutory meaning.  Both "directly" and "indirectly" are adverbs that cannot "alter the meaning of the word" that they modify (here, "offset").  *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019).  It remains the case that the statute restricts only the use of Rescue Plan funds to offset reductions in net tax revenue resulting from changes in state law, not every tax reduction.  If Congress had sought to prohibit *every* reduction in taxes, PI Mot. 14, it could have said so explicitly and concisely.

Taken together, the offset provision's language simply ensures that States are not employing federal funds to finance state tax cuts that decrease net tax revenue.  *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (describing "offset" as balancing out a specific loss with another specific gain).  For example, assuming no other changes, a State could not receive $2 billion in Rescue Plan funds, cut its income tax by an amount equal to $2 billion, and use the Rescue Plan funds to offset the revenue loss.  That would

be using Rescue Plan Funds to "directly" offset a reduction in net tax revenue.  42 U.S.C. § 802(c)(2)(A).  Similarly, again assuming no other changes, a State could not use Rescue Plan funds to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had originally budgeted for that purpose to offset a $2 billion reduction in state income tax.  That would be using Rescue Plan Funds to "indirectly" offset a reduction in net tax revenue.  *Id.*  But States routinely offset reductions in net tax revenue by other means.  And even if a State impermissibly uses Rescue Plan funds to offset a reduction in net tax revenue, the consequence is proportional to the misuse: the State would be required to repay only the portion of the federal money it used to offset the reduction in net tax revenue (not to exceed the amount of the federal grant).  *Id.* § 802(e).

Congress has broad leeway in establishing permissible uses of federal funds.  And Congress has an overriding interest in ensuring that the new Rescue Plan funds will be used for the broad categories of state expenditures it identified and not others Congress chose not to support.  *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143 (1947) (explaining that Congress has the "power to fix the terms upon which its money allotments to [S]tates shall be disbursed").  This is evident from the offset provision itself, which is titled "[f]urther restriction on *use of funds*" and only applies to a State's "*use [of] the funds* provided under this section." 42 U.S.C. § 802(c)(2) (emphasis added).

Plaintiffs contend that the Rescue Plan's conditions on the use of funds are not related to the funding program.  PI Mot. 15–20.  But it is difficult to imagine how they could be *more* related to the funding program because

they specify the uses to which a State may and may not devote the federal funds. That sort of statutory condition is by definition "germane[]" because it ensures that federal funds are used for the public-health and economic-recovery "federal purposes" of the spending program. *Dole*, 483 U.S. at 207. Congress acted well within its Spending Clause authority by both describing broad categories of permissible uses and proscribing certain narrow uses. This more than satisfies the "minimal standard of rationality" required of Spending Clause legislation. *Benning v. Georgia*, 391 F.3d 1299, 1308 (11th Cir. 2004); *see New York v. United States*, 505 U.S. 144, 172 (1992) (finding funding conditions sufficiently related where "both the conditions and the payments embody Congress' efforts to address the pressing problem of radioactive waste disposal"); *Dole*, 483 U.S. at 208–09 (finding that the federal interest in a uniform drinking age was sufficiently germane to States' receipt of highway funds). The offset provision simply ensures that Rescue Plan funds "are spent according to [Congress's] view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580.

Other Spending Clause legislation illustrates that the Rescue Plan and its offset provision advance a valid federal purpose: provisions that require States to maintain their existing fiscal efforts as a condition of receiving federal funds are an uncontroversial and familiar exercise of Congress's spending power. In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Supreme Court explained that, "[i]n order to assure that federal funds would be used to support additional services that would not otherwise be available," the regulations implementing Title I of the Elementary and Secondary Education Act of 1965 "from the outset prohibited the use of federal grants merely to replace state and local expenditures." *Id.* at 659. After receiving complaints that Title I funds were nonetheless being

used to replace state and local funds that otherwise would have been spent for participating children, Congress amended Title I in 1970 to require that Title I funds be used "to supplement and, to the extent practical, increase the level of funds that would, in the absence of such federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter," and "in no case, as to supplant such funds from non-Federal sources." *Id.* at 660 (quoting 20 U.S.C. § 241e(a)(3)(B) (1970)). Federal auditors later found that certain Kentucky programs had violated that provision, and the Secretary of Education required Kentucky to repay the federal funds that had been misused. *Id.* at 661. The Supreme Court upheld that determination, explaining that the State "gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement." *Id.* at 663, 673–74.

In accord with the Supreme Court's decision, courts of appeals have applied and upheld similar provisions in an array of Spending Clause statutes. For example, in *Mayhew v. Burwell*, 772 F.3d 80, 82 (1st Cir. 2014), the First Circuit upheld the Affordable Care Act's requirement that States accepting Medicaid funds maintain their state-level Medicaid eligibility standards for children for a specified period. The Mayhew court held that this requirement "is constitutional, fitting easily within congressional spending power to condition federal Medicaid grants." *Id.*; *see also, e.g., S.C. Dep't of Educ. v. Duncan*, 714 F.3d 249, 252 (4th Cir. 2013) (describing provision in the Individuals with Disabilities Education Act, which generally requires the Secretary to reduce a State's grant by the amount the State has failed to maintain spending for special education for children with disabilities); *Kansas v.*

*United States*, 214 F.3d 1196, 1197 (10th Cir. 2000) (noting similar requirement in the Temporary Assistance to Needy Families program).

As these cases reflect, statutory provisions that limit federal funds from being used to displace state efforts are both common and undoubtedly within Congress's authority. In the cases discussed above, States were required to maintain a certain level of spending; the federal funds could not be used to displace existing State funding. Here, the Rescue Plan's offset provision is even less proscriptive: it does not mandate any particular spending or taxation level but instead merely prevents States from using federal funds to offset a reduction in net tax revenue. Although federal funding conditions are often specific to the particular state program at issue, Rescue Plan funding is not confined to any particular state program or activity—it broadly covers "government services" and "negative economic impacts," among other potential uses. 42 U.S.C. § 802(c)(1). Congress gave States the additional flexibility to determine which of the broadly defined permissible uses of the new funds are most appropriate to their circumstances. And consistent with that generous, four-year outlay of flexible funding, Congress simply sought the assurance that States would not displace their own tax-revenue sources with the federal funds that Congress had appropriated for other purposes.

### B.   The Rescue Plan is not coercive.

Plaintiffs not dispute that Congress generally can prohibit States from using federal grants to fund state tax cuts, and they do not argue that they have a constitutional right to use federal funds to make up for a shortfall caused by a State's decision to decrease net revenues through tax cuts. But they nevertheless urge that the offset provision is "coercive" and an intrusion on their sovereign taxing authority. PI Mot. 9–12.

As an initial matter, Plaintiffs' coercion argument rests on a mischaracterization of the offset provision. *Id.* As explained above, this provision simply limits a State's ability to "use" Rescue Plan funds to "offset" a reduction in "net tax revenue" resulting from changes in state law. *See* Section II.A., *supra*. Plaintiffs are thus wrong to insist that the offset provision somehow "compel[s] [States] to abrogate sovereign tax authority for potentially more than three years." PI Mot. 10.

Plaintiffs' coercion argument is also based on a fundamental misunderstanding of governing law. Nothing in the Constitution or Spending Clause jurisprudence gives States the broad right to do whatever they want with federal funds. *See Sabri*, 541 U.S. at 608 ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."). The Supreme Court has made clear that "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 567 U.S. at 579; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–91 (1937) (holding that where Congress places conditions on how federal funds are used, "[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power"). And even when the Supreme Court has applied a coercion analysis, the inquiry has never extended to funding conditions that "safeguard [the U.S.] treasury" by "govern[ing] the use of the funds" that have been newly appropriated. *NFIB*, 567 U.S. at 578–80; *Dole*, 483 U.S. at 210; *Steward Mach.*, 301 U.S. at 590–91; *see also New York v. United States*, 505 U.S. 144, 171 (1992) (not undertaking a "coercion" inquiry where "Congress has placed conditions—the achievement of the milestones—on the receipt of federal funds"). Where, as here, Congress merely restricts how States use newly appropriated federal money, a coercion analysis is inapplicable. *See,*

*e.g.*, *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015).

Plaintiffs' heavy reliance on the Supreme Court's decision in *NFIB* is also misplaced. *See* PI Mot. 9–11. Unlike the statute challenged here, the Affordable Care Act provision at issue in *NFIB* threatened States with the loss of all of their *preexisting* Medicaid funding unless they agreed to take part in the ACA's expansion of Medicaid coverage to a new adult population. In the controlling opinion for the Court, the Chief Justice recognized that Congress could "make adjustments to the Medicaid program as it developed"—including by altering the conditions on existing funds—but reasoned that the adult eligibility expansion "accomplishe[d] a shift in kind, not merely degree," because it conditioned the receipt of *old* and *new* funds on a State's agreement to establish a fundamentally different program. *NFIB*, 567 U.S. at 583.[3] The Chief Justice concluded that Congress had "crossed the line distinguishing encouragement from coercion" because of "the way it ha[d] structured the funding," and identified as a critical constitutional flaw that, "[i]nstead of simply refusing to grant the new funds to States that [would] not accept the new conditions, Congress ha[d] also threatened to withhold those States' existing Medicaid funds." *Id.* at 579–80 (citation omitted).

By contrast, the Supreme Court made clear that Congress could make the entirety of the *new* federal funds provided by the ACA—totaling $100 billion per year, *see id.* at 576—contingent on a State's adoption of that *new*

---

[3] Because Chief Justice Roberts, writing for a plurality, "struck down Medicaid expansion on narrower grounds than the joint dissent, the plurality opinion is binding." *Gruver*, 959 F.3d at 183 n.5; *Miss. Comm'n on Env't Quality*, 790 F.3d at 176 & n.22; *Mayhew*, 772 F.3d at 88–89; *see also Marks v. United States*, 430 U.S. 188, 193 (1977).

program, *id.* at 585. The Supreme Court emphasized that "[n]othing" in its opinion "preclude[d] Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use." *Id.* The statute's fundamental constitutional flaw was the threat to cut off all *existing* Medicaid funding if a State did not agree to the Medicaid expansion. As the Court summarized, "Congress is not free" to "*penalize* States that choose not to participate in that new program by taking away their *existing* Medicaid funding." *Id.* (emphases added).

The reasoning of *NFIB* forecloses Plaintiffs' argument that the offset provision is coercive. The only funds regulated by the offset provision are the funds that Congress appropriated as part of the Rescue Plan itself. *See* 42 U.S.C. § 802(a)–(c). And unlike *NFIB*, States do not suffer the "penalty" of losing *preexisting* funds if they decline to accept Rescue Plan funds with their attendant conditions. The requirement in the Rescue Plan that States use funds for specified purposes and not for others (including to offset a reduction in net tax revenue that results from changes in state law) is no more "coercive" than any restriction on the receipt of federal funds that the Supreme Court has held to be a valid exercise of Congress's Spending Clause authority. *See, e.g.*, *New York*, 505 U.S. at 171; *Dole*, 483 U.S. at 211; *Bennett*, 470 U.S. at 663; *Steward Mach.*, 301 U.S. at 590–91.

Indeed, the funding condition at issue here is significantly more modest than the prospective funding condition that *NFIB* indicated was permissible. A State's receipt of funds under the Rescue Plan is not an all-or-nothing proposition dependent on compliance with the offset provision. As explained above, the Act provides that if a State were to use Rescue Plan funds to offset a reduction in net tax revenue, it could lose no more than those

funds used for the offset. *See* 42 U.S.C. § 802(e)(1). And, again, there is no threat to preexisting funds if States *decline* the Rescue Plan's generous outlay of federal money.

Finally, Plaintiffs' effort to characterize the offset provision as impermissible commandeering under the Tenth Amendment should also be rejected. PI Mot. 21–27. The Supreme Court has repeatedly affirmed that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." *NFIB*, 567 U.S. at 578; *Coll. Sav. Bank*, 527 U.S. at 686 (same); *Dole*, 483 U.S. at 207 (same). So the inquiry under both the Spending Clause and the Tenth Amendment is whether the challenged "provision is inconsistent with the federal structure of our Government established by the Constitution." *New York*, 505 U.S. at 177; *NFIB*, 567 U.S. at 578–79. And because nothing in the Act "force[s] the States to implement a federal program," *NFIB*, 567 U.S. at 578–79, Plaintiffs' commandeering argument fails.

In cases like this one—where "a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds"—the "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *Id.* at 578; *New York*, 505 U.S. at 168 ("Where Congress encourages state regulation rather than compelling it . . . state officials remain accountable to the people."). If the Plaintiff States dislike the funding condition, or any other provision of the Act, they are free to decline the generous federal aid in whole or in part. Their voters know where to turn if they like, or dislike, the States' choice.

## C.   The Rescue Plan provides clear notice of the funding condi-
tion.

Plaintiffs fare no better in urging that the offset provision is unconsti-
tutionally ambiguous.  PI Mot. 11–15.  In *Pennhurst State School & Hospital v.
Halderman*, the Supreme Court declared that "if Congress intends to impose
a condition on the grant of federal moneys, it must do so unambiguously."
451 U.S. 1, 17, 24 (1981).  But that is not an onerous requirement: Congress
must provide only "clear notice to the States that they, by accepting funds
under the Act, would indeed be obligated to comply with" certain condi-
tions.  *Id.* at 25.  The idea is simply to keep Congress from "surprising par-
ticipating States with post-acceptance or retroactive conditions."  *NFIB*, 567
U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25); *see City of Los Angeles v. Barr*,
929 F.3d 1163, 1174–75 (9th Cir. 2019).

The Supreme Court has also explained that, when Congress makes
clear a State's acceptance of federal funds requires agreement to certain con-
ditions, the details of those conditions can be set out in agency guidance or
regulations that specify the parameters of a condition on federal grants.  For
example, in *Bennett*—where, as discussed above, the Supreme Court upheld
the requirement in Title I of the Elementary and Secondary Education Act—
the Court observed that, "[g]iven the structure of the grant program, the Fed-
eral Government simply could not prospectively resolve every possible am-
biguity concerning particular applications of the requirements of Title I."
470 U.S. at 669.  The Court emphasized that "[t]he fact that Title I was an
ongoing, cooperative program meant that grant recipients had an oppor-
tunity to seek clarification of the program requirements," *id.*, and that "if the
State was uncertain" as to its obligations, "it could have sought clarification

from the Office of Education," *id.* at 672, which was the agency component charged with administering the federal spending program.

Here, "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a reduction in net tax revenue resulting from changes in state law. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Act establishes conditions on the use of funds (§ 802(c)), requires States to certify that they will use the funds for the intended purposes and to report those uses (§ 802(d)), and informs States that the potential consequence of non-compliance is the recoupment of no more than the portion of the funds used to offset a net tax revenue reduction (§ 802(e)). The Act further permits the Secretary to implement its provisions by regulation. *Id.* § 802(f).

These provisions give a state official deciding whether to accept Rescue Plan funds clear notice that those funds are conditioned on the State's agreement not to use the funds to offset a reduction in net tax revenue resulting from changes in state law — and that the Rescue Plan will be implemented through Treasury regulations. "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (citing *Pennhurst*, 451 U.S. at 25); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (noting that the Supreme Court has held "there was sufficient notice under *Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds"); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (same).

Plaintiffs attempt to demonstrate ambiguity by posing hypothetical questions. PI Mot. 13–14. But "Congress is not required to list every factual instance in which a [S]tate will fail to comply with a condition"—a task that would be potentially "impossible." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) ("[S]etting forth every conceivable variation in the statute is neither feasible nor required."); *see Bennett*, 470 U.S. at 666 (explaining that "every improper expenditure" need not be "specifically identified and proscribed" in the statute); *Jackson*, 544 U.S. 167 at 183 (same); *Davis*, 526 U.S. at 650 (same). Congress must simply "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067; *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (distinguishing situations where a statute is "unclear as to whether the [S]tates incurred *any obligations at all* by accepting federal funds" (emphasis added)); *see Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) ("[T]he *existence* of the conditions [must be] clear, such that States have notice that compliance with the conditions is required." (emphasis added and citations omitted)). The offset provision easily clears that bar.

Even if the bar were higher, it would make no difference. The Rescue Plan provides in direct terms that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *See* Section II.A., *supra*. As the Supreme Court has repeatedly confirmed, more particularized questions that arise in the course of implementing the Act can be addressed by Treasury regulations, *see* 42 U.S.C. § 802(f), and by other formal or informal guidance.

### III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST PRECLUDE A PRELIMINARY INJUNCTION.

**1.**   "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Plaintiff States are not entitled to this "extraordinary remedy" because they cannot establish that any is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20; *see Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000) (en banc) (holding that the "absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper").  Plaintiffs' burden to show irreparable harm is higher than what is required to establish standing.  *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Even if Plaintiffs were able to establish standing, they fail to establish irreparable harm.  The States cite no imminent plan to reduce net tax revenue or use Rescue Plan funds to offset that reduction.  So the States' alleged harms are simply not "imminent" enough to warrant the relief they seek.  *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Indeed, their motion characterizes their primary alleged harms as "long-term."  PI Mot. 28.

Importantly, "[i]t is axiomatic that equitable relief is only available where there is no adequate remedy at law." *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) (adding that "cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity").  Even if a Plaintiff State were to accept the conditioned Rescue Plan funding and nonetheless use those funds to offset a reduction in net tax revenue (potentially facing recoupment by Treasury), the State would have an "adequate remedy at law" in any recoupment proceeding.  *Rosen*, 21 F.3d

at 1527; *see, e.g.*, *Hobson v. Fischbeck*, 758 F.2d 579, 581 (11th Cir. 1985) (holding equitable relief unavailable because plaintiff "has an adequate remedy at law—he could pay the disputed tax and then sue for a refund"). Instead, Plaintiffs attempt to short-circuit any recoupment premised on their interpretation of the offset provision. But the potential recoupment action is where the States should make their arguments. With such action nowhere in sight, their challenge is premature and no injunction should issue.

Despite all this, Plaintiffs argue that the offset provision could inflict "long-term" irreparable injury by interfering with "States' sovereign and constitutional authority to tax." PI Mot. 28. As discussed above, however, the Rescue Plan's conditions do not intrude on state sovereign interests or essential functions—either now or in the future. *See* Section I., *supra.*

The States suggest that the Court should "presume irreparable injury in cases where a 'constitutional right is being threatened or impaired.'" PI Mot. 28 (quoting *ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003)). But Plaintiffs have not established any constitutional violation. *See* Section II., *supra.* And in any event, it is unsurprising that they reach "outside the Eleventh Circuit" for such a presumption, PI Mot. 28, because this Circuit's "case law has not gone that far," *Siegel*, 234 F.3d at 1177. "The only areas of constitutional jurisprudence where [this Circuit has] said that an ongoing violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims." *Id.* at 1178; *cf.* PI Mot 27–28 (citing cases on "right to privacy," "right to free speech," and "right to vote"). "This is plainly not such a case." *Siegel*, 234 F.3d at 1178. Here, the States are concerned that they might someday need to repay money received under the Act. Such future harm would categorically fail to qualify as irrep-

arable because it can be "undone through monetary remedies" for improperly recouped funds, if any.  *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).  Indeed, courts have routinely characterized the potential loss of money as a quintessential example of harm that is not irreparable.  *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

To allege "more immediate" irreparable harm, Plaintiffs argue—without any citations whatsoever—that "certification under this ambiguous and overbroad provision could subject the Plaintiff States to unknown penalties based on an unknown set of state legislative or administrative actions."  PI Mot. 28–29.[4]  But Treasury has not yet published the § 802(d) certification that States will use to obtain Rescue Plan funds.  And Plaintiffs have not even alleged any change in law during the covered period that will result in lower net tax revenues, let alone imminently; nor have they alleged that any State will use Rescue Plan funds to offset any such reduction.  Even if they did, the penalties are not "unknown": if a State chooses to use Rescue Plan funds to offset a reduction in net tax revenue, the only consequence under the Act is that the State's grant would be affected only up to the amount of the offset.  *See* 42 U.S.C. § 802(e).  Again, such recoupment proceedings would provide Plaintiffs both ample opportunity to raise their arguments and an "adequate remedy at law."  *Rosen*, 21 F.3d at 1527.

**2.**    Plaintiffs are on no firmer ground in urging that an injunction against enforcement of the offset provision "will not harm Defendants—or anyone else for that matter," on the theory that "[i]njunctive relief does not

---

[4] It bears noting that what the States acknowledge are an "unknown set of state legislative or administrative actions" that may or may not result in reductions in net tax revenue that may or may not then be offset using Rescue Plan funds that may or may not then be subject to recoupment by the Secretary is precisely why Plaintiffs also lack standing and their pre-enforcement facial challenge is not ripe.  PI Mot. 29; *see* Section I., *supra*.

delay or threaten distribution of ARPA funds, nor interfere with any individual's or entity's use of that relief." PI Mot. 30. In other words, Plaintiffs simultaneously assert that an intrusion on its own sovereign interests (if it existed) would constitute irreparable injury, but that enjoining an Act of Congress would not constitute irreparable injury to the federal government.

The Supreme Court takes a different view. "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)). Thus, an injunction would irreparably harm the United States and undermine the public interest. That is only more evident here, where the legislation at issue is a direct response to a national economic and public-health emergency of historic proportions.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS.

If this Court were to enjoin any aspect of the Rescue Plan (and the Court should not), that injunction should apply only to Plaintiffs. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (citing *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)). And principles of equity independently require that injunctions be no broader than "necessary to provide complete relief to the

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).   Indeed, Plaintiffs have no serious interest in whether other States are subject to the offset provision during the pendency of this lawsuit, and they would be fully redressed through a preliminary injunction prohibiting the Treasury Department from "enforcing" the Rescue Plan against only the state Plaintiffs in this case.

## CONCLUSION

For the reasons explained above, Plaintiffs' motion should be denied.

DATED: May 7, 2021           Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*