

FILED
2021 Jul-14  AM 10:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| State of West Virginia, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 7:21-cv-00465-LSC |
| | ) | |
| United States Department of Treasury, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF OPINION AND ORDER
## DENYING MOTION FOR PRELIMINARY INJUNCTION

## I.    Introduction

On March 31, 2021, Plaintiffs West Virginia, Alabama, Arkansas, Alaska, Florida, Iowa, Kansas, Montana, New Hampshire, Oklahoma, South Carolina, South Dakota, and Utah (hereinafter, "the Plaintiff States") brought this action against the United States Department of Treasury ("Treasury"), Treasury Secretary Janet Yellen in her official capacity ("the Secretary"), and Treasury Inspector General Richard Delmar in his official capacity (collectively, "the Defendants"). The Plaintiff States seek to invalidate and enjoin one provision of the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, § 9901, 135 Stat.

4 (2021) (codified at 42 U.S.C. §§ 802 *et seq.*). The ARPA is a $1.9 trillion economic stimulus bill that was passed by Congress and signed into law by President Joseph Biden on March 11, 2021. It was enacted to hasten the United States' recovery from the economic impact of the COVID-19 pandemic and accompanying recession. Among many other provisions, the ARPA distributes roughly $195.3 billion directly to States for specified purposes. 42 U.S.C. § 802(b)(3)(A). However, before a State can receive those funds, it must certify to the Secretary of the Treasury that it will comply with multiple conditions that the ARPA imposes. *Id.* § 802(d)(1). The Plaintiff States contend that one of those conditions—what they call the "Federal Tax Mandate"—exceeds Congress's power under the Spending Clause in Article I, Section 8 of the U.S. Constitution, and violates the Tenth Amendment to the U.S. Constitution, because it prohibits States from reducing taxes. Their Complaint seeks a declaration from this Court stating as much, as well as a declaration that the Defendants have violated the Plaintiff States' rights as sovereigns, and an order permanently enjoining enforcement of the Federal Tax Mandate. (*See* doc. 1).

On April 13, 2021, the Plaintiff States moved, pursuant to Federal Rule of Civil Procedure 65, for an order preliminarily enjoining enforcement of the Federal Tax Mandate, while keeping the remainder of the ARPA intact, while this lawsuit is pending. (Doc. 21.) The Defendants responded in opposition to the motion, claiming

that the Court does not have jurisdiction because the Plaintiff States lack standing and their claims are not ripe, and that, on the merits, the Plaintiff States have failed to show that a preliminary injunction is warranted. (Doc. 54.) The Plaintiff States have replied in support of their motion. (Doc. 59). Numerous amici filed briefs in support of the Plaintiff States' motion for a preliminary injunction. (Docs. 41 (The Buckeye Institute); 42 (78 Members of Congress and the American Center for Law and Justice); 43 (National Taxpayers Union Foundation); 44 (Chamber of Commerce of the United States); and 48 (The New Civil Liberties Alliance).)

As the Court explains below, while it does have subject matter jurisdiction over this action, the preliminary relief that the Plaintiff States seek is not warranted, and the motion for a preliminary injunction is thus due to be denied.

## II.   Background

It goes without saying that the COVID-19 pandemic has caused ongoing economic harm to individuals, businesses, and state and local governments. To ease the financial strain, in March 2020, Congress provided $150 billion in direct assistance for state, local, and Tribal governments under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). *See* Pub. L. No. 116-137, § 5001, 134 Stat. 281, 501 (2020) (codified at 42 U.S.C. § 801). However, economic distress continued. Accordingly, on March 11, 2021, President Joseph Biden signed the

ARPA, which appropriated approximately $1.9 trillion to provide relief to address the impact of the COVID-19 pandemic. *See* Pub. L. No. 117-2, 135 Stat. 4 (codified at 42 U.S.C. § 802 *et seq.*). Out of the roughly $1.9 trillion that the ARPA allocates for pandemic relief, roughly $195.3 billion is tapped for the States. *Id.* § 802(b)(3)(A). These funds represent an average of about 25% of the thirteen Plaintiff States' annual budgets. (Doc. 1 ¶¶ 45–57.) In Arkansas, for instance, anticipated ARPA funding represents 29% of the State's annual budget. (*Id.* ¶ 117.) For West Virginia and Arkansas, it represents over 25% (*id.* ¶ 47, 53); for Alabama, over 21% (*id.* ¶ 50); and Kansas, over 20% (*id.* ¶ 56).

The money comes with certain strings attached. In particular, to qualify for the funding, a State must "provide the Secretary with a certification, signed by an authorized officer of such State . . . that such State . . . requires the payment . . . to carry out the activities specified in subsection (c) . . . and will use any payment under this section . . . in compliance with subsection (c)." 42 U.S.C. § 802(d)(1). The Secretary is to "make the payment required for the State . . . not later than 60 days after the date on which th[at] certification . . . is provided to the Secretary." *Id.* § 802(b)(6)(A)(i). As the above language suggests, the conditions are set forth in subsection (c). In that section, Congress specified that States must use ARPA funds

to respond to the negative economic impacts of the COVID-19 pandemic in one of

four specific ways:

A.    to respond to the public health emergency with respect to COVID-19 or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

B.    to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

C.    for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

D.    to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1)(A)-(D). The States must use the funds by December 31, 2024. *Id.* §

802(c)(1).

    The ARPA also contains two restrictions on the States' use of the money. One

limitation (not challenged here) provides that a State may not deposit ARPA funds

"into any pension fund." *Id.* § 802(c)(2)(B). The other limitation (at issue here)

provides as follows:

> (2) FURTHER RESTRICTION ON USE OF FUNDS. —
>
> (A) IN GENERAL. — A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A). The phrase "directly or indirectly offset" is not defined. Nor did Congress extend this prohibition on reducing taxes to cities, localities, or Tribal governments.

The ARPA also requires States to periodically report to the Treasury any reductions in their tax revenues. *Id.* § 802(d)(2). The Treasury can recoup funds that it interprets were used in violation of the Federal Tax Mandate. *Id.* § 802(e)(1).

The Plaintiff States allege that they are or were actively considering various forms of tax relief for individuals and small businesses, whether directly related to state pandemic-relief efforts or through unrelated policy measures. (Doc. 1 ¶¶ 76–83.) They claim that the Federal Tax Mandate has cast significant uncertainty over these efforts as it is unclear whether States can pass any tax relief measures throughout the covered period without running afoul of the Federal Tax Mandate.

On March 16, 2021, twenty-one State attorneys general wrote a letter to the Secretary, seeking guidance as to the scope of the Federal Tax Mandate. (Doc. 21–1

at 4.) The letter listed several tax cuts proposed by legislatures in Georgia, West Virginia, Alabama, Indiana, Kansas, Kentucky, Montana, and other States and asked if those cuts would expose the States to ARPA recoupment. The letter included the following concern:

> The import of [the ARPA's] prohibition against "offsetting" reductions in state tax revenue is unclear, but potentially breathtaking. This provision might have been intended merely to prohibit States from *expressly* taking COVID-19 relief funds and rolling them directly into a tax cut of a similar amount. But its prohibition on "indirectly" offsetting reductions in tax revenue, combined with the list of prohibited kinds of tax reductions (rate cuts, rebates, deductions, credits, or "otherwise"), could also be read to prohibit tax cuts or relief of any stripe, even if wholly unrelated to and independent of the availability of relief funds. After all, money is fungible, and States must balance their budgets. So, in a sense, *any* tax relief enacted by a state legislature after the State has received relief funds could be viewed as "using" those funds as an "offset" that allows the State to provide that tax relief.

(*Id.* at 5.)

> The Secretary responded on March 23, 2021, writing as follows:

> Nothing in the Act prevents States from enacting a broad variety of tax cuts. That is, the Act does not "deny States the ability to cut taxes in any manner whatsoever." It simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue. If states lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the [Federal Tax Mandate] is not implicated.

(Doc. 21-1 at 12.) The Secretary's letter did not respond to the States' questions regarding the specific tax modification proposals pending in the States.

On March 31, 2021, the Plaintiff States, believing the Federal Tax Mandate to be unconstitutional, sued for declaratory and injunctive relief in this Court. The Plaintiff States' Complaint alleges that the Federal Tax Mandate is unconstitutional for two reasons: (1) it violates the Spending Clause by being coercive and ambiguous (Count 1); and (2) it violates the Tenth Amendment in that it commandeers state taxing authority (Count 2). On April 13, 2021, the Plaintiff States moved for the preliminary injunction that is the subject of this opinion. (Doc. 21.)

On May 11, 2021, the Department of Treasury submitted an "Interim Final Rule" for publication in the Federal Register, which expounded on the ARPA, including the Federal Tax Mandate, and provided notice to this Court of that event. (Doc. 55). The Interim Final Rule was published in the Federal Register on May 17, 2021. Relevant here, the Interim Final Rule announces the Treasury's current approach to enforcing the Federal Tax Mandate. It sets forth "a step-by-step process for determining whether, and the extent to which, [ARPA] funds have been used to offset a reduction in net tax revenue." (Doc. 55-1 at 84.)

The Plaintiff States have not advised this Court whether, during the time that the motion for a preliminary injunction has been pending, they have submitted their certifications stating that they would participate under the ARPA, and, if so, whether the Treasury has doled out any ARPA funds.

### III.   Discussion

This Court would typically begin its analysis by determining whether it has subject matter jurisdiction over the Plaintiff States' claims because the Defendants have contended that the Plaintiff States lack standing and that their claims are not yet ripe. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) ("[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.") (quoting *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)). Here, however, the jurisdictional and merits issues are so related that the Court feels it necessary to first discuss the nature of the rights that the Plaintiff States are claiming under both their Spending Clause and Tenth Amendment violation claims, because whether the Plaintiff States have suffered or will suffer an injury in fact for standing purposes turns on how their rights under those constitutional provisions are characterized.

### A.   The Plaintiff States' Spending Clause Violation Claim (Count 1)

The Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning

receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). However, Congress's spending power is not unlimited. *Id.* at 207. Although Congress can condition a State's receipt of federal money, any such condition must comply with several requirements (the "*Dole* factors"). *See id.* at 207–08. First, the condition must "be in pursuit of 'the general welfare.'" *Id.* at 207 (quoting *Helvering v. Davis*, 301 U.S. 619, 640–41 (1937)). Second, the condition must be unambiguous so that States can "exercise their choice [whether to accept federal funds] knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Third, the condition must be reasonably related to a "federal interest in particular national projects or programs." *Id.* (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)). Fourth, no condition attached to receipt of federal funds may violate another provision of the U.S. Constitution. *Id.* at 208. Beyond those four limitations, the Supreme Court has "recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 211 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). If a federal condition induces a State to act "not of her unfettered will, but

under the strain of a persuasion equivalent to undue influence," then the condition exceeds Congress's Spending Clause authority. *Steward Mach.*, 301 U.S. at 590.

The Plaintiff States claim in Count 1 of their Complaint that, while Congress may have exercised its spending power for the general welfare through the Federal Tax Mandate provision of the ARPA, the mandate violates every other *Dole* factor. First, they contend that the mandate is unconstitutionally coercive because the amount of ARPA funding offered to the States is so large a percentage of their annual budgets that they have no real choice but to accept the mandate's restriction on their sovereign taxing powers. Second, they claim that the mandate is unconstitutionally ambiguous because it contains no explanation as to how the Treasury will determine whether a State has—either directly or indirectly—offset its tax cuts with ARPA funds. Thus, the Plaintiff States state that they are unable make an informed choice of whether to accept or decline ARPA funds, and if they accept ARPA funds, whether to cut taxes without putting those ARPA funds at risk of being recouped by the Treasury. Third, they contend that the mandate is not reasonably related to the purpose that the ARPA serves—to assist in the rebound from the COVID-19 pandemic's economic devastation—because prohibiting state tax reductions does not advance the goal of providing economic relief to individuals and entities affected by the pandemic. Finally, they claim that the mandate violates an independent

constitutional provision—the Tenth Amendment, which reserves power to the States.

In order to explain its decision on standing and ripeness in the next sections, this Court must further explain the law supporting the Plaintiff States' argument that the Federal Tax Mandate is unconstitutionally ambiguous. In *Pennhurst*, the Supreme Court likened Congress's conditioning of federal money to a contract: "in return for federal funds, the States agree to comply with federally imposed conditions." 451 U.S. at 17. Just as a contract requires a knowing acceptance of the offer's terms, conditioned federal money must "enable the States to exercise their choice knowingly, cognizant of the consequences of" their acceptance. *Id*. The Court in *Pennhurst* continued, "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*. (internal citations and footnote omitted).

### B.    The Plaintiff States' Tenth Amendment Violation Claim (Count 2)

The Plaintiff States also believe that the Federal Tax Mandate violates the Tenth Amendment's reservation of power to the States and the "anticommandeering doctrine." The anti-commandeering doctrine generally precludes Congress from forcing States to implement its laws and policies. *See Printz*

*v. United States*, 521 U.S. 898, 925 (1997). The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved to the States, as the Tenth Amendment confirms. And a State's authority to set its tax policy is "central to state sovereignty." *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994); *see also McCulloch v. Maryland*, 17 U.S. 316, 428 (1819) ("[T]he power of taxing the people and their property[] is essential to the very existence of government.").

Federal orders to the States are unconstitutional under the anticommandeering doctrine where they implicate either of two concerns. First, the doctrine applies where federal action threatens the "healthy balance of power between the States and the Federal Government." *Murphy v. Nat'l Collegiate Ath. Ass'n*, 138 S. Ct. 1461, 1477 (2018) (quoting *New York v. United States*, 505 U.S. 144, 181–82). Second, the doctrine "promotes political accountability" by keeping decisions that affect the States in the hands of state leaders. *Id.* ("[I]f a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred."). The Plaintiff States contend that the Federal Tax Mandate upsets both interests. They claim that, by implementing a mandatory state tax policy preference of Congress—to allow tax increases but forbid tax reductions by States—the Federal Tax Mandate both blurs the political accountability necessary to have an effective

dual sovereignty governmental structure and commandeers the Plaintiff States' sovereign power to tax and spend and determine their own fiscal policies.

## C.     Standing

Keeping the aforementioned principles in mind, the Court turns to whether this Court has subject matter jurisdiction over the Plaintiff States' Complaint. Article III of the Constitution restricts federal courts to the resolution of cases and controversies. "Standing is a doctrine that 'stems directly from Article III's "case or controversy" requirement,' and thus it 'implicates [this Court's] subject matter jurisdiction.'" *Bochese*, 405 F.3d at 974 (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)). Plaintiffs are required to "'alleg[e] such a personal stake in the outcome of the controversy' as to . . . justify [the] exercise of the court's remedial powers on [their] behalf." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). To show standing, a plaintiff must generally demonstrate that he suffered or shall immediately suffer an injury in fact, that the injury was caused by the defendant's conduct, and that the injury is redressable by a favorable court decision. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008). Further, "'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S.

724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Jurisdiction is assessed under the facts as they existed when the complaint was filed. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 606 n.4 (1992).

Defendants focus on the injury in fact element, arguing that the Plaintiff States lack standing because they have not yet alleged that any tax cuts that they have already enacted, or any that are under consideration by their legislatures, will decrease their net tax revenue, let alone alleged that they intend to use ARPA funds to offset that theoretical net revenue reduction. Thus, according to Defendants, since recoupment of ARPA funds by the Treasury is not imminent, the Plaintiff States have not suffered an injury in fact to establish standing.

True, an injury sufficient to satisfy Article III must be "concrete and particularized" and "actual and imminent, not 'conjectural or hypothetical.'" *See Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Yet, the Court disagrees that the Plaintiff States lack standing because it does not consider recoupment to be the only injury that the Plaintiff States have, or will, suffer.

First, the Court considers the Spending Clause violation claim in Count 1 of the Complaint, and specifically, the Plaintiff States' argument that Congress violated the Spending Clause in passing the Federal Tax Mandate because the text of the

mandate is unconstitutionally ambiguous. The Spending Clause jurisprudence discussed above requires Congress to state clearly the terms upon which it extends an offer of conditional funding to the States. *See Pennhurst*, 451 U.S. at 17. That clarity is critical to a State's ability to exercise its sovereign power in deciding whether to accept or decline an offer of funds. If this Court takes the Plaintiff States' allegations as true, it follows that Congress violated the Constitution when it passed the ARPA, because it offered federal funds to the States based on unconstitutionally-ambiguous terms. Thus, the Plaintiff States suffered an injury in fact when Congress passed the ARPA because they were presented with an unconstitutionally ambiguous deal. In other words, it was Congress passing the Act, not the States accepting the money, nor the Treasury eventually recouping the money, if that ever happens, that violated the Constitution. So, for standing purposes, the injury in fact that the Plaintiff States have suffered is that they were not offered a clear understanding of the deal that Congress is offering.[1]

---

[1]     The Court notes that the argument could be made that the Secretary's Interim Final Rule "cures" any ambiguity in the text of the Federal Tax Mandate. However, the Defendants have not yet presented that argument. Indeed, the implication of the Interim Final Rule on the Plaintiff States' claim that the mandate is ambiguous under the Spending Clause has not been briefed by the parties. In any event, the Interim Final Rule has no bearing on the standing analysis because the Plaintiff States' standing is determined at the time of the filing of their Complaint, and the Interim Final Rule was not promulgated until later. *Lujan*, 504 U.S. at 606 n.4.

The Court also finds that the Plaintiff States have suffered an injury in fact for standing purposes with regard to the anti-commandeering doctrine claim in Count 2 of their Complaint. The Plaintiff States allege that the Defendants have already intruded into their sovereign authority to set their own tax policy. Their injury in fact is having to choose between forgoing a benefit (federal funds) or accepting that benefit on unconstitutional terms. According to the Plaintiff States, the legislatures of Alabama, Oklahoma, and New Hampshire have already announced proposed State budgets that include future tax cuts, and the legislatures of Utah, West Virginia, and Montana have already enacted tax cuts. (Doc. 59 at 17–19.) These Plaintiff States must either revise their laws or budget for possible recoupment by the Treasury.

Even if one might argue that the injury that the Plaintiff States are currently suffering—i.e., having to choose whether to accept ARPA funds on unconstitutional terms—is not sufficiently "concrete and particularized" enough to satisfy Article III, *see Lujan*, 504 U.S. at 560, the Plaintiff States can nonetheless establish standing under the line of federal cases permitting pre-enforcement review of an unconstitutional law. When a plaintiff seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and there exists a credible threat of [enforcement] thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Here, the Plaintiff States have alleged "an intention to engage in a course of conduct" (accepting ARPA funds and reducing state taxes) that is "arguably affected with a constitutional interest" (the Plaintiff States' Tenth Amendment rights and inherent limits on Congress's Spending Clause power) that is "proscribed by a statute" (based on a plain reading of the Federal Tax Mandate) and that comes with a "credible threat of [enforcement] thereunder" (recoupment of ARPA funds by the Treasury). *See id.*

Finally, there is no question that the injuries in fact as discussed above are fairly traceable to the Federal Tax Mandate, and they can be redressed by a court order invalidating the mandate. *See Browning*, 522 F.3d at 1159. Accordingly, the Plaintiff States possess standing.

### D. Ripeness

"The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). The ripeness inquiry requires a two-part determination of "(1) the fitness of the issues

for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–49 (1967)). "Courts must resolve 'whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court.'" *Id.* (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)).

Defendants again argue that the Plaintiff States' claims are not ripe because the claimed harm is potential recoupment of some ARPA funds by the Treasury, which is not imminent. True, before recoupment could occur, the Plaintiff States must first submit certifications that they plan to accept ARPA funds, receive those funds from the Treasury, reduce state taxes or enact some other changes in state tax laws, have those reductions or changes cause their net tax revenues to decrease, and use ARPA funds to offset that reduction. However, as noted in the above section on standing, Defendants mischaracterize the harm suffered by the Plaintiff States. It is not that the Treasury may recoup ARPA funds at some point in the future; it is that the Plaintiff States do not have the constitutionally-required clarity to make an informed decision on whether to accept ARPA funds now. Alternatively, it is that the Plaintiff States' sovereign power to determine their own fiscal policies has

already been intruded upon. Thus, the Court easily concludes that the Plaintiff States' constitutional claims are ripe.

### E.    Preliminary Injunction

Having found that the Plaintiff States possess standing to pursue the claims in their Complaint and that those claims are ripe, the Court turns to whether the Plaintiff States are due a preliminary injunction—which would enjoin the Secretary from enforcing the Federal Tax Mandate—during the pendency of this lawsuit.

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Parties seeking a preliminary injunction must demonstrate (1) substantial likelihood of success on the merits, (2) that they will suffer irreparable injury unless the injunction issues, (3) that the threatened injury to the movant outweighs any damage the injunction might cause the opposing party, and (4) that the injunction would not be adverse to the public interest. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

Preliminary injunctive relief is always "the exception rather than the rule." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).

The Court would typically begin with the first element—whether the Plaintiff States can show a substantial likelihood of success on the merits of their claims. However, the Court need not reach a decision on that element because it finds that the Plaintiff States cannot establish the second element—that they will suffer irreparable injury unless this Court issues a preliminary injunction. *See United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983) (the plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm").

A substantial threat of irreparable injury "is an indispensable prerequisite to a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000). It's the "*sine qua non* of injunctive relief." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)). Because "[p]reservation of the status quo enables the court to render a meaningful decision on the merits," the "harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Lambert*, 695 F.2d at 540. An injury is irreparable "only if it cannot be undone

through monetary remedies." *City of Jacksonville*, 896 F.2d at 1285. As the Eleventh Circuit stated in *City of Jacksonville*, quoting the Supreme Court:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

The problem for the Plaintiff States in their quest for a preliminary injunction is that the preliminary injunctive relief that they request from this Court is an order prohibiting the Secretary from exercising her recoupment powers *until this Court issues a merits decision in this case*. But recoupment of ARPA funds is a quintessentially *reparable* injury because it can be "undone through monetary remedies." *See City of Jacksonville*, 896 F.2d at 1285. Indeed, if the Secretary were to recoup ARPA funds from the Plaintiff States during the pendency of this lawsuit, this Court could simply—assuming it ultimately issues a permanent injunction and declares the Federal Tax Mandate unconstitutional—order the funds returned to the Plaintiff States. *Cf. id.* ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Moreover, the Court cannot even provide preliminary relief that would address the harm that the Plaintiff States claim they would suffer absent a preliminary injunction. As noted previously, the Plaintiff States claim that they are being harmed because they must soon make the decision whether to certify compliance with ARPA's substantive provisions, meaning that they will have to promise to comply with an allegedly ambiguous unconstitutional condition or lose billions in federal aid. They also claim that they are being harmed in that their legislatures do not currently know if they can reduce the taxes of their constituents without suffering future recoupment of ARPA funds and thus may be forced to delay passing fiscal legislation until next year. However, consider the fact that, whether this Court grants or denies the motion for preliminary relief, the Plaintiff States will still have to take into consideration, when accepting the ARPA funds, that the funds are subject to possible recoupment if this Court were to ultimately issue a merits decision declining to issue a permanent injunction. Thus, granting a preliminary injunction in this case does nothing to remedy the Plaintiff States' alleged harm, which is that they are having to decide whether to certify participation in ARPA without clarity as to what the Federal Tax Mandate means. Indeed, the only difference stemming from whether this Court grants or denies the motion for a preliminary injunction is that, if the Court were to grant the motion, the Secretary

could not recoup funds in between now and when the Court decides the ultimate issues in this case. However, there is virtually no likelihood that the Secretary will recoup ARPA funds from the Plaintiff States during this time frame. Indeed, recall that for recoupment to happen, first the Plaintiff States would have to certify ARPA compliance, receive ARPA funds, pass a net reduction in tax revenue, and then the Secretary would have to determine that ARPA funds "directly or indirectly offset" the net reduction. This is extremely unlikely to happen between now and this Court's final decision. In other words, an injunction stopping the Secretary from recouping ARPA funds while this case is pending stands no real prospect of ever being enforced. And even if the Secretary did recoup some ARPA funds in the near future, as already noted, this Court could order those funds returned to the States should it ultimately decide this case in the Plaintiff States' favor.

Accordingly, because proof of irreparable injury is an indispensable prerequisite to a preliminary injunction, the Plaintiff States are not entitled to a preliminary injunction at this time. As previously noted, the Court declines to decide whether the Plaintiff States have established a substantial likelihood of success on the merits of their claims because such an analysis would require the Court to reach the Plaintiff States' constitutional arguments. The Court finds this to be the appropriate approach due to the "fundamental and longstanding principle of judicial

restraint . . . that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).

Nonetheless, the Court is of the opinion that this action is well suited for an expedited decision on the merits. This action appears to present purely legal issues, meaning that the parties do not need discovery. If the parties agree that no discovery is warranted, they are encouraged to submit a proposed briefing schedule that would aid in a prompt resolution of this action.

## IV.   Conclusion

The Plaintiff States' request for a preliminary injunction is due to be denied because they have failed to show that this Court can provide preliminary relief that would address the harm they will suffer in the absence of the injunction. As a result, their Motion for a Preliminary Injunction (doc. 21) is **DENIED**.

**DONE** and **ORDERED** on July 14, 2021.

_____
L. Scott Coogler
United States District Judge

160704