FILED

2021 Jul-29 PM 05:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

**STATE OF WEST VIRGINIA**, by and through Patrick Morrisey, Attorney General of the State of West Virginia; **STATE OF ALABAMA**, by and through Steve Marshall, Attorney General of the State of Alabama; **STATE OF ARKANSAS**, by and through Leslie Rutledge, Attorney General of the State of Arkansas; **STATE OF ALASKA**, by and through Treg R. Taylor, Attorney General of the State of Alaska; **STATE OF FLORIDA,** by and through Ashley Moody, Attorney General of the State of Florida; **STATE OF IOWA**; **STATE OF KANSAS,** by and through Derek Schmidt, Attorney General of the State of Kansas; **STATE OF MONTANA**, by and through Austin Knudsen, Attorney General of the State of Montana; **STATE OF NEW HAMPSHIRE**; **STATE OF OKLAHOMA**, by and through Mike Hunter, Attorney General of the State of Oklahoma; **STATE OF SOUTH CAROLINA**, by and through Alan Wilson, Attorney General of the State of South Carolina; **STATE OF SOUTH DAKOTA**, by and through Jason R. Ravnsborg, Attorney General of the State of South Dakota; and **STATE OF UTAH,** by and through Sean Reyes, Attorney General of the State of Utah,

      Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF THE TREASURY**;

**JANET YELLEN**, in her official capacity as the Secretary of the United States Department of the Treasury; and

**RICHARD K. DELMAR**, in his official capacity as acting inspector general of the Department of the Treasury,

      Defendants.

Case No. 7:21-cv-00465-LSC

**MOTION FOR PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

## MOTION FOR PERMANENT INJUNCTION
## AND A DECLARATORY JUDGMENT

The "Tax Mandate" in the American Rescue Plan Act of 2021, *see* Pub. L. No. 117-2, § 9901, 135 Stat. 4 (enacting § 602(c)(2)(A) to the Social Security Act (42 U.S.C. § 801 *et seq.*)), unconstitutionally infringes on the Plaintiff States' sovereignty under the Tenth Amendment and exceeds Congress' authority under the Spending Clause. *See* U.S. Const. art. I, § 8, cl.1. Plaintiff States therefore move for a final judgment permanently enjoining the Tax Mandate's enforcement against them and declaring the Tax Mandate unlawful.

Respectfully submitted:

/s/ Edmund G. LaCour Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAg.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov

***Counsel for State of Alabama***

/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See (*pro hac vice*)
  *West Virginia Solicitor General*
David C. Tryon (*pro hac vice*)
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing under
  supervision of W. Va. attorneys)
Jessica A. Lee (*pro hac vice*)
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov

***Counsel for State of West Virginia***

<u>/s/ Nicholas Bronni</u>
LESLIE RUTLEDGE
  *Arkansas Attorney General*
Nicholas J. Bronni (*pro hac vice*)
  *Arkansas Solicitor General*
Vincent M. Wagner (*pro hac vice*)
  *Deputy Solicitor General*
Dylan L. Jacobs (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov

**Counsel for State of Arkansas**

*[Additional counsel listed at end]*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................1

STATEMENT OF FACTS ..............................................................3

ARGUMENT ..................................................................................7

I.   The Tax Mandate Is Unconstitutional ....................................7

    A. The Tax Mandate Violates the Spending Clause ......................7

       1. The Tax Mandate Is Coercive ............................................17

          *a. The Interim Final Rule Cannot Cure An Unconstitutionally Ambiguous Law* ..............................................................11

          *b. Congress Did Not Delegate Treasury the Authority to Cure the Tax Mandate's Ambiguity* ........................................13

          *c. The Interim Final Rule is Unconstitutionally Ambiguous* .............15

       2. The Tax Mandate Is Coercive ............................................17

       3. The Tax Mandate Is Unrelated to ARPA's Purpose .........19

    B. The Tax Mandate Violates the Tenth Amendment .................20

II.  The Court Should Enjoin the Tax Mandate and Declare It Unconstitutional ..............................................................23

    A. The Court Should Issue a Permanent Injunction ....................23

    B. The Court Should Award Declaratory Relief .........................24

CONCLUSION ..............................................................................25

# TABLE OF AUTHORITIES

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ........................................................................................10

*Bank of Hamilton v. Lessee of Dudley*,
  27 U.S. 492 (1829) ...................................................................... 12, 13

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) .........................................................8, 9

*Bond v. United States*,
  564 U.S. 211 (2011) ......................................................................12

*Carey v. Throwe*,
  957 F.3d 468 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1054 (2021) ...................22

*Cas. Indem. Exch. v. High Croft Enters., Inc.*,
  714 F. Supp. 1190 (S.D. Fla. 1989)....................................................24

*Cty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017)..................................................11

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ......................................................................23

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824) ...................................................... 14, 23

*Graham Cnty. Soil & Water Conservation Dist. v. United States*,
  545 U.S. 409 (2005) ........................................................................8

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ......................................................................14

*Gundy v. United States*,
  139 S. Ct. 2116 (2019).....................................................................13

iv

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010).............................................................................................9

*Hollis v. Itawamba Cty. Loans*,
    657 F.2d 746 (5th Cir. Unit A Sept. 1981)................................................. 24, 25

*Ivanhoe Irrigation Dist. v. McCracken*,
    357 U.S. 275 (1958) .......................................................................................19

*King v. Burwell*,
    576 U.S. 473 (2015) .......................................................................................14

*Marbury v. Madison*,
    1 Cranch 137 (1803).......................................................................................12

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270 (1941) .......................................................................................24

*Med. Assur. Co. v. Hellman*,
    610 F.3d 371 (7th Cir. 2010).........................................................................24

*Montgomery v. Louisiana*,
    577 U.S. 190 (2016) .......................................................................................12

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018)........................................................................ 12, 20, 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................ 7, 16, 17, 18, 20

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................19, 22

*Ohio v. Yellen*, No.
    1:21-CV-181, 2021 WL 2712220 (S.D. Ohio July 1, 2021).............. 10, 13, 14, 15

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .........................................................................................8, 11

*Printz v. United States*,
    521 U.S. 898 (1997) ...............................................................21

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ...........................................23

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020)...........................................................12

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................8, 19

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021)................................................11

*United States v. Lopez*,
    514 U.S. 549 (1995) ..............................................................12

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014)...........................................................14

*Va. Dep't of Educ. v. Riley*,
    106 F.3d 559 (4th Cir. 1997)................................................11

*Whitman v. Am. Trucking Associations*,
    531 U.S. 457 (2001) ..............................................................11

**Statutes**

28 U.S.C. § 2201(a) ......................................................................24

42 U.S.C. § 801 *et seq.*................................................................. i

42 U.S.C. § 802 *et seq.*..................................................................2

42 U.S.C. § 802(b)(3)....................................................................17

42 U.S.C. § 802(b)(3)(A).................................................................3

42 U.S.C. § 802(c)(1)(A-D).........................................................3, 19

42 U.S.C. § 802(c)(1)...........................................................................19

42 U.S.C. § 802(c)(2)(A) ........................................................ 3, 8, 9, 15

42 U.S.C. § 802(d)(1)...........................................................................7

42 U.S.C. § 802(d)(2)...........................................................................4

42 U.S.C. § 802(e) ...............................................................................9

42 U.S.C. § 803 ..................................................................................20

42 U.S.C. § 803(c) ...............................................................................4

**Federal Regulations**

Coronavirus State and Local Fiscal Recovery Funds,
    86 Fed. Reg. 26786 (May 17, 2021)........................................ 5, 6, 7, 15, 16, 22

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl.1 .................................................................. i

**Public Laws**

Pub. L. No. 117-2, § 9621...............................................................4, 20

Pub. L. No. 117-2, § 9673...............................................................4, 20

Pub. L. No. 117-2, § 9901, 135 Stat. 4 .............................................. i

Pub. L. No. 117-2, 135 Stat. 4 ...........................................................2

**Other Authority**

Alabama Department of Finance, Executive Budget Office,
    *State Receipts*, https://budget.alabama.gov/state-receipts/...................................18

Ilya Somin, *Making Federalism Great Again*, 97 Tex. L. Rev. 1247 (2019) .........12

Nat'l Assoc. of State Budget Officers, 2020 State Expenditure Report, available   at
https://perma.cc/62WG-B9LW .................................................................. 3, 18, 19

U.S. Department of Treasury, Allocation for States,
available at https://home.treasury.gov/system/files/136/fiscalrecoveryfunds
-statefunding1-508A.pdf ...............................................................................3, 19

## INTRODUCTION

This Court has already determined that the Plaintiff States alleged facts sufficient to establish standing and ripeness because they properly alleged several different injuries under Article III: (1) they "were not offered a clear understanding of the deal that Congress is offering" because of the Tax Mandate's ambiguity; (2) their sovereignty was intruded upon by "having to choose between forgoing a benefit (federal funds) or accepting that benefit on unconstitutional terms"; and (3) there is a credible threat of enforcement in the form of a recoupment action. Doc. 71 at 14-20. Each of these holdings is supported by the facts—Congress passed ARPA, most Plaintiff States have now accepted the terms of the agreement while others continue to consider the ambiguous offer, and all Plaintiffs States are now compelled to attempt to legislate in the shadow of a looming recoupment proceeding. Moreover, the States have passed revenue-related laws during ARPA's covered period, which heightens the States' needs for certainty over what the Tax Mandate means and whether it is constitutional.[1] Finally, States that have accepted ARPA funds must meet intrusive reporting requirements to assist Treasury in its enforcement of the unconstitutional Tax Mandate. The Plaintiff States have thus already suffered harm from the Tax Mandate, and they continue to suffer harm that this Court can redress.

---

[1] A list that includes some of these State laws is attached as Exhibit 1 to this motion.

Thus, before the Court are two straightforward merits questions: (1) whether the Tax Mandate is unconstitutionally coercive, ambiguous, or unrelated to its stated purpose in violation of the Spending Clause (it is), and (2) whether Congress has commandeered State legislatures in violation of the Tenth Amendment (it has). ARPA "offers" States exorbitant payoffs in exchange for their sovereignty, an offer the States can't refuse while they and their residents recover from an economic crisis caused by a once-in-a-century pandemic. But the States have no way to understand the terms of the deal that Congress offered. And the deal as understood (which prohibits tax relief alone) is unrelated to ARPA's stated purpose of promoting economic recovery from the COVID-19 pandemic. Further, the Tax Mandate intrudes on State sovereignty by dictating State tax policy, an outcome that blurs responsibility and undermines political accountability. Thus, the Court should declare the Tax Mandate unconstitutional and permanently enjoin its enforcement.

These issues have already been briefed at length, and Plaintiff States incorporate that briefing and argument in full. (Docs. 21, 59.) Plaintiff States succinctly re-state those arguments here and focus this brief on two new issues: (1) the effect of the Department of Treasury's Interim Final Rule (none), and (2) the relief to which Plaintiff States are entitled at this stage of the litigation (a permanent injunction and declaratory judgment).

## STATEMENT OF FACTS

On March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 ("ARPA"), which appropriated approximately $1.9 trillion to provide relief to address the economic impact of the COVID-19 pandemic. *See* Pub. L. No. 117-2, 135 Stat. 4 (codified at 42 U.S.C. § 802 *et seq*.). Out of the roughly $1.9 trillion that ARPA allocates for pandemic relief, roughly $195.3 billion goes to the States. *Id.* § 802(b)(3)(A). For each State, these amounts represent a sizeable percentage of the State's annual revenue and expenditures.[2]

Congress specified that States must use ARPA funds to respond to the economic effects of COVID-19 in one of four specific ways: (1) providing assistance to "households, small businesses, and nonprofits" and "impacted industries such as tourism, travel, and hospitality"; (2) responding "to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers"; (3) making up for pandemic-related reductions in state government revenue; and (4) paying for "necessary investments in water, sewer, or broadband infrastructure." 42 U.S.C. § 802(c)(1)(A-D). In addition to specifying affirmative uses for the funds, Congress placed a special restriction on tax cuts. Section 802(c)(2)(A)—the Tax Mandate—provides:

---

[2] *Compare* Nat'l Assoc. of State Budget Officers, 2020 State Expenditure Report, p. 8 (Table 1), available at https://perma.cc/62WG-B9LW, *with* U.S. Dep't of Treasury, Allocation for States, available at https://home.treasury.gov/system/files/136/fiscalrecoveryfunds-statefunding1-508A.pdf (last visited July 29, 2021).

(2) FURTHER RESTRICTION ON USE OF FUNDS.—

(A) IN GENERAL.—A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

The phrase "directly or indirectly offset" is not defined. Congress did not extend this prohibition to cities, localities, or Tribal governments. *See* 42 U.S.C. § 803(c). And in other sections of ARPA, Congress enacted federal tax relief. *See*, *e.g.*, ARPA § 9621 (expanding earned income tax credit), § 9673 (exempting small business revitalization funds).

Further, ARPA requires any State that receives funds to "provid[e] a detailed accounting" to Defendants of "all modifications to the State's … tax revenue sources" for years to come, as well as "such other information as the Secretary may require for the administration of" the law. 42 U.S.C. § 802(d)(2).

Believing the Tax Mandate to be an unconstitutional intrusion on their sovereignty, Plaintiff States sued for injunctive and declaratory relief. Doc. 1. This Court, in resolving the States' preliminary injunction motion (Doc. 21), held that, accepting the allegations in the Complaint as true, the States had Article III standing to maintain this action and that the States' claims were ripe. Doc. 71 at 16-18. The

Court did not reach the merits of the claims, but "encouraged" an expedited briefing schedule to "aid in a prompt resolution of this action." *Id.* at 25.

Toward the close of briefing on the preliminary injunction motion, the Department of Treasury released an interim final rule purporting to implement ARPA. *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26786 (May 17, 2021). The Interim Final Rule states that "because money is fungible," even ARPA funds "not explicitly or directly used to cover the costs of changes that reduce net tax revenue … may be used in a manner inconsistent with the statute by indirectly being used to substitute for the State's or territory's funds that would otherwise have been needed to cover the costs of the reduction." 86 Fed. Reg. at 26807. The Rule creates a framework for identifying illegal indirect offsets.

*First*, every fiscal year, States "identify and value" anticipated legislative and administrative actions that might reduce tax revenue. *Id.* However, changes to income-tax rates that comply with federal law, rate reductions automatically triggered by laws in effect prior to March 3, 2021, and "[c]hanged administrative interpretations" that correct "prior inaccurate interpretations" are not counted as "covered changes." *Id.* at 26808.

*Second*, if the State's covered changes are anticipated to decrease revenue by 1 percent or less of the State's 2019 inflation-adjusted revenue, the decreases are deemed "de minimis" and do not trigger the Mandate. *Id.* at 26807, 26809, 26823.

*Third*, a State falls within a safe harbor from the Mandate if its actual tax revenue for a fiscal year exceeds its inflation-adjusted 2019 tax revenue. *Id.* at 26807, 26809.

*Finally*, if neither the de minimis exception nor the safe harbor apply, Treasury considers whether the decreased revenue has been offset by increases in revenue or certain qualified spending cuts. *Id.* at 26807, 26809–10, 26823. Spending cut values are set by comparing a State's most recent expenditure to its expenditure in 2019 (adjusting for inflation). *Id.* at 26809–10. If the federal government determines that revenue increases and "covered spending cuts" fully counterbalance drops in net tax revenue, then the federal government will deem that the State has not violated the Tax Mandate. To determine which spending cuts are "covered," Treasury's supervision must extend beyond how States are spending ARPA funds to also cover how States are spending State funds. Spending cuts in "areas" where States spent ARPA funds are not "covered spending cuts" and thus cannot offset a decrease in revenue. *Id.* at 26810.

Even a spending cut that a legislature thinks would qualify as covered in one year may become an uncovered spending cut years later. Treasury promises to "monitor changes in spending throughout the covered period," and if a spending cut in one year is, years later, "replaced with Fiscal Recovery Funds and used to indirectly offset a reduction in net tax revenue resulting from a covered change,

6

Treasury may consider such change to be an evasion of the restrictions of the offset provision and seek recoupment of such amounts." *Id.*

Ultimately, "all relevant facts and circumstances" are in play when Treasury determines whether a State has violated the Tax Mandate. *Id.*

As of July 23, 2021, the following Plaintiff States have submitted to the Treasury Secretary signed certifications and have received funds under ARPA: Alabama, Arkansas, Alaska, Florida, Iowa, Kansas, Montana, New Hampshire, Utah, and West Virginia. *See* Doc. 74, Joint Stipulation of Facts; 42 U.S.C. § 802(d)(1). The remaining Plaintiff States—Oklahoma, South Carolina, and South Dakota—have not yet provided certifications to the Secretary.

## ARGUMENT

### I.    The Tax Mandate Is Unconstitutional.

#### A. The Tax Mandate Violates the Spending Clause.

Congress' spending powers permit it to place *some* restrictions on the States as conditions for receiving federal funds that Congress may not otherwise impose on the States. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 576 (2012) (op. of Roberts, C.J.).[3] But this power is far from unlimited. Stipulations on the use of federal funds exceed Congress' spending power unless they meet all the following conditions: (1) the expenditure must benefit the general welfare; (2) any

---

[3] Unless otherwise noted, citations to *NFIB* are to the controlling opinion of Chief Justice Roberts.

condition must be unambiguous; (3) any condition must be reasonably related to the grant's purpose; (4) the grant and any conditions attached to it cannot violate an independent constitutional provision; and (5) the grant cannot amount to coercion as opposed to encouragement. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). Though ARPA may advance the general welfare, the Tax Mandate is unconstitutional because it violates every other *Dole* factor, and Treasury's attempt to save the provision through regulation does not cure these constitutional defects.

### 1. The Federal Tax Mandate Is Ambiguous.

Congress must "speak with a clear voice" "[i]f [it] intends to impose a condition on the grant of federal moneys"—that is, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This requirement means that Congress must "define those conditions clearly enough for the states to make an informed choice." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) (citing *Penhurst*, 451 U.S. at 25). Congress neglects this duty when a provision's "text, literally read, admits of two plausible interpretations." *Graham Cnty. Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 419 n.2 (2005). The Federal Tax Mandate is an example of such neglect. Here is its text:

> (A) IN GENERAL.—A State or territory shall not use the funds provided under this section ... to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a

> rate, a rebate, a deduction, a credit, or otherwise) or delays the
> imposition of any tax or tax increase.

42 U.S.C. § 802(c)(2)(A). The statute does not provide a way to determine whether a State's net tax revenues are "reduc[ed]." It does not specify whether its prohibition reaches all tax rate reductions, even if such a reduction is expected to be—or is actually—revenue neutral. Especially as Plaintiff States emerge from the economic effects of the pandemic, the tax revenues States receive may differ significantly from what States expect. Does the Tax Mandate turn on *expected* tax reductions, or *actual* tax reductions? Congress did not answer the question.

And that, arguably, isn't even the most confusing part of the statute. Congress did not define what it means to "directly or indirectly" offset tax cuts, and neither Plaintiffs nor Defendants can divine these words' meaning from the text of the statute. In prior briefing before this Court, Defendants were unable to give a clear explanation for what these terms mean. Nevertheless, Congress gave the Secretary authority to claw back funds Treasury suspects were used as a direct or indirect offset. *See* 42 U.S.C. § 802(e). And because "[m]oney is fungible," *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010), *any* ARPA funds the Plaintiff States receive could be viewed as indirectly offsetting *any* reduction in tax revenue from a change in state law or policy. After all, a decrease in one part of a State's revenue is necessarily offset somehow to achieve a balanced budget.

It is impossible for the Plaintiff States to "make an informed choice" about the costs of receiving ARPA funds because it is impossible to know how to exercise taxing authority without putting ARPA funding at risk. *Benning*, 391 F.3d at 1306; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("We must ask whether such a state official would clearly understand … the obligations[.]"). If the best interpretation is that the Tax Mandate covers *every* change that leads to decreased revenue, then Congress passed a statute with startling breadth and the constitutional concerns are all the more troubling. And if that is not what Congress intended, how can States know where the line actually lies? Nothing in the statutory text answers when "indirect" dwindles to "nonexistent." Thus, ARPA harms every State by presenting them "an unconstitutionally ambiguous deal," Doc. 71 at 16, and by inflicting an uncertainty that "will continue to exert pressure on state legislators not to consider any tax change, or set of tax changes, as to which the Tax Mandate implications cannot be assessed," *Ohio v. Yellen*, No. 1:21-CV-181, 2021 WL 2712220, at *8 (S.D. Ohio July 1, 2021).

The text of the Tax Mandate raises more questions than it answers. States were presented a bargain that was hopelessly ambiguous as to one of its most critical provisions, and they are continuing to suffer the effects of that ambiguity. *See* Ex. 2, Albritton Decl. The Court should redress these harms by holding that the Tax Mandate is unconstitutionally ambiguous under the Spending Clause.

### a. The Interim Final Rule Cannot Cure An Unconstitutionally Ambiguous Law.

Treasury's recently issued Interim Final Rule cannot and does not solve the ambiguity problem. As a threshold matter, it is "*Congress*" that must speak "unambiguously" if it "intends to impose a condition on the grant of federal moneys." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). Thus, "[i]t is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted." *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc). Just as an agency cannot "cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001), an agency cannot make an unconstitutionally vague condition enforceable through later action.

This conclusion necessarily follows from the fact that Congress, not the President, wields the spending power. The Constitution "carefully separates the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361-62 (5th Cir. 2021). Because "the President does not have the power to place conditions on federal funds," he "cannot delegate this power" to the Treasury Department. *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017). To hold otherwise would

allow the Executive to materially alter a bargain between the States and Congress. Granting the Executive the power to "attach new conditions to federal grants, unauthorized by Congress, … would give the Executive enormous power to pressure states and localities." Ilya Somin, *Making Federalism Great Again*, 97 Tex. L. Rev. 1247, 1285 (2019). Of course, preventing such "concentration of power" is precisely why the Constitution creates a government of separated powers. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020) (quotation omitted).

Moreover, the Interim Final Rule cannot save the Tax Mandate, for if it could, the Executive Branch would gain a power the Constitution never granted it: the power to revive (and later effectively repeal) unconstitutional laws. When Congress enacts a law that exceeds its enumerated powers, the law is "void." *Marbury v. Madison*, 1 Cranch 137, 177 (1803); *see, e.g., Murphy v. NCAA*, 138 S. Ct. 1461, 1485 (2018); *United States v. Lopez*, 514 U.S. 549, 566 (1995). And just as void laws may not be enforced in court by the judicial branch, *see Marbury*, 1 Cranch at 177–78, they may not be enforced out of court by the executive branch, *see Bond v. United States*, 564 U.S. 211, 226–27 (2011); *Lopez*, 514 U.S. at 567–68. All three branches must follow the Constitution when it trumps a statute. Thus, when a statute violates the Constitution, no branch should give it effect. *Id.*; *Montgomery v. Louisiana*, 577 U.S. 190 (2016); *Marbury*, 1 Cranch at 177-78; *Bank of Hamilton v.*

*Lessee of Dudley*, 27 U.S. 492, 526 (1829). Were it otherwise, the executive branch (and ultimately the judiciary) would be enforcing an unconstitutional law.

Finally, the Rule cannot save the Tax Mandate without violating the nondelegation doctrine. The Treasury Department is essentially claiming the power to toggle the Tax Mandate on or off depending on whether the agency has issued guidance of sufficient clarity. But as even the plurality in *Gundy v. United States* recognized, if the Executive were given "plenary power to determine [a statute]'s applicability," "we would face a nondelegation question." 139 S. Ct. 2116, 2123 (2019). Indeed, if ARPA has effectively granted Treasury the authority to determine whether the Tax Mandate will lie dormant as an unconstitutionally vague provision or spring to life through vivifying regulations, then Congress has impermissibly delegated Treasury "a quintessentially legislative power." *Id.* at 2144 (Gorsuch, J., dissenting). The Interim Final Rule thus cannot cure the Tax Mandate's unconstitutional ambiguity.

### b. *Congress Did Not Delegate Treasury the Authority to Cure the Tax Mandate's Ambiguity.*

Even if Congress could assign an agency the power to clarify an unconstitutionally ambiguous Spending Clause condition, Congress did not do so here. *See Ohio*, 2021 WL 2712220, at *18-20. This follows from the major questions doctrine, for "there can be little doubt that the language of [the Tax Mandate] leaves open 'major questions.'" *Id.* at *19.

13

The major questions doctrine recognizes that while ambiguity in a statute typically "constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps," when the ambiguous provision concerns "a question of deep 'economic and political significance' that is central to th[e] statutory scheme," then courts should recognize that, "had Congress wished to assign that question to an agency, it surely would have done so expressly." *King v. Burwell*, 576 U.S. 473, 485 (2015) (quoting *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014)).

"The Tax Mandate 'involv[es] billions of dollars in spending each year,' *see Burwell*, 576 U.S. at 485, and is expressly directed at a core State function, the power to tax, that has long been recognized as 'indispensable' to the States' very existence." *Ohio*, 2021 WL 2712220, at *19 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824)). The Tax Mandate thus implicates several "question[s] of deep 'economic and political significance.'" *King*, 576 U.S. at 485. It follows then that if Congress intended to give Treasury the power to issue regulations that "upset the usual constitutional balance of federal and state powers," Congress would have made "its intention to do so unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation omitted). But the Tax Mandate contains no clear indication that it would be incomplete until Treasury finished the job.

To the contrary, "[u]nder ARPA as written, … States were authorized to send in certifications immediately upon the effective date of the Act. That is strong

evidence that Congress considered the terms of the deal to be complete as of that date." *Ohio*, 2021 WL 2712220, at \*20. This fact means that "the conditional-spending offer here—which included the Tax Mandate, but not yet the regulations— violated the Constitution when first presented to the States." *Id.* And because Congress never gave Treasury the authority to try to cure this defective deal, the Tax Mandate is unconstitutional.

### c. The Interim Final Rule is Unconstitutionally Ambiguous.

The Interim Final Rule also fails to solve Defendants' ambiguity problems because the Rule itself is ambiguous. For example, when it comes to assessing "reduction[s] in the net tax revenue … resulting from a change in law, regulation, or administration interpretation … that reduces any tax," 42 U.S.C. §802(c)(2)(A), the Rule sets out four characteristics. *First*, the "change in law" must be a "covered change." 86 Fed. Reg. at 26809. But the "covered change" definition itself introduces ambiguity, for it excludes certain changes including administrative interpretations that are "corrections to replace prior inaccurate interpretations." *Id.* at 26808. How Treasury will determine whether a state agency's interpretation of state law was accurate now or before is anyone's guess.

And while the Rule provides some more guidance than the statutory text, it still fails to clearly define how a State "indirectly offsets" spending cuts with ARPA funds. A State, for example, can cut taxes so long as decreases in revenue are

15

counterbalanced by "[s]pending cuts in areas not being replaced by Fiscal Recovery Funds." *Id.* at 26808. But the Rule does not define "areas." And because the "interim final rule provides benefits across several areas" due to the breadth with which ARPA funds can be used, *id.* at 26816, few "areas" of State spending will be suitable candidates for spending cuts that could offset a decrease in revenue.[4]

Worse still, Treasury has multiple years during which it can assess whether "a spending cut is subsequently replaced with Fiscal Recovery Funds and used to indirectly offset a reduction in net tax revenue resulting from a covered change." *Id.* at 26810. Thus, a spending cut in 2021 followed by a use of ARPA funds in 2023 could later be deemed "an evasion of the restrictions of the offset provision" that would entitle Treasury to recoupment. *Id.* In short, the Rule still leaves States guessing as to how they may exercise their core sovereign power to tax. Because neither Congress nor Treasury has clearly set out the terms of the Tax Mandate condition, it cannot be enforced against the States.

---

[4] The Rule appears to provide some clarity by declaring that a State can, without fear, count as covered spending cuts any cuts from a "department, agency, or authority" on which the State has spent no ARPA funds. 86 Fed. Reg. at 26810. But if the State has spent any ARPA funds on any "area" at a department, agency, or authority, ARPA funds "generally w[ill] be deemed to have replaced the amount of spending cut" from the department, agency, or authority. *Id.* The Rule thus suggests that a State spending ARPA funds on one "area" at an agency *might* have room to make covered spending cuts in another "area" covered by the agency, but that doing so is risky for a State, as Treasury might later view the relevant "area" differently.

## 2. The Tax Mandate Is Coercive.

"When a heavy federal tax is levied to support a federal program that offers large grants to the States, States may, as a practical matter, be unable to refuse to participate in the federal program and to substitute a state alternative." *NFIB*, 567 U.S. at 680 (Scalia, J., with Kennedy, Thomas, and Alito, JJ., dissenting). Such laws amount to unconstitutional coercion. *NFIB* flowed from Congress' decision to condition Medicaid funding on a State's willingness to expand Medicaid coverage— a "threatened loss of over 10 percent of a State's overall budget." *Id.* at 581-82 (plurality op.). This amount meant the funding was not "relatively mild encouragement," but "a gun to the head." *Id.* at 581. Thus, the Court found the legislation markedly different from the law *Dole* approved, where if States refused to raise the drinking age to 21, they were threatened with loss of less than half of one percent of their budgets. *Id.*

When it comes to conditional funding, the Tax Mandate—as in *NFIB*—is a "shift in kind, not merely degree." *See* 567 U.S. at 583. ARPA uses the financial needs of the Plaintiff States and their citizens stemming from a global pandemic to compel them to surrender sovereign taxing authority for years to come. Only the federal government can quickly borrow the massive sums of money allocated through ARPA, and the sums are massive. *See* 42 U.S.C. § 802(b)(3).

17

The Supreme Court in *NFIB* did not set a bright line for the constitutionality of spending programs, but "wherever that line may be," the Tax Mandate "is surely beyond it." 567 U.S. at 585. The *NFIB* Court held that conditioning "10 percent of a State's overall budget" on compliance with federal conditions was coercion, *id.* at 581-82, and here the stakes are likewise high. Alabama, for example, is slated to receive over $2.1 billion, and Alabama estimates that it will have about $9.7 billion in revenue for the legislature to appropriate through the State's general fund budget and education trust fund budget for fiscal year 2021.[5] To be sure, in addition to this discretionary revenue, there are other earmarked funds (including, for example, federal Medicaid dollars) that increase the size of each State's total expenditures. Thus, a report by the National Association of State Budget Officers pegged Alabama's estimated discretionary spending for 2020 at roughly $9.3 billion and its estimated expenditures at roughly $28.6 billion.[6] But whether ARPA funds are measured against the smaller denominator of discretionary revenue or larger denominator of expenditures, the statute falls within the zone of *NFIB*'s coercion analysis, as recent data suggest the States stand to forfeit funds that equate to between 5.7 percent (Arkansas) and 20.1 percent (South Dakota) of the State's

---

[5]   Alabama Department of Finance, Executive Budget Office, *State Receipts*, https://budget.alabama.gov/state-receipts/ (last visited July 29, 2021).
[6] Nat'l Assoc. of State Budget Officers, 2020 State Expenditure Report, p. 8 (Table 1), available at https://perma.cc/62WG-B9LW. The Association is "composed of the heads of state finance departments," *id.* at i, its "data are self-reported by the states." *id.* at v.

expenditures.[7] The sheer size of these funds, combined with the tolls of a once-in-a-century pandemic, leave the States no meaningful way to "defend their prerogatives" through a "legitimate choice" to say "no thanks." *NFIB*, 567 U.S. at 577–79. Put simply, "Congress has 'crossed the line distinguishing encouragement from coercion,'" *id.* at 579 (quoting *New York v. United States*, 505 U.S. 144, 175 (1992)), and any argument to the contrary "ignores reality," 567 U.S. at 680 (Scalia, J., with Kennedy, Thomas, and Alito, JJ., dissenting).

### 3. The Tax Mandate Is Unrelated to ARPA's Purpose.

Spending conditions must be germane to the purposes of the grant, *Dole*, 483 U.S. at 208, which demands relevance "to federal interest in the project and to the over-all objectives," *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295 (1958). Otherwise, "the spending power could render academic the Constitution's other grants and limits of federal authority." *New York*, 505 U.S. at 167.

ARPA was created and promoted as a plan to assist in the rebound from the pandemic's economic devastation. This purpose appears in the four categories where Congress affirmatively authorized state spending—on financially impacted households and businesses, essential worker compensation, lost state government revenue, and infrastructure investment. 42 U.S.C. § 802(c)(1)(A-D).

---

[7] *Compare id.* at 8 (Table 1) *with* U.S. Department of Treasury, Allocation for States, available at https://home.treasury.gov/system/files/136/fiscalrecoveryfunds-statefunding1-508A.pdf (last visited July 29, 2021).

Prohibiting tax reductions, however, does not advance ARPA's goal of providing meaningful relief to individuals and entities affected by the pandemic. States are already required by 42 U.S.C. § 802(c)(1) to spend the federal funds on ARPA's identified purposes. The Tax Mandate does nothing to require that States spend funds on COVID-related purposes; a State could zero out its spending on COVID, fund those expenditures with ARPA funds, and use the surplus State funds on *anything* except tax relief. Thus, beyond clarifying that ARPA funds must be used on expenditures and not tax cuts, the Tax Mandate does nothing to further the goal of providing COVID relief. Indeed, by allowing States to spend State funds on non-COVID purposes while punishing them for providing tax relief to those affected by the pandemic, the Tax Mandate undercuts ARPA's ultimate goal. After all, ARPA itself provides tax relief. *See* ARPA, Pub. L. No. 117-2, § 9621 (expanding earned income tax credit), § 9673 (exempting small business revitalization funds). And ARPA allows localities—but not States—to provide tax relief by providing them funds free from any Tax Mandate. *See* 42 U.S.C. § 803. It thus appears that the only purpose of the Tax Mandate is bigger government for big government's sake, which is certainly not the stated purpose of ARPA.

## B. The Tax Mandate Violates the Tenth Amendment.

The anticommandeering doctrine serves the important function of safeguarding "a fundamental structural decision incorporated into the Constitution,

*i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475. The federal government "may act only where the Constitution authorizes it to do so." *Printz v. United States*, 521 U.S. 898, 937 (1997). And "[s]tate sovereignty is not just an end in itself"; honoring "federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *NFIB*, 567 U.S. at 536 (citation omitted); *see also* The Federalist No. 45 (J. Madison) (explaining that federalism helps ensure that powers, which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people," were held by locally accountable leaders). The Constitution's division of federal-state powers, including the anticommandeering doctrine, thus ultimately exists "for the protection of individuals." *Murphy*, 138 S. Ct. at 1477 (citations omitted).

Anticommandeering applies to both affirmative and negative commands: Directives *not* to act are still "direct orders to state legislatures." *Murphy*, 138 S. Ct. at 1478. And federal orders to the States are unconstitutional under the anticommandeering doctrine when they implicate either of two concerns. First, because the doctrine serves as "one of the Constitution's structural protections of liberty," it applies when federal action threatens the "healthy balance of power between the States and the Federal Government." *Id.* at 1477. Second, it "promotes political accountability" when it keeps decisions that affect the States in the hands of state leaders. *Id.* (citations omitted). The Tax Mandate upsets both interests.

21

First, the Tax Mandate is an unprecedented intrusion on State sovereignty in an area the Constitution reserves for the States: tax policy. *See* Doc. 21 at 31–33. Second, the Tax Mandate prevents voters from holding their lawmakers accountable, *see id.* at 33–34, for it undeniably restricts States' ability to cut at least some taxes. When a State imposes (or keeps in place) taxes only because of congressional command, responsibility is blurred and political accountability avoided. *See New York*, 505 U.S. at 168–69. The Tenth Amendment forbids this outcome.

The Interim Final Rule exacerbates this intrusion. To determine whether a decrease in revenue has been indirectly offset by spending cuts or ARPA funds, Treasury now must determine whether spending cuts by the States "in certain areas" are acceptable to "pay for covered changes that reduce tax revenue." 86 Fed. Reg. at 26809. Thus, Treasury now finds itself in the business of analyzing and ultimately influencing countless revenue and expenditure actions by the State.

Finally, it is "immaterial whether states voluntarily choose to be part of a federal program, if Congress lacked the power to create such a program in the first place." *Carey v. Throwe*, 957 F.3d 468, 481 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1054 (2021). Congress lacked the power to create and impose the Tax Mandate, and this Court should enjoin its enforcement against the Plaintiff States.

22

## II.    The Court Should Enjoin the Tax Mandate and Declare It Unconstitutional.

### A.    The Court Should Issue a Permanent Injunction.

A plaintiff is entitled to a permanent injunction if: (1) it "suffered an irreparable injury"; (2) the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the "balance of hardships between the plaintiff and the defendant" justify an equitable remedy; and (4) "the public interest would not be disserved be a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiff States satisfy each factor. First, the Tax Mandate has and will continue to inflict irreparable injury on Plaintiff States, who are all either faced with or bound by an unconstitutionally ambiguous and coercive "deal" that is intruding on each State's ability to exercise its "indispensable" sovereign power to tax. *See Gibbons v. Ogden*, 22 U.S. 1, 199 (1824). Second, because the States cannot sue the federal government for damages, and their harms are not redressable through damages, "the remedies available at law" are "inadequate." *eBay*, 547 U.S. at 391. Third, the balance of hardships favor the States, which have a strong interest in not having their sovereign authority impinged by an unconstitutional law, while Defendants' have no legitimate interest in enforcing that law. Fourth, an injunction will promote the public interest because "the public … has no interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010).

23

**B.     The Court Should Award Declaratory Relief.**

The Declaratory Judgment Act provides a federal court with jurisdiction over "a case of actual controversy" the authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). When an actual controversy is present, a declaratory judgment can help relieve "uncertainty and insecurity with respect to rights, status, and other legal relations," *Cas. Indem. Exch. v. High Croft Enters., Inc*., 714 F. Supp. 1190, 1193 (S.D. Fla. 1989), and thus "facilitate efficient outcomes," *Med. Assur. Co. v. Hellman*, 610 F.3d 371, 381 (7th Cir. 2010).

Because Plaintiff States are suffering harms from the Tax Mandate, they have standing to sue and this case involves an "actual controversy." *Id.* And because the Tax Mandate is unconstitutional, this Court may say so. "[W]hether to grant declaratory relief is a matter for the court's sound discretion." *Hollis v. Itawamba Cty. Loans*, 657 F.2d 746, 750 (5th Cir. Unit A Sept. 1981). "In the exercise of their

sound discretion to entertain declaratory actions[,] the district courts may not decline on the basis of whim or personal disinclination[.]" *Id.* Here, there is no reason for the Court not to award declaratory relief and several reasons for it to do so. By clarifying the relationship between the States and the federal government, the Court will dispel the uncertainty inhibiting the States' exercise of their sovereign authority. And that clarity will redound to the benefit of the States and their people, as elected representatives will be free to exercise sovereign taxing power without fear of federal punishment in the coming months and years.

## CONCLUSION

The Court should enjoin enforcement of the Tax Mandate and declare it unconstitutional.

Respectfully submitted,

/s/ Edmund G. LaCour, Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour, Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAG.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov
**Counsel for State of Alabama**

/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See (*pro hac vice*)
  *West Virginia Solicitor General*
David C. Tryon (*pro hac vice*)
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing
  under supervision of West Virginia
  attorneys)
Jessica A. Lee (*pro hac vice*)
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov
**Counsel for State of West Virginia**

/s/ Bryan M. Taylor
Bryan M. Taylor
Bachus Brom & Taylor LLC
3536 Independence Dr.
Birmingham, AL 35209
Tel: (334) 595-9650
btaylor@bachusbrom.com

/s/ Nicholas Bronni
LESLIE RUTLEDGE
  *Arkansas Attorney General*
Nicholas J. Bronni (*pro hac vice*)
  *Arkansas Solicitor General*
Vincent M. Wagner (*pro hac vice*)
  *Deputy Solicitor General*
Dylan L. Jacobs (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov
**Counsel for State of Arkansas**

/s/ John M. Ptacin
TREG R. TAYLOR
  *Attorney General of Alaska*
John M. Ptacin (*pro hac vice*)
  *Chief Assistant Attorney General*
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Facsimile: (907) 276-3697
John.ptacin@alaska.gov
**Counsel for State of Alaska**

26

/s/ Jason Hilborn
ASHLEY MOODY
 *Florida Attorney General*
Jason H. Hilborn (*pro hac vice*)
 *Assistant Solicitor General*
Office of the Florida
Attorney General
Office of the Attorney General
State of Florida
PL-01 The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Jason.Hilborn@myfloridalegal.com
**Counsel for State of Florida**

/s/ David M.S. Dewhirst
AUSTIN KNUDSEN
 *Attorney General of Montana*
David M.S. Dewhirst (*pro hac vice*)
 *Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-4145
David.Dewhirst@mt.gov
**Counsel for the State of Montana**

/s/ Jeffrey S. Thompson
THOMAS J. MILLER
 *Attorney General of Iowa*
Jeffrey S. Thompson (*pro hac vice*)
 *Solicitor General*
1305 East Walnut Street
Des Moines, IA 50319
Tel: 515-281-5164
jeffrey.thompson@ag.iowa.gov
**Counsel for State of Iowa**

/s/ Anthony J. Galdieri
Anthony J. Galdieri (*pro hac vice*)
Senior Assistant Attorney General
Office of the New Hampshire
Attorney General
33 Capitol Street
Concord, NH 03301-6397
Tel: (603) 271-1214
Anthony.J.Galdieri@doj.nh.gov
**Counsel for the State of
New Hampshire**

/s/ Dwight R. Carswell
DEREK SCHMIDT
 *Kansas Attorney General*
Dwight R. Carswell (*pro hac vice*)
 *Assistant Solicitor General*
Office of the Kansas
Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8410
dwight.carswell@ag.ks.gov
**Counsel for State of Kansas**

/s/ Mithun Mansinghani
MIKE HUNTER
 *Oklahoma Attorney General*
Mithun Mansinghani (*pro hac vice*)
 *Solicitor General*
Oklahoma Office Of The
Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
mithun.mansinghani@oag.ok.gov
**Counsel for the State of Oklahoma**

/s/ J. Emory Smith, Jr.
ALAN WILSON
  *South Carolina Attorney General*
J. Emory Smith, Jr. (*pro hac vice*)
  *Deputy Solicitor General*
Office of the South Carolina
Attorney General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
esmith@scag.gov
**Counsel for State of South Carolina**

/s/ Jeffery J. Tronvold
JASON RAVNSBORG
  *South Dakota Attorney General*
Jeffery J. Tronvold (*pro hac vice*)
  *Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Tel:  (605) 773-3215
Jeffery.tronvold@state.sd.us
**Counsel for State of South Dakota**

/s/ Melissa A. Holyoak
SEAN REYES
  *Utah Attorney General*
Melissa A. Holyoak (*pro hac vice*)
  *Utah Solicitor General*
Office of the Utah Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Tel: (801) 366-0260
**Counsel for State of Utah**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2021, I electronically filed the foregoing Complaint with the Clerk of the United States District Court for the Northern District of Alabama using the CM/ECF system. Participants who are registered CM/ECF users have been served by the CM/ECF system.

<u>/s/ Edmund G. LaCour, Jr.</u>
Edmund G. LaCour, Jr.