FILED
2021 Aug-12 PM 08:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| STATE OF WEST VIRGINIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF THE TREASURY, *et al.*,<br><br>Defendants. | Case No. 7:21-cv-00465-LSC |

**DEFENDANTS' COMBINED MOTION TO DISMISS
AND OPPOSITION TO PLAINTIFFS' MOTION FOR
PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

## MOTION TO DISMISS

Defendants move to dismiss Plaintiffs' complaint, Compl., ECF No. 1, under Federal Rule of Civil Procedure 12(b)(1) and (6) for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted.

DATED: August 12, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

/s/ *Stephen Ehrlich*
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS


INTRODUCTION ........................................................................ 1

BACKGROUND........................................................................ 3

LEGAL STANDARDS.................................................................. 6

ARGUMENT.......................................................................... 7

I. PLAINTIFFS HAVE FAILED TO ESTABLISH JURISDICTION............................ 7

A. Plaintiffs have neither pled nor proved the required elements for pre-enforcement standing.................................. 8

B. Plaintiffs' other purported injuries do not suffice for standing. ........................................................ 12

II. PLAINTIFFS FAIL TO STATE A CLAIM AND CANNOT SUCCEED ON THE MERITS..................................................................... 15

A. The offset provision is unambiguous. .................................... 15

1. The Rescue Plan satisfies the unambiguity requirement.............................................................. 16

2. The Rule impliments the unambiguous text of the offset provision. ...................................................... 21

B. The Rescue Plan is not coercive or commandeering. ................ 26

C. The offset provision relates to the Rescue Plan's purposes. ...... 30

III. THE COURT SHOULD NOT ENJOIN THE OFFSET PROVISION OR DECLARE IT UNCONSTITUTIONAL................................................................ 31

A. The States are not entitled to a permanent injunction............... 31

B. The Court should not issue a declaratory judgment................. 34

CONCLUSION ........................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*Ameritas Variable Life Ins. Co. v. Roach*,
411 F.3d 1328 (11th Cir. 2005) .......... 34

*Arizona v. Yellen*,
2021 WL 3089103 (D. Ariz. July 22, 2021) .......... *passim*

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) .......... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7

*Babbitt v. Farm Workers*,
442 U.S. 289 (1979) .......... 8

*Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar*,
956 F.3d 689 (5th Cir. 2020) .......... 23

*Bell v. New Jersey*,
461 U.S. 773 (1983) .......... 2, 10, 29, 30

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) .......... 15, 20, 21, 26

*Bennett v. New Jersey*,
470 U.S. 632 (1985) .......... 15

*Benning v. Georgia*,
391 F.3d 1299 (11th Cir. 2004) .......... *passim*

*Bochese v. Town of Ponce Inlet*,
405 F.3d 964 (11th Cir. 2005) .......... 7

*California v. Texas*,
141 S. Ct. 2104 (2021) .......... 14

*Carey v. Throwe*,
957 F.3d 468 (4th Cir. 2020) ........................................................ 29, 30

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ........................................... 17, 20, 21, 26

*Children's Hosp. Ass'n of Texas v. Azar*,
933 F.3d 764 (D.C. Cir. 2019) ............................................................ 23

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ............................................................ 31

*Coll. Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) ............................................................................ 29

*Cutter v. Wilkinson*,
423 F.3d 579 (6th Cir. 2005) .............................................................. 18

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .............................................................................. 8

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .................................................................. 17, 20, 26

*ebay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ........................................................................ 7, 8, 32

*Franklin v. Curry*,
738 F.3d 1246 (11th Cir. 2013) ............................................................ 7

*Graham Cnty. Soil & Water Conservation Dist. v. United States*,
545 U.S. 409 (2005) .............................................................................. 17

*Greater Birmingham Ministries v. Alabama*,
161 F. Supp. 3d 1104 (N.D. Ala. 2016) ................................................. 7

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
959 F.3d 178 (5th Cir. 2020) .............................................................. 27

*Harper v. Pro. Prob. Servs. Inc.*,
976 F.3d 1236 (11th Cir. 2020) ............................................................ 7

*Harris v. Olszewski*,
442 F.3d 456 (6th Cir. 2006) .......................................................................... 23

*Hobson v. Fischbeck*,
758 F.2d 579 (11th Cir. 1985) .......................................................................... 32

*Irving Indep. Sch. Dist. v. Tatro*,
468 U.S. 883 (1984) .......................................................................... 23

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .......................................................................... 17, 20, 26

*King v. Burwell*,
576 U.S. 473 (2015) .......................................................................... 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 7, 8, 12

*Maryland v. King*,
567 U.S. 1301 (2012) .......................................................................... 33

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) .......................................................................... 30

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002) .......................................................................... *passim*

*Miss. Comm'n on Env't Quality v. EPA*,
790 F.3d 138 (D.C. Cir. 2015) .......................................................................... 27

*Missouri v. Yellen*,
2021 WL 1889867 (E.D. Mo. May 11, 2021) .......................................................................... *passim*

*Munn v. Illinois*,
94 U.S. 113 (1876) .......................................................................... 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......................................................................... *passim*

*Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) .......................................................................... 32, 33

*New York v. United States*,
505 U.S. 144 (1992)....................................................................30, 31

*Ohio v. Yellen*,
2021 WL 2712220 (S.D. Ohio July 1, 2021) ............................................22

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
330 U.S. 127 (1947)....................................................................10, 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......................................................................16, 18

*Petit v. U.S. Dep't of Educ.*,
675 F.3d 769 (D.C. Cir. 2012)........................................................23

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952)........................................................................15

*Religious Sisters of Mercy v. Azar*,
513 F. Supp. 3d 1113, 2021 WL 191009 (D.N.D. Jan. 19, 2021),
*appeal pending on other grounds*, No. 21-1890 (8th Cir. 2021).....................27

*Renne v. Geary*,
501 U.S. 312 (1991)..........................................................................7

*Reno v. Condon*,
528 U.S. 141 (2000)........................................................................21

*Rosen v. Cascade Int'l, Inc.*,
21 F.3d 1520 (11th Cir. 1994) ...........................................................32

*Rostker v. Goldberg*,
453 U.S. 57 (1981)..........................................................................21

*Rust v. Sullivan*,
500 U.S. 173 (1991)........................................................................30

*Sabri v. United States*,
541 U.S. 600 (2004)............................................................ 10, 15, 30

*Sampson v. Murray*,
415 U.S. 61 (1974)....................................................................................33

*School Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
584 F.3d 253 (6th Cir. 2009)..........................................................................29

*South Dakota v. Dole*,
483 U.S. 203 (1987)............................................................................28, 29, 31

*Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937)....................................................................................13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...........................................................................8, 10, 12

*United States v. Butler*,
297 U.S. 1 (1936)...................................................................................28, 29

*United States v. Miami University*,
294 F.3d 797 (6th Cir. 2002)..........................................................................23

*United States v. Morrison*,
529 U.S. 598 (2000)....................................................................................21

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001)....................................................................................33

*Va. Dep't of Educ. v. Riley*,
106 F.3d 559 (4th Cir. 1997)..........................................................................18

*W. Va. Dep't of Health & Hum. Res. v. Sebelius*,
649 F.3d 217 (4th Cir. 2011)..........................................................................20

*W. Va. v. U.S. Dep't of Treasury*,
2021 WL 2952863 (N.D. Ala. July 14, 2021)..................................... *passim*

*Walters v. Nat'l Ass'n of Radiation Survivors*,
468 U.S. 1323 (1984)..................................................................................34

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)....................15

**Statutes**

28 U.S.C. §2201....................7, 34

42 U.S.C. § 802.................... *passim*

American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Pub. L. No. 117-2....................1

**Rules**

Fed. R. Civ. P. 12....................7

Fed. R. Civ. P. 56....................6

**Regulations**

Coronavirus State and Local Fiscal Recovery Funds,
86 Fed. Reg. 26,786 (May 17, 2021).................... *passim*

**Other Authorities**

Ilya Somin, *Making Federalism Great Again*,
97 Tex. L. Rev. 1247 (2019)....................18

## INTRODUCTION

As part of the American Rescue Plan Act ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. Congress gave States considerable flexibility to use these new federal funds, which may be directed to a broad variety of state efforts to respond to the public health emergency created by the COVID-19 pandemic and to its economic effects. *Id.* § 802(c). But to ensure that the new federal funds would be used for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *Id.* § 802(c)(2)(A) (the "offset provision"). Congress also gave the Secretary of the Treasury the power to "issue such regulations as may be necessary or appropriate to carry out" Section 802, *id.* § 802(f), and the Treasury Department exercised this authority by issuing an Interim Final Rule, *see* Notice of Interim Final Rule, 86 Fed. Reg. 26,786 (May 17, 2021) ("the Rule"), ECF No. 33. In addition to implementing the permissible uses of Rescue Plan funds, the Rule outlines a step-by-step process that Treasury will follow to determine whether States are impermissibly using Rescue Plan funds to offset net-tax-revenue reductions. *Id.* at 26,807.

This lawsuit by thirteen Plaintiff States—seeking to prematurely enjoin the offset provision—is one of six around the country. In two of the three cases already decided, district courts in Missouri and Arizona dismissed nearly-identical complaints for lack of standing. *See Arizona v. Yellen*, 2021 WL 3089103, at *6 (D. Ariz. July 22, 2021), *appeal filed*, No. 21-16227 (9th Cir. July 26, 2021); *Missouri v. Yellen*, 2021 WL 1889867, at *5 (E.D. Mo. May 11, 2021), *appeal filed,* No. 21-2118 (8th Cir. May 18, 2021). This Court should do the same because Plaintiffs have not pled, let alone proved, that

there is a credible threat of enforcement from the offset provision or that they have suffered any other cognizable injury.

Failing that, the Court should dismiss this case because Plaintiffs cannot succeed on the merits. The offset provision is not ambiguous because "nobody questions the [offset provision] exists as a condition to [States] accepting the [Rescue Plan] funds," and "[i]n that regard, Congress fulfilled its duty under" the Spending Clause. *Arizona*, 2021 WL 3089103, at *3. In any event, the offset provision provides far more information than the Spending Clause requires, explaining the nature and scope of the funding condition. Not to mention that the Rule lays out a comprehensive framework for implementing the offset provision, a framework that many Plaintiff States understood when they certified compliance with the offset provision in order to receive, to date, over $10.6 billion in federal funds. *See* Joint Stipulation of Facts, ECF No. 74.

Nor is the offset provision coercive or commandeering. Plaintiffs were (and are) free to decline Rescue Plan funds if they dislike the offset provision. Nothing happens if States do so, a result that *all* Justices deemed acceptable in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ["NFIB"]. And while Plaintiffs complain that the offset provision "intrudes on [their] State sovereignty," Mot. for Permanent Inj. & Declaratory J. at 2, ("FJ Mot."), ECF No. 75, the Supreme Court has said the opposite: "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell v. New Jersey*, 461 U.S. 773, 790 (1983). Indeed, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *NFIB*, 567 U.S. at 578.

Many of these issues were previously briefed at length when Plaintiffs moved for a preliminary injunction. *See generally* Opp'n to Mot. for Prelim. Inj. ("PI Opp'n"), ECF No. 54. Defendants incorporate that briefing and argument in full, and now ask the Court to dismiss Plaintiffs' meritless case.

**BACKGROUND**

As part of the American Rescue Plan Act, Congress established the Coronavirus State Fiscal Recovery Fund, which provides nearly $200 billion to the States and the District of Columbia. 42 U.S.C. § 802(b)(2)(A). The Rescue Plan provides States with considerable latitude, in scope and duration, to use the Rescue Plan funds for pandemic-related purposes. Through the "covered period," a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
>
> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;
>
> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or
>
> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1).[1]

The Rescue Plan includes two "further restrictions" to ensure that the broad outlay of funds is used for the identified purposes while funds are available. 42 U.S.C. § 802(c)(2). One limitation (not challenged here) provides that a State may not "deposit" Rescue Plan funds "into any pension fund." *Id.* § 802(c)(2)(B). The other limitation (at issue here) provides in relevant part that a State:

> shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).

By its terms, the funding condition is a "[f]urther restriction on [the] use of funds," which applies only to reductions in "net" tax revenue. *Id.* The statute thus does not prevent a State from changing its tax policy or modifying its tax code—including by cutting taxes. But if a State chooses to reduce its net tax revenue, it may not use the Rescue Plan funds to "offset" that reduction.

The Rescue Plan also authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out" the applicable statutory provisions. *Id.* § 802(f). On May 10, 2021, Treasury posted an Interim Final Rule implementing the Rescue Plan, which was published

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to, or recovered by, the Secretary." 42 U.S.C. § 802(g)(1).

in the Federal Register the following week. *See* 86 Fed. Reg. 26,786. The Rule sets forth a framework for determining when a State has used Rescue Plan funds to "directly or indirectly offset" a reduction in net tax revenue:

1. For each year during the covered period, a State will use its ordinary budget-scoring process to evaluate whether changes in law, regulation, or interpretation will result in a reduction in tax revenue. If so, the amount of the reduction is the amount a State needs to "pay for" with sources other than Rescue Plan funds.

2. A State need not show how reductions are paid for if the reductions are de minimis, defined as less than 1% of the State's inflation-adjusted 2019 tax revenue. Under those circumstances, a State will not be subject to recoupment.

3. A State will consider the amount of actual tax revenue recorded in the reporting year. If the State's actual tax revenue is greater than its inflation-adjusted 2019 tax revenue, the State did not violate the offset provision (regardless of what changes it made to its tax laws) because it experienced no reduction in net tax revenue.

4. If a State's actual tax revenue in the reporting year is less than the State's inflation-adjusted 2019 tax revenue, the State will identify any sources of funds that have been used to permissibly offset the total value of covered tax changes. These include any tax changes that increase tax revenue and any spending cuts in areas where the State is not spending Rescue Plan funds. The State then subtracts those permissible offsets from the total value of revenue-reducing changes calculated in Step 1 to determine what portion of the revenue-reducing changes has not been paid for. The State is

then potentially subject to recoupment for that amount or the difference between the State's actual tax revenue and its inflation-adjusted 2019 tax revenue, whichever is greater.

5. If there are any amounts that could be subject to recoupment, Treasury will provide notice to the State and the State will have an opportunity to respond.

*See* 86 Fed. Reg. at 26,806–10.

On March 31, 2021, the thirteen Plaintiff States filed a complaint alleging that the offset provision is unconstitutional on its face. Plaintiffs then moved for a preliminary injunction, which this Court denied. *West Virginia v. U.S. Dep't of Treasury*, 2021 WL 2952863, at *10 (N.D. Ala. July 14, 2021). Between May and July 2021, ten of the thirteen Plaintiff States submitted their certifications to Treasury under 42 U.S.C. § 802(d), agreeing to abide by the offset provision and Treasury's implementing regulations. *See* Joint Stipulation of Facts, ECF No. 74. To date, those States have received a total of over $10.6 billion in federal funds through the Rescue Plan. *Id.*

## LEGAL STANDARDS

Plaintiffs seek a permanent injunction and declaratory judgment. Such relief is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A permanent injunction requires not only success on the merits, but also a demonstration that (1) the movant has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) an equity remedy is warranted after balancing the hardships; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "In a case of actual controversy within [a

district court's] jurisdiction," the Declaratory Judgment Act also authorizes the court, in its discretion, to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

But Plaintiffs have not even made plausible allegations in their complaint that would support this Court's jurisdiction or a valid claim on the merits. "Standing is a doctrine that stems directly from Article III's 'case or controversy' requirement, and thus implicates [a court's] subject matter jurisdiction." *Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104, 1113 (N.D. Ala. 2016) (Coogler, J.) (some internal quotation marks omitted) (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted). For purposes of Defendants' Rule 12(b)(6) motion, the Court must "accept as true all non-conclusory allegations in the plaintiffs' complaint" and determine whether they state a plausible claim for relief. *Harper v. Pro. Prob. Servs. Inc.*, 976 F.3d 1236, 1238 n.1 (11th Cir. 2020). "Mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action will not do,' and a plaintiff cannot rely on 'naked assertions devoid of further factual enhancement.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO ESTABLISH JURISDICTION.

The party that invokes federal jurisdiction must establish its standing at every stage of the litigation "for each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)), with a burden of proof that

increases "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561. So for final judgment, Plaintiffs must adduce actual evidence to prevail. *Id.* But Plaintiffs have not sufficiently pled, much less proved, that they can satisfy Article III's requirements. The Court should follow the lead of two other district courts and dismiss this case for lack of subject matter jurisdiction. *See Arizona*, 2021 WL 3089103, at *6; *Missouri* , 2021 WL 1889867, at *5.

**A. Plaintiffs have neither pled nor proved the required elements for pre-enforcement standing.**

When a plaintiff seeks to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see id.* at 161–67 (analyzing these three elements separately). In other words, the prospect of enforcement must be "sufficiently imminent" to create a concrete injury. *Id.* at 159.

At the preliminary-injunction phase, the Court found pre-enforcement standing on the following theory:

> Plaintiff States have alleged "an intention to engage in a course of conduct" (accepting ARPA funds and reducing state taxes) that is "arguably affected with a constitutional interest" (the Plaintiff States' Tenth Amendment rights and inherent limits on Congress's Spending Clause power) that is "proscribed by a statute" (based on a plain reading of the Federal Tax Mandate) and that comes with a "credible threat of [enforcement] thereunder" (recoupment of ARPA funds by the Treasury).

*West Virginia*, 2021 WL 2952863, at *7. Defendants respectfully submit that this analysis was incorrect. But regardless, at the final-judgment phase, Plaintiffs must *prove* standing, and they have not done so.

Here, the course of conduct that is proscribed by statute is not "accepting ARPA funds and reducing state taxes."[2] *Id.* But the offset provision restricts a State only from using Rescue Plan funds to "offset a reduction in the net tax revenue . . . resulting from a change in law," 42 U.S.C. § 802(c)(2)(A); it does not prohibit the proposal or adoption of any tax change. As other courts have put it, "State tax cuts are not proscribed by the ARPA," and States are "free to propose and pass tax cuts as [they] see[] fit." *Missouri*, 2021 WL 1889867, at *4; *Arizona*, 2021 WL 3089103, at *5 (finding that Arizona lacked standing in this context because it did not "claim to have directly or indirectly used ARPA funds to supplement a reduction in its net income"). This Court recognized as much: "before recoupment could occur [under the offset provision], the Plaintiff States must first . . . reduce state taxes or enact some other changes in state tax laws, have those reductions or changes cause their net tax revenues to decrease, *and use ARPA funds to offset that reduction*." *West Virginia*, 2021 WL 2952863, at *7 (emphasis added). Because Plaintiffs have neither alleged nor proved any intent to violate the offset provision, they cannot establish standing under *Driehaus*.

For similar reasons, Plaintiffs have not engaged in a "course of conduct" that is "arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 159. Again, the offset provision does not "intrude[] into [States'] sovereign authority to set their own tax policy," *West Virginia*, 2021 WL 2952863,

[2] Of course, "accepting ARPA funds" is not "proscribed by statute"; the whole purpose of the Rescue Plan is for States to accept this federal gift and "mitigate the fiscal effects stemming from the public health emergency." 42 U.S.C. § 802(a)(1).

at *7, because it merely restricts a State's ability to use *federal funds* distributed under the Rescue Plan to offset a reduction in net tax revenue. No State has a sovereign interest in using federal funds for that purpose, so the States' "sovereign power to set [their] own tax policy is not implicated by the [Rescue Plan]." *Missouri*, 2021 WL 1889867, at *4.

Quite the opposite: the Supreme Court has repeatedly made clear that *Congress* has a sovereign interest in conditioning the receipt of federal funds "on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580; *see Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 143 (1947) (explaining that Congress has the "power to fix the terms upon which its money allotments to [S]tates shall be disbursed"). Put simply, "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell*, 461 U.S. at 790.

Finally, Plaintiffs have not come close to proving that there is a "credible threat of [enforcement]"—that is, recoupment of misspent funds. *Driehaus*, 573 U.S. at 159. As this Court already explained, "for recoupment to happen, first the Plaintiff States would have to certify ARPA compliance, receive ARPA funds, pass a net reduction in tax revenue, and then the Secretary would have to determine that ARPA funds 'directly or indirectly offset' the net reduction." *West Virginia*, 2021 WL 2952863, at *9. Plaintiffs have neither pled nor proved that those steps have occurred or will imminently occur, especially any net-tax-revenue reduction or any impermissible offset.

*See generally* Compl. ¶¶ 58–100. So "there is virtually no likelihood that the Secretary will recoup ARPA funds from the Plaintiff States" any time soon. *West Virginia*, 2021 WL 2952863, at *9; *see also id.* ("[A]n injunction stopping the Secretary from recouping ARPA funds while this case is pending stands no real prospect of ever being enforced."). Two other courts have properly denied standing on this basis. *See Missouri*, 2021 WL 1889867, at *4 (denying standing because "recoupment is not triggered by a reduction in State tax revenue, it is triggered by a State's use of federal recovery fund to offset a reduction in its net tax revenue," which was not imminent); *Arizona*, 2021 WL 3089103, at *5 (denying standing because Arizona did not "claim to have directly or indirectly used ARPA funds to supplement a reduction in its net income" or "even claim the tax cut will result in a reduction in Arizona's net income").

This is especially true in light of the Rule, which outlines a comprehensive step-by-step process that Treasury will follow to determine whether States are impermissibly using Rescue Plan funds to offset net-tax-revenue reductions. *See* 86 Fed. Reg. at 26,807. So regardless of whether Plaintiffs misinterpret the offset provision as prohibiting *any* tax reductions, the Treasury Department—charged with enforcing the offset provision—has affirmatively rejected that reading. Under the Rule, "[a] recipient government would only be considered to have used [Rescue Plan] Funds to offset a reduction in net tax revenue . . . if, and to the extent that, the recipient government could not identify sufficient funds from sources other than the [Rescue Plan] Funds to offset the reduction in net tax revenue." *Id.* And state tax-law changes that increase tax revenue, certain spending cuts, and organic revenue growth—increased tax revenue from existing sources due to, for example, an improved economy—can all be used to "offset" net-tax-revenue

reductions. *Id.*; 86 Fed. Reg. at 26,809–10. Plaintiffs have said nothing concrete about any reduction in net tax revenue, how they intend to offset it, or whether any such offsets would contravene the Rule. *See generally* Compl. ¶¶ 58–100; FJ Mot. 1–25. So they have not proved, with evidence, that there is any credible threat of enforcement.

Plaintiffs have developed no factual record demonstrating "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder.'"[3] *Driehaus*, 573 U.S. at 159. Because they have not—which is required for pre-enforcement standing—the Court should deny Plaintiffs' motion and dismiss this action.

**B. Plaintiffs' other purported injuries do not suffice for standing.**

As the Court implied, any injury that does not meet the requirements of *Driehaus* "is not sufficiently 'concrete and particularized' enough to satisfy Article III." *West Virginia*, 2021 WL 2952863, at *7 (quoting *Lujan*, 504 U.S. at 560). In any event, Plaintiffs' other purported injuries are not cognizable.

For starters, Plaintiffs do not have an "injury in fact" based on their "anti-commandeering doctrine claim" that they must "choose between forgoing a benefit (federal funds) or accepting that benefit on unconstitutional terms." *West Virginia*, 2021 WL 2952863, at *7. Plaintiffs are free to decline Rescue Plan funds if they dislike Congress's offer; there are no consequences for doing so. *See* Section II.B., *infra*; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–91 (1937) (holding that where Congress places conditions on how federal funds are used, "[i]n such circumstances, if in no others, inducement or persuasion does not go beyond the bounds of power"). So Plaintiffs cannot

[3] For the same reasons, this case is not ripe for review. *See* PI Opp'n at 13–15; *Missouri*, 2021 WL 1889867, at *4–5.

manufacture standing based on their incorrect legal conclusions about "coercion" or "commandeering." *Arizona*, 2021 WL 3089103, at *5 (denying standing based on coercion because "ARPA will not revoke any federal funding Arizona enjoyed prior to accepting", so "[t]he downside to declining the ARPA funds is just that—Arizona would not have received ARPA funds"); *Missouri*, 2021 WL 1889867, at *4 ("Missouri's sovereign power to set its own tax policy is not implicated by the ARPA. The Missouri legislature is free to propose and pass tax cuts as it sees fit.").

Plaintiffs also did not suffer "an injury in fact when Congress passed the ARPA because they were presented with an unconstitutionally ambiguous deal."[4] *West Virginia*, 2021 WL 2952863, at *6. Neither Plaintiffs nor the Court cited any Spending Clause cases finding pre-enforcement standing for a purported ambiguity injury. And that makes sense because Congress must only "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (quoting *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002)); *see* Section II.A.1., *infra*. Congress has done so here, which is why another court recently rejected this exact theory of standing. *Arizona*, 2021 WL 3089103, at *3–4. As that court explained, Congress "made the existence of the condition upon which [States] could accept funds 'explicitly obvious.'" *Id.* at *4 (quoting *Mayweathers*, 314 F.3d at 1067). That States may be "unsure of 'every factual instance' of possible noncompliance does not

[4] This goes double for the ten Plaintiff States that have already certified and received billions in Rescue Plan Funds. *See* Joint Stipulation of Facts. At the preliminary-injunction stage, the Court's exercise of jurisdiction hinged on the States' supposed uncertainty over whether to certify. *West Virginia*, 2021 WL 2952863, at *6. Regardless of whether the States suffered a cognizable injury from uncertainty when they brought this action (and they did not), accepting the deal moots that injury as to those ten States.

amount to a violation of Congress' duty." *Id.* (quoting *Mayweathers*, 314 F.3d at 1067). Plaintiffs therefore have "not suffered a cognizable injury simply because" they allege "that the [offset provision] is ambiguous."[5] *Id.*

Finally, Plaintiffs' newfound suggestion that they are suffering an injury stemming from "intrusive reporting requirements" is meritless. FJ Mot. 1. They have not challenged the source of these requirements: the statutory provision requiring a "detailed accounting" of "all modifications to" States' "tax revenue sources during the covered period," 42 U.S.C. § 802(d)(2), or the reporting requirements implemented in the Rule. And the Supreme Court recently rejected this exact standing theory—premised on harms from unchallenged statutory provisions—because it was not traceable to the provision at issue. *California v. Texas*, 141 S. Ct. 2104, 2119 (2021). Not to mention that the Rule allows States to use Rescue Plan funds to cover reporting costs, 86 Fed. Reg. at 26,822, so States need not use their own resources to meet the reporting requirements.

Given the nature of the Plaintiffs' pre-enforcement facial challenge to a federal statute, it is especially critical to ensure that the jurisdictional prerequisites for this suit are satisfied. *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952). "Facial challenges," as opposed to as-applied challenges, "are disfavored" because "they raise the risk of a premature interpretation of statutes on the basis of factually barebones records," and this is especially true of pre-enforcement facial challenges. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri*, 541 U.S.

[5] As the *Arizona* court recognized, the *Ohio* court's contrary conclusion was unsupported by any case law. *Arizona*, 2021 WL 3089103, at *4 n.2. It also contravened numerous Spending Clause precedents—including *Maywaeathers*, which was adopted by the Eleventh Circuit in *Benning*. *See id.*; *Benning*, 391 F.3d at 1307; Section II.A., *infra*.

at 609). Indeed, courts routinely review agency decisions requiring the repayment of federal funds *after* they occur. *See, e.g.*, *Bennett v. Kentucky*, 470 U.S. 656, 658 (1985) (explaining that "the dispute is whether the Secretary correctly demanded repayment based on a determination that Kentucky violated requirements that Title I funds be used to supplement, and not to supplant, state and local expenditures for education"); *Bennett v. New Jersey*, 470 U.S. 632, 637 (1985) (explaining that the dispute arose out of the Secretary's final decision ordering repayment of specified federal education funds). That is exactly the path the Court should take here by dismissing this case for lack of jurisdiction.

## II. PLAINTIFFS FAIL TO STATE A CLAIM AND CANNOT SUCCEED ON THE MERITS.

### A. The offset provision is unambiguous.

Plaintiffs' principal contention on the merits is that the offset provision is unconstitutionally ambiguous. FJ Mot. 8–16; Compl. ¶¶ 104–05. But Plaintiffs' arguments misunderstand the nature of the constitutional inquiry. *See* PI Opp'n 26–28. To uphold a statute as constitutional, Congress must simply make clear that acceptance of federal funds obligates States to comply with a condition. *Id.* That is exactly what the Rescue Plan does: "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with those funds" would "clearly understand that one of the obligations of the Act is the obligation" not to use Rescue Plan funds to offset a net-tax-revenue reduction resulting from changes in state law. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). As one court recently held, "nobody questions the [offset provision] exists as a condition to [States] accepting the

funds," and "[i]n that regard, Congress fulfilled its duty under *Pen[n]hurst* and *Arlington Central*." *Arizona*, 2021 WL 3089103, at *3.

***1. The Rescue Plan satisfies the unambiguity requirement.***

Precedent on Spending Clause unambiguity establishes that Congress must only make clear that acceptance of federal money obligates the States to comply with a condition. In *Pennhurst*—the origin of the Spending Clause unambiguity requirement—the Supreme Court held that "if Congress intends to *impose a condition* on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981) (emphasis added). There, the statute provided money to States and contained a "bill of rights" provision specifying that mentally disabled citizens "have a right to appropriate treatment, services, and habilitation for such disabilities" to be provided "in the setting that is least restrictive of the person's personal liberty." *Id.* at 13. The Court held that these statements "represent general statements of federal policy, not newly created legal duties" and "in no way suggests that the grant of federal funds is 'conditioned' on a State's funding the rights described therein." *Id.* at 23. The *Pennhurst* Court then explicitly recognized that a State's obligations may be "largely indeterminate," so long as Congress gives "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" the condition. *Id.* at 25.

Numerous Spending Clause cases—in the Supreme Court, the Eleventh Circuit, and other Circuits—all confirm that States make an "informed choice" when Congress simply makes clear that acceptance of federal money

obligates the States to comply with a condition.[6] *Id.* The Supreme Court itself has repeatedly affirmed that "there [i]s sufficient notice under *Pennhurst* where a statute ma[kes] clear that some conditions [a]re placed on the receipt of federal funds." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). And the Circuits have done the same, holding that the Spending Clause is satisfied where a "statute's *intention to impose a condition* is expressed clearly," even though the operation of a funding condition "is perhaps unpredictable." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *Charles v. Verhagen*, 348 F.3d 601, 607–08 (7th Cir. 2003) ("[T]he exact nature of the conditions may be 'largely indeterminate,' provided that the *existence of the conditions* is clear . . . ." (emphasis added)); *Benning*, 391 F.3d at 1307 ("The federal law in *Pennhurst* was unclear as to whether the [S]tates incurred any obligations *at all* by accepting federal funds, but [the statute at issue] is clear that [S]tates incur an obligation when they accept federal funds, even if the method for compliance is left to the [S]tates." (emphasis added)); *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005). Congress must only "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Benning*, 391 F.3d at 1307 (quoting *Mayweathers*, 314 F.3d at 1067).

---

[6] Plaintiffs oddly cite *Graham County* for the proposition that a condition is unconstitutionally ambiguous when "a provision's text, literally read, admits of two plausible interpretations." FJ Mot. 8 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States*, 545 U.S. 409, 419 n.2 (2005)). But *Graham County* was not a Spending Clause case and it says nothing about the proper inquiry for funding conditions. In fact, the quoted language is drawn from a footnote explaining that where "there are two plausible constructions of a statute of limitations, we should adopt the construction that starts the time limit running when the cause of action [ ] accrues." *Graham Cnty.*, 545 U.S. at 419.

When *Pennhurst* (and the legion of other cases) are properly applied, agency regulations have no bearing on the Spending Clause analysis. If a statutory funding condition exists, the implementing agency could regulate the details of the condition subject to the Administrative Procedure Act and the other typical constraints; if not, any agency regulation imposing funding conditions would be unauthorized by the statute. That is the upshot of Plaintiffs' own cited materials. FJ Mot. 11–13; *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 568 (4th Cir. 1997) (en banc) (reasoning that an agency could not, by regulation, act *ultra vires* by imposing spending conditions that did not exist as part of the statute); Ilya Somin, *Making Federalism Great Again*, 97 Tex. L. Rev. 1247, 1284 (2019) (arguing that the Executive should not be able "to attach conditions to federal grants that were *not authorized by Congress*" (emphasis added)). And that's exactly what *Pennhurst* requires: Congress must provide only "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" a condition. *Pennhurst*, 451 U.S. at 25. The idea is simply to keep Congress from "surprising participating States with post-acceptance or retroactive conditions." *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25).

Here, Congress made abundantly clear that the acceptance of Rescue Plan funds obligates the State to comply with the offset provision, easily passing muster under binding Supreme Court and Eleventh Circuit precedent. 42 U.S.C. § 802(c)(1) (delineating "[f]urther restriction[s] on the use of funds," including the offset provision, which governs a State's "use [of] the funds provided under this section"). As one court recently held in this context, "nobody questions the [offset provision] exists as a condition to [States] accepting the funds," and "[i]n that regard, Congress fulfilled its duty under" Spending Clause precedents. *Arizona*, 2021 WL 3089103, at *3.

But the Rescue Plan does not just provide the existence of a condition; it explains the nature and scope of the condition as well. By its plain terms, the offset provision only applies when a State uses Rescue Plan funds to "offset" a reduction in "net" tax revenue resulting from changes in state law. 42 U.S.C. § 802(c)(2)(A). Taken together, the statute's language simply ensures that States are not using federal funds to finance state tax cuts that decrease net tax revenue. *See* PI Opp'n 17–18. And while Plaintiffs ask "whether its prohibition reaches all tax rate reductions, even if such a reduction is expected to be—or is actually—revenue neutral," that question is already answered by the plain text. FJ Mot. 9. The statute restricts only the use of Rescue Plan funds to offset reductions in *net* tax revenue resulting from changes in state law, not every tax reduction. *See* PI Opp'n 17. So if a State balances some tax reductions with other tax increases or implements revenue-neutral tax reductions, then the offset provision is not implicated. *Id.* Had Congress sought to prohibit every reduction in taxes, it could easily have said so explicitly. *Contra* FJ Mot. 10.

Likewise, the meaning of "directly or indirectly offset" is clear. *See* PI Opp'n 17–18. For example, assuming no other changes, a State could not receive $2 billion in Rescue Plan funds, cut its income tax by an amount equal to $2 billion, and use the Rescue Plan funds to offset the revenue loss. That would be using Rescue Plan funds to "directly" offset a net-tax-revenue reduction. 42 U.S.C. § 802(c)(2)(A); *see* Directly, Oxford English Dictionary Online, available here (last visited August 12, 2021) (defining "directly" as "[i]n a direct manner or way"). Similarly, again assuming no other changes, a State could not use Rescue Plan funds to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had origi-

nally budgeted for that purpose to offset a $2 billion reduction in state income tax. That would be using Rescue Plan funds to "indirectly" offset a net-tax-revenue reduction. 42 U.S.C. § 802(c)(2)(A); *see* Indirectly, Oxford English Dictionary Online, available here (last visited August 12, 2021) (defining "indirectly" as "through some intervening person or thing"). But States are free to offset such reductions by other means, including certain spending cuts and revenue increases from macroeconomic growth.

Especially in the context of an emergency aid statute that Congress enacted quickly, "[t]here are far too many circumstances affecting the States in different ways for Congress to have envisioned all aspects of compliance and noncompliance." *Charles*, 348 F.3d at 608. Instead, "Congress permissibly conditioned the receipt of federal money in such a way that each State is made aware of the condition and is simultaneously given the freedom to tailor compliance according to its particular . . . circumstances." *Benning*, 391 F.3d at 1307 (quoting *Charles*, 348 F.3d at 608). That is straightforwardly allowed by the Spending Clause. *Id.* Plaintiffs' argument—that Congress itself must essentially specify minute details of a funding condition—is wrong. *See* FJ Mot. 9–10. "[I]t is simply impossible" for Congress to "delineate every instance in which a State may or may not comply with" the offset provision. *Charles*, 348 F.3d at 608; *Mayweathers*, 314 F.3d at 1067; *Arizona*, 2021 WL 3089103, at *3–4. As the Supreme Court has admonished, "every improper expenditure" need not be "specifically identified and proscribed" in the statute. *Bennett*, 470 U.S. at 666; *Jackson*, 544 U.S. 167 at 183 (reiterating *Bennett*); *Davis*, 526 U.S. at 650 (same); *see W. Va. Dep't of Health & Hum. Res. v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011) ("Congress need not spell out every condition with flawless precision for a provision to be enforceable.").

The Court should find the offset provision plainly within Congress's Spending Clause authority because "[i]t made the existence of the condition upon which [States] could accept funds explicitly obvious." *Arizona*, 2021 WL 3089103, at *4 (citation omitted). And States are not without recourse if they dislike the offset provision or have concerns about its ambiguity: they may decline the Rescue Plan funds, seek a better bargain in the halls of Congress, or work cooperatively with the Treasury Department. *See Bennett*, 470 U.S, at 669 (describing a conditional grant program "an ongoing, cooperative program" in which "grant recipients ha[ve] an opportunity to seek clarification of the program requirements"); *Charles*, 348 F.3d at 608 (explaining that States who dislike the ambiguity of an imposed condition "certainly could have refused federal funding"). But because declaring an Act of Congress unconstitutional is "the gravest and most delicate duty that" federal courts are "called on to perform," *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quotation marks omitted), "[d]ue respect for the decisions of a coordinate branch of Government demands that [courts] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds," *United States v. Morrison*, 529 U.S. 598, 607 (2000); *Reno v. Condon*, 528 U.S. 141, 148 (2000); *Munn v. Illinois*, 94 U.S. 113 (1876). Plaintiffs have not come close to making such a showing here.

**2. *The Rule implements the unambiguous text of the offset provision.***

Plaintiffs' additional arguments about the major-questions doctrine and the ambiguity of the Rule are inapposite here because they are not challenging the Rule. *Compare* FJ Mot. 13–16 *with* Compl. ¶¶ 101–31. And Plaintiffs' quibbles with the Rule cannot inform the Article I inquiry of whether

Congress properly exercised its Spending Clause authority (it has).[7] *Accord* FJ Mot. 11. But if the Court disagrees, then the Rule—which is authorized by the statute—supplies the requisite notice.

The Rule sets forth a comprehensive framework for the Treasury Department to make the determination called for by the statute: whether a State has "directly or indirectly offset" a "reduction in net tax revenue" with Rescue Plan funds. *See* Background, *supra*. The Rule explains that, in projecting whether a State will experience a reduction in net tax revenue, the State may rely on the same budget model and reasonable assumptions that it uses in the ordinary course of its own budgetary processes. 86 Fed. Reg. at 26,809. As for offsets—both direct and indirect—the Rule covers that as well. A State "would only be considered to have used [Rescue Plan] Funds to offset a reduction in net tax revenue" if the State "could not identify sufficient funds from sources other than the [Rescue Plan] Funds to offset the reduction in net tax revenue." *Id.* at 26,807. "If sufficient funds from other sources cannot be identified to cover the full cost of the reduction in net tax revenue," the "remaining amount not covered by these sources will be considered to have been offset by [Rescue Plan] Funds, in contravention of the offset provision." *Id.* State tax-law changes that increase tax revenue, certain spending cuts, and organic revenue growth—increased tax revenue from existing sources due to, for example, an improved economy—can all be used to "offset" net-tax-revenue reductions. *Id.*; 86 Fed. Reg. at 26,809–10; *see* PI Opp'n 16–19. And States need not demonstrate how they have offset net-

[7] The *Ohio* court's contrary holding misreads governing precedent and misconceives the Spending Clause inquiry. *Compare* Section II.A.1. *with* FJ Mot. at 13–16 (quoting *Ohio v. Yellen*, 2021 WL 2712220, at *18–20 (S.D. Ohio July 1, 2021)).

tax-revenue reductions *at all* if the reductions are less than 1% of their inflation-adjusted 2019 tax revenue. Fed. Reg. at 26,809.

Not only did Treasury have explicit statutory authority to issue that guidance, 42 U.S.C. § 802(f), but this type of implementation is common in Spending Clause programs. Agencies are routinely empowered to operationalize statutory funding conditions, and courts have long deferred to agency interpretations of Spending Clause legislation, such as education statutes and Medicaid. *See, e.g.*, *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891–92 (1984) (Education of the Handicapped Act); *Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 692-93 (5th Cir. 2020) (Medicaid); *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (Medicaid); *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 778 (D.C. Cir. 2012) (Individuals with Disabilities Education Act); *Harris v. Olszewski*, 442 F.3d 456, 466-67 (6th Cir. 2006) (Medicaid); *United States v. Miami University*, 294 F.3d 797, 811-15 (6th Cir. 2002) (Family Educational Rights and Privacy Act). Here, Defendants are not asking the Court to defer to the Rule because Plaintiffs have not challenged it. *See* Compl. ¶¶ 101–31. But these cases illustrate that when Congress clearly attaches a funding condition, agency regulations can play a role in implementing the condition.

Both sides agree that agencies cannot impose funding conditions that Congress itself has not attached. *See* Section II.A.1., *supra*. Plaintiffs err, however, in suggesting that Treasury is essentially without power to operationalize the offset provision when its existence is "explicitly obvious." *Arizona*, 2021 WL 3089103, at *4 (citation omitted). For example, Plaintiffs complain that the Rule cannot implement the offset provision because the provision "implicates several questions of deep economic and political significance." *See* FJ Mot. 13–15 (quoting *King v. Burwell*, 576 U.S. 473, 485

(2015)). But Plaintiffs nowhere explain what those purported "major questions" are. *See id.* And, in any event, their citation to *King v. Burwell* is inapt. There, addressing the question whether the Internal Revenue Service (IRS) could have interpreted a provision of the Patient Protection and Affordable Care Act in a way that would have destabilized insurance markets, the Supreme Court found it "especially unlikely that Congress would have delegated this decision to the *IRS*, which has no expertise in crafting health insurance policy of this sort." *King*, 576 U.S. at 486. Here, by contrast, the offset provision involves tax issues, which are at the core of Treasury's expertise. So Plaintiffs cannot rely on *King* to nullify both the offset provision and the very rulemaking authority that Congress included to effectuate its purposes. 42 U.S.C. § 802(f).

Nor are Plaintiffs correct that the Rule itself is "unconstitutionally ambiguous." FJ Mot. 15–16. Again, Plaintiffs have not challenged the Rule on ambiguity or any other grounds. But, procedurally improper arguments aside, Plaintiffs identify only three minor aspects in the 66-page single-spaced Rule that are purportedly ambiguous. None is.

First, Plaintiffs note Treasury's guidance that "administrative interpretations" do not implicate the offset provision if they are "corrections to replace prior inaccurate interpretations." FJ Mot. 15 (quoting 86 Fed. Reg. at 26,808). But Plaintiffs do not explain how that is in any way unclear: while "new" or "changed" administrative interpretations that reduce net tax revenue fall within the offset provision, "corrections to replace prior inaccurate interpretations" do not because "the operative change in those circumstances is the underlying legislation or regulation that occurred prior to the covered period." 86 Fed. Reg. at 26,808.

Second, Plaintiffs take issue with the word "areas," as in States "may cut spending in certain areas to pay for covered changes that reduce tax revenue." *Id.* at 26,809. But Plaintiffs almost immediately acknowledge that the Rule fully describes this feature. *See* FJ Mot. 16 n.4. "To better align with existing reporting and accounting," Treasury considers "whether the recipient government has spent [Rescue Plan] Funds on th[e] same department, agency, or authority" from which that government has cut spending. 86 Fed. Reg. at 26,809–10. If the recipient governments "have not spent [Rescue Plan] Funds in a department, agency, or authority, the full amount of the reduction in spending counts as a [permissible] covered spending cut, up to the recipient government's net reduction in total spending." *Id.* at 26,810. "If they have, the [Rescue Plan] Funds generally would be deemed to have replaced the amount of spending cut and only reductions in spending above the amount of [Rescue Plan] Funds spent on the department, agency, or authority would count" as permissible offsets for a reduction in net tax revenue. *Id.* By "prevent[ing] recipient governments from using [Rescue Plan] Funds to supplant State or territory funding in the eligible use areas, and then us[ing] those State or territory funds to offset tax cuts," Treasury's approach implements the plain text of the offset provision by "ensur[ing] that [Rescue Plan] Funds are not used to 'indirectly' offset revenue reductions due to covered changes." *Id.*; *see* Section II.A.1., *supra*; PI Opp'n 16–18.

Third, Plaintiffs complain that Treasury has not spelled out every circumstance in which a State could "eva[de]" the offset provision through "a spending cut [that] is subsequently replaced with [Rescue Plan] Funds and used to indirectly offset a reduction in net tax revenue." FJ Mot. 16 (citing 86 Fed. Reg. at 26,810). But it is not difficult to understand what the regulatory language refers to: the prospect that a State might cut spending in an

area where it is not spending Rescue Plan funds in a given year, then might spend Rescue Plan funds in that area in a subsequent year, effectively using the Rescue Plan funds to backfill the earlier cut. For example, if a State claims to be funding a $1 billion tax cut with spending cuts on necessary sewer infrastructure, only to turn around the next year and spend $1 billion of Rescue Plan funds on necessary sewer infrastructure, then Treasury may scrutinize that action to "ensure recipient governments use [Rescue Plan] Funds in a manner consistent with the prescribed eligible uses" and not to "indirectly offset a reduction in net tax revenue." 86 Fed. Reg. at 26,810. At any rate, not "every improper expenditure" must be "specifically identified and proscribed" to satisfy the Spending Clause. *Bennett*, 470 U.S. at 666; *Jackson*, 544 U.S. at 183 (same); *Davis*, 526 U.S. at 650 (same). Such premonition is "impossible" for both Congress and the agency. *See Charles*, 348 F.3d at 608; *Mayweathers*, 314 F.3d at 1067.

Because Congress made "the existence of the condition upon which [States] could accept funds explicitly obvious," Congress "fulfilled its duty under" the Spending Clause. *Arizona*, 2021 WL 3089103, at *4 (citation omitted). That Congress also described the nature and scope of the condition, and that Treasury implemented the statute's plain text with the Rule, only highlights that the offset provision is not unconstitutionally ambiguous.

**B. The Rescue Plan is not coercive or commandeering.**

Plaintiffs fare no better in arguing that the offset provision violates the Tenth Amendment and unconstitutionally coerces States into accepting Rescue Plan funds with the attendant conditions. Compl. ¶¶ 114–21, 123–28; FJ Mot. 17–19, 20–22; PI Opp'n 25 (explaining that the inquiry under both the Spending Clause and the Tenth Amendment is the same). The offset provi-

sion is, by any measure, a modest restriction on an otherwise generous outlay of federal funds. It simply ensures that Congress's substantial monetary outlay will be used as intended for the public-health and economic-recovery purposes. PI Opp'n 18. And if Plaintiffs disliked the offset provision, they were (and are) free to simply decline the federal money.

In arguing otherwise, Plaintiffs misconstrue governing law. For starters, Congress has full "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580; PI Opp'n 22–23. That is exactly what Congress has done here: titled "[f]urther restriction on the *use of funds*," the offset provision only applies to a State's "*use [of] the funds* provided under this section." 42 U.S.C. § 802(c)(2) (emphasis added). So a coercion analysis is inapplicable because Congress here is not "pressuring the States to accept policy changes" independent of the new federal funds. *NFIB*, 567 U.S. at 580; *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. Jan. 19, 2021), *appeal pending on other grounds*, No. 21-1890 (8th Cir. Apr. 21, 2021). Plaintiffs are free to do what they want with their own money or tax scheme, including cutting taxes, providing rebates, increasing spending, or cutting expenditures. *See* PI Opp'n 16–18, 20–23. The States must simply refrain from using the *federal* money to "directly or indirectly offset a reduction in net tax revenue" resulting from state tax-law changes. 42 U.S.C. § 802(c)(2)(A).

Even if the coercion analysis did apply here, Plaintiffs would lose under *NFIB*. As Defendants previously explained, the key aspect of the Medicaid expansion that *NFIB* found to be coercive was that Congress "penalize[d] States that choose *not to participate* in that new program by taking away their *existing* Medicaid funding." *NFIB*, 567 U.S. at 585 (emphasis added). Here, in stark contrast, there are no monetary consequences if a State chooses to decline the Rescue Plan funds. PI Opp'n 23–25. As one court recently explained in rejecting this exact argument, the Rescue Plan "will not revoke any federal funding [States] enjoyed prior to accepting. The downside to declining the ARPA funds is just that—[States] would not have received ARPA funds." *Arizona*, 2021 WL 3089103, at *5.

Contrary to Plaintiffs' contention, FJ Mot. 17–19, the amount of funding at issue in *NFIB* was only relevant to the *preexisting* funding that would be withdrawn if States *declined* the Medicaid expansion. *Compare NFIB*, 567 U.S. at 582 (finding that a threatened loss of *preexisting* Medicaid funds—ten percent of States' overall budgets—was coercive) *with South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (finding that a threatened five-percent loss of *preexisting* highway funds was not coercive). After all, "[t]hreat of loss, not hope of gain, is the essence of economic coercion." *United States v. Butler*, 297 U.S. 1, 81 (1936) (Stone, J., dissenting). And *all* Justices in *NFIB* agreed that, despite the amount of funding at issue, "Congress could have made just the *new* funding provided under the ACA contingent on acceptance of the terms of the Medicaid Expansion." *NFIB*, 567 U.S. at 687–88 (joint dissent); *id.* at 576, 585 (plurality) (same); *id.* at 624–46 (Ginsburg, J., concurring in part) (finding no coercion). That holding defeats Plaintiffs' claim that the sheer *amount* of offered funding is dispositive, regardless of whether it is being newly provided or eliminated. Notably, the offset provision is more modest

than the prospective funding condition that all Justices in *NFIB* indicated was permissible: a State does not lose *all* of its Rescue Plan funding if it violates the offset provision, but only the amount it uses as an improper offset. *See* 42 U.S.C. § 802(e)(1).

Perhaps recognizing these fatal flaws, Plaintiffs look to the Tenth Amendment, arguing that the offset provision intrudes on States' sovereign authority to set tax policy. FJ Mot. 22. But, again, the offset provision does not regulate "States' ability to cut at least some taxes," *id.*; it simply precludes States from using *federal funds* to offset a reduction in net tax revenue. *See* Section II.A., *supra*. More fundamentally, though, Plaintiffs continue to misunderstand both the Spending Clause and the Tenth Amendment. It has long been established that "Congress can use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers." *NFIB*, 567 U.S. at 578; *Coll. Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999) (same); *Dole*, 483 U.S. at 207 (same); *Butler*, 297 U.S. at 66 (same). And "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty."[8]

[8] Plaintiffs miscite *Carey v. Throwe* for the proposition that it is "immaterial whether states voluntarily choose to be part of a federal program, if Congress lacked the power to create such a program in the first place." FJ Mot. 22 (quoting 957 F.3d 468, 481 (4th Cir. 2020)). But Congress did not lack the power to enact the Rescue Plan using its Spending Clause authority, which was not at issue in *Carey*. And while Congress may not, for example, "force state law enforcement agencies to issue certain identification as part of a federal concealed carry scheme," *Carey*, 957 F.3d at 481, Congress can always "use [its Spending Clause] power to implement federal policy it could not impose directly under its enumerated powers," *NFIB*, 567 U.S. at 578. As *Carey* recognizes, "[t]he anticommandeering doctrine turns on the nature of the federal ask," *Carey*, 957 F.3d at 481, and the "federal ask" in the Spending Clause context is only an offer of money that States may decline. *See Bell*, 461 U.S. at 790; *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923).

*Bell*, 461 U.S. at 790; *School Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 283 (6th Cir. 2009) (Sutton, J., concurring) ("[T]he Tenth Amendment, the Eleventh Amendment and the Constitution's other structural limitations on congressional authority do not limit properly enacted spending-clause legislation.").

Because Plaintiffs had (and have) "a legitimate choice whether to accept the federal conditions in exchange for federal funds," *NFIB*, 567 U.S. at 578, their coercion and Tenth Amendment arguments should be rejected. They are free to say "no thanks" to the federal money, FJ Mot. 19; their voters know where to turn if they like, or dislike, the States' choice. *NFIB*, 567 U.S. at 578 (explaining that "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer"); *New York v. United States*, 505 U.S. 144, 168 (1992).

**C. The offset provision relates to the Rescue Plan's purposes.**

Plaintiffs also incorrectly argue that the offset provision is not sufficiently related to the Rescue Plan's purposes. FJ Mot. 19–20; Compl. ¶¶ 106–13. But the paragon of a condition that is related to the purposes of federal spending is one that ensures "that public funds [are] spent for the purposes for which they were authorized." *Rust v. Sullivan*, 500 U.S. 173, 196 (1991). And that's exactly what the offset provision does: it merely specifies how States may use the newly appropriated federal funds to ensure that they are used for the public-health and economic-recovery purposes of the Act. *See Sabri*, 541 U.S. at 608; *Oklahoma*, 330 U.S. at 143; Section II.B., *supra*. Congress did not provide the Rescue Plan funds as a means to replace purposeful decreases in net tax revenue; it provided the money to help States economically recover from the pandemic in ways they otherwise could not.

This is more than sufficient to meet the "minimal standard of rationality" required of Spending Clause legislation. *Benning*, 391 F.3d at 1308; *see New York*, 505 U.S. at 172 (finding funding conditions sufficiently related where "both the conditions and the payments embody Congress' efforts to address the pressing problem of radioactive waste disposal"); *Dole*, 483 U.S. at 208–09 (finding that the federal interest in a uniform drinking age was sufficiently related to States' receipt of highway funds). In fact, Plaintiffs point to no case, and Defendants are aware of none, in which a court has struck down a funding condition on relatedness grounds. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019) (recognizing that the relatedness standard "is not demanding" and that "the Court has never struck down a condition on federal grants based on this relatedness prong"). Plaintiffs' relatedness argument should be rejected.

## III. THE COURT SHOULD NOT ENJOIN THE OFFSET PROVISION OR DECLARE IT UNCONSTITUTIONAL.

Even if the Court finds a constitutional defect in the offset provision, neither a permanent injunction nor a declaratory judgment is appropriate.

### A. The States are not entitled to a permanent injunction.

A court, in its "equitable discretion," may enter a permanent injunction if a plaintiff can demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391 (citations omitted).

Plaintiffs fail each of these requirements. "It is axiomatic that equitable relief is only available where there is no adequate remedy at law." *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) (adding that "cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity"); *see also Hobson v. Fischbeck*, 758 F.2d 579, 581 (11th Cir. 1985) (holding equitable relief unavailable because plaintiff "has an adequate remedy at law—he could pay the disputed tax and then sue for a refund"). Even if Plaintiffs were to use Rescue Plan funds to offset a reduction in net tax revenue and face potential recoupment by the Secretary, any such recoupment proceedings would be an adequate forum for Plaintiffs' to present their defenses. *See* 86 Fed. Reg. at 26,811–12 (detailing the recoupment process, including a "reconsideration process [that] provides a recipient the opportunity to submit additional information it believes supports its request" for reconsideration). Because the States may assert their constitutional argument as a legal defense to a recoupment action, and could sue for a refund if necessary, they therefore have an adequate remedy at law.[9] *See Hobson*, 758 F.2d at 581. And if the States were unable to succeed in such hypothetical future proceedings, the result would simply be that it has to repay money—the quintessential example of harm that is *not* irreparable. *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies. . . . Mere injuries, however substantial, in terms of money, . . . are not enough." (quoting *Sampson v. Murray*, 415 U.S. 61, 90

[9] Plaintiffs' argument that relief would be unavailable is incorrect. *See* FJ Mot. 23. States could get improperly recouped funds set aside under the Administrative Procedure Act if they properly brought a challenge seeking to do so.

(1974))). With potential recoupment nowhere in sight, Plaintiffs' challenge is premature and no injunction should issue.

Indeed, the Court has already found that Plaintiffs cannot demonstrate irreparable harm. In denying the motion for preliminary injunction, the Court noted that "recoupment of ARPA funds is a quintessentially *reparable* injury because it can be 'undone through monetary remedies.'" *West Virginia*, 2021 WL 2952863, at *9 (quoting *Jacksonville*, 896 F.2d at 1285). And "if the Secretary were to recoup ARPA funds from the Plaintiff States," a court adjudicating a properly filed Administrative Procedure Act claim could essentially "order the funds returned to the Plaintiff States." *Id.*; *see* Note 9, *supra*. A showing of irreparable injury is required for both preliminary and permanent injunctions, so Plaintiffs' inability to satisfy this element defeats their claim for a permanent injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

By contrast, enjoining an Act of Congress would unquestionably impose irreparable harm on the federal government and contravene the public interest. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasizing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (quotation marks omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)). "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

An injunction would thus irreparably harm the United States and undermine the public interest. That is only more evident where, as here, the legislation at issue is a direct response to a national health and economic emergency of historic proportions.

**B. The Court should not issue a declaratory judgment.**

A court may issue a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. §2201(a). Assuming the threshold requirements of standing and ripeness are met, the Court may consider various factors in determining whether to issue a declaratory judgment, including whether the declaratory judgment would serve a useful purpose in clarifying the legal relations and whether there is an alternative remedy that is better or more effective. *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1331 (11th Cir. 2005).

Here, a declaratory judgment is not necessary to clarify any legal relations. As discussed above, the Rescue Plan—especially in combination with the Rule—provides more than sufficient clarity. And if Plaintiffs' have any lingering questions, "Treasury encourages State, local, and Tribal governments in particular to provide feedback and to engage with Treasury regarding issues that may arise regarding all aspects of th[e] [Rule] and Treasury's work in administering the [Rescue Plan] Funds." 86 Fed. Reg. at 26,788.

A declaratory judgment also should not issue because there is an alternative remedy available: Plaintiffs may assert their constitutional arguments as a defense to a recoupment action. This alternative is superior to a declaratory judgment because a recoupment action may never come to pass at all, either because Plaintiffs do not use Rescue Plan funds to offset a reduction in net tax revenue, or because the Secretary may exercise her enforcement

discretion not to seek recoupment. Plaintiffs' request for declaratory judgment should therefore be denied.

## CONCLUSION

For the reasons explained above, Plaintiffs' final-judgment motion should be denied and this case should be dismissed. But if the Court were to enjoin or declare unconstitutional any aspect of the Rescue Plan, that ruling should be tailored to the portion of the program that the Court believes to be unconstitutional and only to the Plaintiff States. *See* PI Opp'n 32–33.

DATED: August 12, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*