FILED
2021 Aug-19  PM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

STATE OF WEST VIRGINIA, *et al.*,

      Plaintiffs,

    v.

U.S. DEPARTMENT OF THE
TREASURY, *et al.*,

      Defendants.

Case No. 7:21-cv-00465-LSC

## REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF AND BRIEF IN OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................. i

TABLE OF AUTHORITIES ...................................................................... ii

I.    Plaintiff States Have Standing. .......................................................5

II.   Plaintiff States Prevail On The Merits .............................................9

    A. The Tax Mandate Is Ambiguous. ...........................................9

    B. The Tax Mandate Is Coercive.................................................13

    C. The Tax Mandate Is Unrelated to ARPA's Purpose.............15

    D. The Tax Mandate Violates the Tenth Amendment................16

III.  Plaintiff States Are Entitled To Relief.............................................17

CONCLUSION......................................................................................18

CERTIFICATE OF SERVICE ...............................................................22

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006) ........................................................................................2, 10

*Barnes v. Gorman*,
   536 U.S. 181 (2002) ............................................................................................10

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004)............................................................... 2, 10, 12

*King v. Burwell*,
   576 U.S. 473 (2015) ...........................................................................................13

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ..............................................................................................6

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ......................................................... 3, 13, 14, 15

*New York v. United States,*
   505 U.S. 144 (1992) .................................................................... 15, 17

*Ohio v. Yellen*,
   No. 1:21-cv-181, --- F. Supp. 3d ---, 2021 WL 1903908 (S.D. Ohio May 12,
   2021).....................................................................................................................12

*Ohio v. Yellen*,
   No. 1:21-cv-181, --- F. Supp. 3d ---, 2021 WL 2712220 (S.D. Ohio July 1,
   2021) ..................................................................................... 7, 9, 12, 13

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ....................................................................... 10, 13

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ..............................................................................................9

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)..........................................................................5

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .............................................................................8

**Statutes**

42 U.S.C. § 802.................................................................... *passim*

42 U.S.C. § 803 ...............................................................................16

Ala. Code § 40-2B-1 ........................................................................7

Ala. Code § 40-2B-2(a).....................................................................7

**Rules**

Fed. R. Civ. P. 25(d) ......................................................................1

**Other**

American Rescue Plan Act, Pub. L. No. 117-2, § 9621 .........................16

American Rescue Plan Act, Pub. L. No. 117-2, § 9673 .........................16

The American Rescue Plan Act represents an unprecedented intrusion by the federal government into the States' sovereign taxing authority. While States and their people struggled to recover from the COVID-19 crisis, the federal government leveraged its exclusive ability to allocate trillions of dollars and "offered" this borrowed money to the States in exchange for their taxing authority. This "offer" and the nebulous strings attached to it are unconstitutional. The Plaintiff States[1] have been harmed by the offer and by the federal government's ensuing and ongoing intrusion into the States' sovereign power. This Court should grant the States injunctive and declaratory relief from this unique assault on our federal system.

Throughout their brief, Defendants insist that the Tax Mandate "does not regulate States' ability to cut at least some taxes." Resp. 29; *see also id.* at 9. But they still cannot explain how, by the provision's text, that could be so. *See id.* at 9 (reciting but not explaining the text of Tax Mandate, while omitting the phrase "directly or indirectly"). They do not engage with the premise that money is fungible, even though that principle means that *any* ARPA funds the States receive could be viewed as indirectly offsetting *any* reduction in State tax revenue. *See* Doc. 75 at 9–10. After all, every federal dollar a State spends on an expenditure represents one dollar of *State funds* that the State may no longer need to use for that expenditure.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, John M. O'Connor was "automatically substituted as a party" in his capacity as Attorney General of Oklahoma when he took office on July 23, 2021.

The Tax Mandate is a powerful restriction on *those* State dollars. It singles out State tax relief as forbidden where no other State activity using State funds is so restricted.[2] Thus, States that accept desperately needed federal funds are forced to limit how they use *State funds* to go about State business to avoid creating a reduction in tax revenue. The Constitution bars the federal government from using such coercive "offers" to control the State House.

Nothing Defendants say in their Response changes this outcome. *First*, the Tax Mandate is unconstitutionally ambiguous. Defendants double down on their position that a statute need not state what a condition *means*, so long as the statute says that a condition *exists*. That isn't right. The question is "whether … a state official would clearly understand … the obligations." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). In other words, the federal statute must "link unambiguously its conditions to the receipt of federal funds *and define those conditions clearly enough for the states to make an informed choice*." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) (emphasis added). And the States here could not make an "informed choice" simply because they knew that *some* condition existed, just as a homebuyer could not make an "informed choice" to purchase a house if he knows only that he must pay *some price* at closing.

---

[2] For example, it appears States are restricted only from *directly* depositing ARPA money into pension funds. *See* 42 U.S.C. § 802(c)(2)(B).

2

*Second*, the Tax Mandate is unconstitutionally coercive. Defendants misapprehend how *NFIB* applies. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). There, the Supreme Court approved Congress's ability to "condition the receipt of funds" for Medicaid expansion "on the States' complying with restrictions on the use of *those* funds[.]" *Id.* at 580 (emphasis added). The problem was that Congress conditioned the receipt of traditional Medicaid funds on adopting an unrelated program—Medicaid expansion. What mattered was not that the federal funds Congress threatened were preexisting, but that Congress leveraged sizeable funds to coerce policy changes that went beyond mere conditions on the use of those funds. *NFIB*, 567 U.S. at 580. The same dynamic is at play here. ARPA is unobjectionable to the extent it conditions receipt of federal funds on those funds being spent on ARPA purposes. The problem is that the Tax Mandate goes further, restricting the use of *other* funds—State funds—and directing how States can set their own tax policy as a condition of receiving indisputably massive sums of money. Just as Congress could not use threats to traditional Medicaid funds to coerce States into adopting an expanded Medicaid program, Congress cannot use ARPA funds to coerce States into forgoing tax relief.

*Third*, the Tax Mandate is not germane to ARPA's purpose. It does not "merely specif[y] how States may use the newly appropriated federal funds to ensure that they are used for the public-health and economic-recovery purposes of the Act."

3

Resp. 30. By affirmatively requiring funds to be spent on ARPA's four purposes, Section 802(c)(1) already does that. 42 U.S.C. § 802(c)(1). Instead, the Tax Mandate penalizes States for tax cuts—and tax cuts alone. Surplus State funds can be *spent* by States on anything a legislature could dream of, no matter how unrelated to COVID relief. But even though ARPA repeatedly uses federal tax relief to promote COVID recovery, the States are penalized for using similar tools. This irrationality shows that the Tax Mandate's aim is not an increase in COVID relief, but an increase in the size of government. Because *that* isn't related to ARPA's stated purposes, the Tax Mandate is unconstitutionally unrelated to Congress's aims.

Defendants argue not just that they win on the merits, but that the Court should not consider the merits of Plaintiffs' claims in the first place. This is so, they argue, because the States have not suffered any injury. But the Tax Mandate has been harming Plaintiffs since March 3, 2021, the date it became effective (regardless of whether or when States accepted its conditions). Any reduction in revenue considered or enacted since then has been under a cloud of uncertainty; indeed, some laws did not pass, at least in part, because of the uncertainty surrounding the Tax Mandate. *See, e.g.*, Albritton Decl. ¶ 8 (Doc. 75-2). As the Court has already held and as borne out by undisputed facts, the States have standing to maintain this action. Defendants' Motion to Dismiss should be denied and the Court should declare the Tax Mandate unconstitutional and enjoin its enforcement.

## I.   Plaintiff States Have Standing.

Plaintiffs have standing if they suffer an injury in fact, fairly traceable to the defendant's conduct, that is likely to be redressed by a favorable ruling. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Defendants contest only whether Plaintiffs have shown an injury. This Court previously held that Plaintiffs had properly pleaded facts to establish such an injury for several different reasons. Doc. 71 at 14–20.[3] Nothing has changed that would affect the Court's analysis or conclusion.

Defendants do not dispute the relevant facts: Congress passed ARPA, which includes the Tax Mandate, reporting requirements, and a recoupment proceeding; States considered whether to accept its conditions, and many States have done so and are now subject to ARPA requirements that include the Tax Mandate, reporting requirements, and the threat of recoupment proceedings (Doc. 74); and States have passed laws that will likely lower tax revenues (Doc. 75-1). Given this Court's legal conclusions and the undisputed, judicially noticeable facts, it follows that Plaintiffs have established standing to satisfy Article III.

Defendants resist this conclusion primarily by emphasizing their arguments about the merits of the case. *See* Resp. 9 (arguing that Plaintiffs haven't suffered an injury because the Tax Mandate "does not prohibit the proposal or adoption of any

---

[3] Plaintiffs previously responded to many of Defendants' same arguments, including those about standing, as part of briefing Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs incorporate that prior briefing (Doc. 59) in full.

tax change"); *id.* at 12–13 (arguing that Plaintiffs "cannot manufacture standing based on their incorrect legal conclusions about coercion or commandeering") (citation and quotation marks omitted); *id.* at 13 (arguing that Plaintiffs have not suffered an injury based on ambiguity because Congress must only make clear that *some* condition on funds exists, not that the condition means anything in particular). But, as set out in prior briefing and further explained here, whether Defendants' arguments are viewed as going to the merits or standing, they fail.

Defendants have little to say about the actual injury that Plaintiffs have already suffered—the intrusion into their sovereign authority to set tax policy. *See* Doc. 59 at 10; *McCulloch v. Maryland,* 17 U.S. 316, 428 (1819) ("[T]he power of taxing the people and their property[] is essential to the very existence of government."). As explained in a declaration by an Alabama lawmaker—evidence unmentioned by Defendants in their brief—State legislatures must understand the financial effects of the laws they pass to effectively craft State budgets. Doc. 75-2. The uncertainty surrounding ARPA caused, in part, at least one bill in the Alabama Legislature to fail despite widespread approval by legislators. *Id.* ¶ 8. The court in *Ohio v. Yellen* explained how the same uncertainty caused a cognizable injury to the State of Ohio:

> [I]f the Tax Mandate is ambiguous as to a broad range of potential tax changes, then that ambiguity will have consequences of its own. The uncertainty itself, uncertainty that exists now that Ohio has tendered its certification, will continue to exert pressure on state legislators not to consider any tax change, or set of tax changes, as to which the Tax Mandate implications cannot be assessed. As further

described below, that essentially means that Ohio's legislature may be
disinclined to consider *any* rate reduction, as to *any* state tax, because
the Secretary could interpret that reduction as triggering a right to
recoupment. Or, at the very least, Ohio legislators will have incentives
to minimize the *size* of any such reductions in hopes of reducing the
magnitude of any associated recoupment.

That type of thumb on the legislative scale is a current and
ongoing injury to Ohio in its sovereign capacity.

*Ohio v. Yellen*, No. 1:21-cv-181, --- F. Supp. 3d ---, 2021 WL 2712220, at *8–9

(S.D. Ohio July 1, 2021). The same analysis applies here: legislators and other State

officials[4] are forced to act in the shadow of the Tax Mandate, even where acceptance

of ARPA funds is only prospective, not yet accomplished, and even where no

recoupment action is yet underway. *See* Doc. 71 at 16 ("[T]he Plaintiff States

suffered an injury in fact when Congress passed the ARPA because they were

presented with an unconstitutionally ambiguous deal."). In fact, Plaintiffs are subject

to continuous and ongoing harm even if no recoupment action *ever* happens because

of the harm that the Tax Mandate inflicts on the legislative process.

Finally, through the lens of pre-enforcement caselaw, this Court recognized

that "the Plaintiff States have alleged 'an intention to engage in a course of conduct'

(accepting ARPA funds and reducing state taxes) that is 'arguably affected with a

---

[4] It's not just members of State Legislatures who are subject to the Tax Mandate. For example, the
Tax Mandate also prohibits "administrative interpretation[s]" that decrease tax revenue. In
Alabama, the Alabama Tax Tribunal is a state agency that "resolve[s] disputes between the
Department of Revenue and taxpayers." Ala. Code §§ 40-2B-1, 40-2B-2(a). By ARPA's plain
language, Alabama would be penalized if its Tax Tribunal interpreted Alabama law in a way that
results in a tax decrease for an Alabama taxpayer.

constitutional interest' (the Plaintiff States' Tenth Amendment rights and inherent limits on Congress's Spending Clause power) that is 'proscribed by a statute' (based on a plain reading of the Federal Tax Mandate) and that comes with a 'credible threat of [enforcement] thereunder' (recoupment of ARPA funds by the Treasury)." Doc. 71 at 18 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Certainly as to those Plaintiffs that have already accepted ARPA funds, each of those allegations is now supported by undisputed facts. Most States have accepted ARPA's terms. *See* Doc. 74. And though Defendants assert that "Plaintiffs have said nothing concrete about any reduction in net tax revenue, how they intend to offset it, or whether any such offsets would contravene the Rule," Resp. 12, Defendants ignore the numerous tax cuts and tax credits the Plaintiff States have passed since ARPA's covered period opened. *See* Doc. 75-1. Unless Defendants are prepared to bless these dozens of laws as beyond Treasury's recoupment power, States face a substantial risk of future recoupment proceedings. *See* 42 U.S.C. § 802(e). After all, the Secretary has committed to enforcement—a commitment any reasonable onlooker can glean from the Interim Rule's aggressive system of accounting and monitoring, as well as Defendants' vigorous defense of the Tax Mandate in courts around the country.

In sum, Defendants ask this Court to ignore a startling intrusion into State sovereignty because, they say, the States have not suffered any cognizable injury.

8

But as Defendants' briefing shows, their arguments about standing rest almost entirely on the substantive validity of the Tax Mandate. Consistent with this Court's prior determinations on standing, the Court should deny Defendants' Motion to Dismiss and proceed to the merits of this case.

## II.   Plaintiff States Prevail On The Merits.

### A.   The Tax Mandate Is Ambiguous.

Ambiguous Spending Clause conditions are unconstitutional. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Nevertheless, Defendants primarily[5] argue that "[p]recedent on Spending Clause unambiguity establishes that Congress must only make clear that acceptance of federal money obligates the States to comply with *a* condition." Resp. 16 (emphasis added). Defendants insist that Congress need not tell States what the condition *means*, so long as Congress states clearly that some condition on the funds *exists*. But decisions from both the Supreme Court and the Eleventh Circuit demonstrate that incomprehensible or unknown conditions do not pass Spending Clause muster.

"When Congress uses its power under the Spending Clause, *the conditions imposed by Congress must be unambiguous*." *Benning v. Georgia*, 391 F.3d 1299,

---

[5] Defendants dedicate about two paragraphs, Resp. 19, to arguing that the Tax Mandate as passed by Congress is an unambiguous condition on the use of federal funds. As explained in prior briefing, their argument is unpersuasive. Doc. 59 at 6–9; *see also Ohio*, 2021 WL 2712220, at *13–15 (S.D. Ohio July 1, 2021).

1305 (11th Cir. 2004) (emphasis added). Congress's use of its spending power "is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 2 (1981). Though the Supreme Court has been "careful not to imply that all contract-law rules apply to Spending Clause legislation," it has also "regularly applied the contract-law analogy in cases" involving receipt of federal funds. *Barnes v. Gorman*, 536 U.S. 181, 186 (2002). Against that backdrop, it is clear that Congress cannot strike a deal with the States that informs them only that *some* unidentified strings are attached to federal funds. Rather, the relevant inquiry must be "whether … a state official would clearly understand … the obligations" that follow. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Defendants lean on the Eleventh Circuit's *Benning* decision to assert that "Congress must only 'make the existence of the condition itself … explicitly obvious,'" Resp. 17 (quoting *Benning*, 391 F.3d at 1307), but *Benning* undercuts their point. After all, if Congress must make clear "the existence of *the* condition," then it is not enough to simply warn the States that *a* condition will attach to their deal with Congress. And in *Benning*, the specific condition the State faced was clear, even if the condition would manifest differently in different settings. The case involved a provision of the Religious Land Use and Institutionalized Persons Act

(RLUIPA) that "applie[d] strict scrutiny to government actions that substantially burden[ed] the religious exercise of institutionalized persons" where the burden was imposed in a program that received federal funds. 391 F.3d at 1304. Georgia argued that the "strict scrutiny" standard—requiring a State to show that the burden was in furtherance of a compelling governmental interest and that the burden was the least restrictive means of furthering that interest—was unconstitutionally ambiguous because Georgia could not definitively know whether its actions satisfied strict scrutiny. *Id.* at 1305–06. The Eleventh Circuit rejected the argument, pointing out that the strict scrutiny standard was "not new to Georgia or any state." *Id.* at 1306. Though Congress "need not specifically identify and proscribe in advance every conceivable state action that would be improper," *id.* (citation omitted), it nevertheless must "define those conditions clearly enough for the states to make an informed choice" and must make the "spending condition … clear and actionable." *Id.* RLUIPA made unambiguously clear to States that if they accepted the relevant funds, they were agreeing to the familiar strict scrutiny standard.

The Tax Mandate is nothing like this RLUIPA provision. Every lawyer is familiar with the strict scrutiny standard. In contrast, one "cannot fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law ... that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise).'" *Ohio v. Yellen*, No. 1:21-cv-181 --- F. Supp.

11

3d. ---, 2021 WL 1903908, at *12 (S.D. Ohio May 12, 2021) (quoting § 802(c)(1)(A)). The statute that Congress crafted provides *no* guidance on critical interpretive questions. *See* Doc. 75 at 8–10; *see also Ohio*, 2021 WL 2712220, at *13–15 (S.D. Ohio July 1, 2021). For example, the Tax Mandate does not tell States how to determine whether revenues have been or will be reduced, and it does not explain whether the Tax Mandate applies to expected or actual tax revenues. There is thus no way for States to comply with ARPA by looking to the text of the provision itself. Therefore, States had no way to "make an informed choice" about the costs of receiving ARPA funds. *Benning*, 391 F.3d at 1306.

Finally, Defendants appear to concede that the Interim Final Rule could not cure the Tax Mandate if the statute were unconstitutionally ambiguous under the Spending Clause. Resp. 23 ("Both sides agree that agencies cannot impose funding conditions that Congress itself has not attached.").[6] Instead of arguing that the Department of Treasury has such a power, Defendants retreat to their position that Congress only needed to make known the *existence* of a condition. *Id.* (again arguing that the existence of some sort of condition is "explicitly obvious") (citation omitted); *id.* at 26 (same).[7] As set forth above and in prior briefing, that's not correct.

---

[6] In one sentence, Defendants state that the Interim Final Rule "supplies the requisite notice." Resp. 22. It is not clear what "notice" refers to, but Defendants do not appear to argue that an agency has the authority to create a condition on the use of federal funds where that condition was not passed by Congress. *See also id.* at 23 ("Defendants are not asking the Court to defer to the Rule[.]").

[7] To the extent Defendants contend that § 802(f) establishes their authority to create unambiguous regulations out of ambiguous statutory text, the "general provision that '[t]he Secretary shall have

For Congress to validly exercise its spending power, the State receiving funds must be able to "voluntarily and knowingly accept[] the terms of the 'contract'" between the State and federal government. *Pennhurst*, 451 U.S. at 17. That cannot happen when the conditions themselves are ambiguous.

## B.    The Tax Mandate Is Coercive.

ARPA's Tax Mandate requires Plaintiff States to sacrifice either core elements of their sovereignty or billions of dollars of relief the States cannot realistically turn down in the aftermath of the economic devastation caused by the pandemic. By making such an offer, Congress impermissibly used "financial inducements to exert a 'power akin to undue influence.'" *NFIB,* 567 U.S. at 577.

Defendants' response rests on the false premise that the Tax Mandate dictates only what States do with federal funds. Plaintiffs have never contested whether the federal government can require States to spend *federal* funds on the four purposes in § 802(c)(1). The problem is that the Tax Mandate does far more—it regulates how States may use *State* funds. The coercion test applies to Spending Clause laws that "pressur[e] the States to accept policy changes." *NFIB,* 567 U.S. at 580. The Tax

---

the authority to issue such regulations as may be necessary or appropriate to carry out this section,' 42 U.S.C. § 802(f) does not suffice," for "the statute at issue in *Burwell* had a similar provision." *Ohio*, 2021 WL 2712220, at *19. The decisions Defendants made in implementing the Tax Mandate through the Interim Final Rule shift the balance of power between States and the federal government by dictating how deeply the federal government will intrude into State affairs. "[H]ad Congress wished to assign th[ese] question[s] to an agency, it surely would have done so expressly." *King v. Burwell*, 576 U.S. 473, 486 (2015).

Mandate's restriction on direct or indirect state tax cuts pressures States into adopting a particular—and federally preferred—tax policy. While Defendants try to frame the Tax Mandate as a garden-variety restriction on the use of federal funds, Congress cannot evade the limits on its authority by artful drafting. *Id.* at 582.

Defendants attempt to distinguish *NFIB* by arguing that the conditions at issue there threatened not just prospective funds, but funds that States had received in past years. Resp. 28–29. *NFIB,* however, relied not on the fact that the threatened funds were pre-existing, but that they were *distinct* from the challenged condition. *NFIB*, 567 U.S. at 580 (noting importance of "threats to terminate other significant independent grants"). Because pre-existing federal grants are not affected here, Defendants say, "there are no monetary consequences if a State chooses to decline the Rescue Plan funds." Resp. 28. But how can that be? *Not* receiving billions of dollars in federal aid (financed by States' own citizens' tax dollars) is undeniably a "monetary consequence." By refusing exorbitant funds offered to every State, any one State would put itself at an immense competitive disadvantage if it refused the funds and insisted on maintaining its sovereign taxing authority. As it relates to the coercion analysis, the question for the Court is "whether the financial inducement offered by Congress was so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (citations omitted). Here, based on the size of the funds offered and the circumstances States experienced during the economic

devastation caused by the COVID-19 pandemic, the "pressure turn[ed] into compulsion" to sacrifice State sovereignty for COVID relief.

Finally, the Tax Mandate is not more "modest" than the statute at issue in *NFIB* simply because the Secretary may recoup only a portion of the funds a State receives. *See* Resp. 28–29. The Tax Mandate's problem is not only the amount of money States stand to lose if they violate the condition (which is an "all or nothing proposition" for an as-yet undisclosed amount), but the sovereignty they must sacrifice to obtain the money. The sovereign right to control state taxing and spending policies is more important than money. But in any event "the size of the new financial burden imposed on a State is irrelevant in analyzing whether the State has been coerced into accepting that burden. 'Your money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500." *NFIB,* 567 U.S. at 582 n.12.

### C.    The Tax Mandate Is Unrelated to ARPA's Purpose.

Because restricting States' ability to use their funds for tax cuts is wholly unrelated to ARPA's purpose of providing COVID relief, the Tax Mandate violates the requirement that spending conditions be germane to the purposes of the grant. *See New York v. United States,* 505 U.S. 144, 167 (1992). Defendants claim that the Tax Mandate "merely specifies how States may use the newly appropriated federal funds to ensure that they are used for the public-health and economic-recovery

15

purposes of the Act." Resp. 30. But § 802(c)(1) already requires States to spend the federal funds on ARPA's four identified purposes. Instead, as spelled out above (and throughout briefing before this Court), the Tax Mandate dictates what States do with State funds. And Defendants fail to explain how restricting States from implementing tax cuts with State funds furthers ARPA's purpose. Nor could they; after all, ARPA itself provides tax relief. *See* ARPA, Pub. L. No. 117-2, § 9621 (expanding earned income tax credit); *id.* § 9673 (exempting small business revitalization funds). And ARPA allows localities to provide tax relief by providing funds to them free from any Tax Mandate. *See* 42 U.S.C. § 803. Uniquely disabling the States from doing the same has no plausible connection to COVID relief.

### D.     The Tax Mandate Violates the Tenth Amendment.

Defendants characterize Plaintiffs' argument about their sovereign rights under the Tenth Amendment as an alternative argument Plaintiffs make only because of perceived "fatal flaws" in their Spending Clause claims. Resp.29. That is wrong. Though Defendants largely ignore the Tenth Amendment, it is an important and vital guarantee of State power. Defendants offer no clear defense of the Tax Mandate's intrusion on State sovereignty in an area the Constitution reserves for the States: tax policy. *See* Doc. 21 at 31–33; Doc. 75 at 20–22. Further, the Tax Mandate prevents voters from holding their lawmakers accountable, *see* Doc. 21 at 33–34; Doc. 75 at 21–22, for it restricts States' ability to cut at least some taxes. When a State imposes

(or keeps in place) taxes only because of Congressional command, responsibility is blurred and political accountability avoided. *See New York,* 505 U.S. at 168–69. The Tenth Amendment forbids this outcome.

### III. Plaintiff States Are Entitled To Relief.

Plaintiff States ask this Court to declare unconstitutional and enjoin enforcement of the Tax Mandate, which under ARPA includes (1) prefunding certification of compliance with the Tax Mandate; (2) immediate and repeated reporting on state tax cuts, state revenues and other information to show ongoing compliance with the Tax Mandate; and (3) Treasury recoupment actions related to the Tax Mandate. Defendants argue against any relief, restating their arguments on the merits to explain their belief that Plaintiffs aren't entitled to the relief they seek.

Defendants' argument here seems to be that Plaintiff States should wait for a future recoupment action instead of being awarded any form of relief in this case. Resp. 31–34. They cite no authority for such an outcome. Defendants still ignore the real and significant injury that Plaintiff States have already suffered and continue to suffer: their loss of sovereignty. That ongoing injury cannot be remedied after the fact in some future administrative decision. An order of this Court is needed both to right the wrongs inflicted by the Tax Mandate *and* to prevent future (unconstitutional) enforcement actions. There should be no question that, if the Court finds the Tax Mandate unconstitutional, Plaintiffs are entitled to relief.

## CONCLUSION

The Court should enjoin enforcement of the Tax Mandate and declare it unconstitutional.

DATED: August 19, 2021                    Respectfully submitted,

/s/ Edmund G. LaCour Jr.
STEVE MARSHALL
  *Alabama Attorney General*
Edmund G. LaCour Jr.
  *Alabama Solicitor General*
James W. Davis
A. Reid Harris
  *Assistant Attorneys General*
Office of the Alabama
Attorney General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 353-2196
edmund.lacour@alabamaAg.gov
jim.davis@AlabamaAG.gov
reid.harris@AlabamaAG.gov
**Counsel for State of Alabama**


/s/ Lindsay S. See
PATRICK MORRISEY
  *West Virginia Attorney General*
Lindsay S. See (*pro hac vice*)
  *West Virginia Solicitor General*
David C. Tryon (*pro hac vice*)
  *Special Assistant to the*
  *Attorney General*
  (Admitted in Ohio; practicing
  under supervision of West Virginia
  attorneys)
Jessica A. Lee (*pro hac vice*)
  *Assistant Solicitor General*
Office of the West Virginia
Attorney General
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Lindsay.S.See@wvago.gov
**Counsel for State of West Virginia**

/s/ Bryan M. Taylor
Bryan M. Taylor
Bachus Brom & Taylor LLC
3536 Independence Dr.
Birmingham, AL 35209
Tel: (334) 595-9650
btaylor@bachusbrom.com


/s/ Nicholas Bronni
LESLIE RUTLEDGE
  *Arkansas Attorney General*
Nicholas J. Bronni (*pro hac vice*)
  *Arkansas Solicitor General*
Vincent M. Wagner (*pro hac vice*)
  *Deputy Solicitor General*
Dylan L. Jacobs (*pro hac vice*)
  *Assistant Solicitor General*
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel: (501) 682-6302
nicholas.bronni@arkansasag.gov
**Counsel for State of Arkansas**


/s/ John M. Ptacin
TREG R. TAYLOR
  *Attorney General of Alaska*
John M. Ptacin (*pro hac vice*)
  *Chief Assistant Attorney General*
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Tel: (907) 269-5100
Facsimile: (907) 276-3697
John.ptacin@alaska.gov
**Counsel for State of Alaska**

19

/s/ Jason Hilborn
ASHLEY MOODY
 *Florida Attorney General*
Jason H. Hilborn (*pro hac vice*)
 *Assistant Solicitor General*
Office of the Florida
Attorney General
Office of the Attorney General
State of Florida
PL-01 The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Jason.Hilborn@myfloridalegal.com
**Counsel for State of Florida**

/s/ Jeffrey S. Thompson
THOMAS J. MILLER
 *Attorney General of Iowa*
Jeffrey S. Thompson (*pro hac vice*)
 *Solicitor General*
1305 East Walnut Street
Des Moines, IA 50319
Tel: 515-281-5164
jeffrey.thompson@ag.iowa.gov
**Counsel for State of Iowa**

/s/ Dwight R. Carswell
DEREK SCHMIDT
 *Kansas Attorney General*
Dwight R. Carswell (*pro hac vice*)
 *Assistant Solicitor General*
Office of the Kansas
Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8410
dwight.carswell@ag.ks.gov
**Counsel for State of Kansas**

/s/ David M.S. Dewhirst
AUSTIN KNUDSEN
 *Attorney General of Montana*
David M.S. Dewhirst (*pro hac vice*)
 *Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-4145
David.Dewhirst@mt.gov
**Counsel for the State of Montana**

/s/ Anthony J. Galdieri
Anthony J. Galdieri (*pro hac vice*)
*Senior Assistant Attorney General, Civil Bureau*
New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301
Tel: (603) 271-1214
Anthony.J.Galdieri@doj.nh.gov
**Counsel for the State of New Hampshire**

/s/ Mithun Mansinghani
JOHN M. O'CONNOR
 *Oklahoma Attorney General*
Mithun Mansinghani (*pro hac vice*)
 *Solicitor General*
Oklahoma Office Of The
Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
mithun.mansinghani@oag.ok.gov
**Counsel for the State of Oklahoma**

/s/ J. Emory Smith, Jr.
ALAN WILSON
  *South Carolina Attorney General*
J. Emory Smith, Jr. (*pro hac vice*)
  *Deputy Solicitor General*
Office of the South Carolina
Attorney General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-3680
esmith@scag.gov
**Counsel for State of South Carolina**

/s/ Melissa A. Holyoak
SEAN REYES
  *Utah Attorney General*
Melissa A. Holyoak (*pro hac vice*)
  *Utah Solicitor General*
Office of the Utah Attorney General
160 E. 300 S., 5th Floor
Salt Lake City, UT 84114
Tel: (801) 366-0260
**Counsel for State of Utah**

/s/ Jeffery J. Tronvold
JASON RAVNSBORG
  *South Dakota Attorney General*
Jeffery J. Tronvold (*pro hac vice*)
  *Deputy Attorney General*
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Tel:  (605) 773-3215
Jeffery.tronvold@state.sd.us
**Counsel for State of South Dakota**

## **CERTIFICATE OF SERVICE**

I hereby certify that on  August 19, 2021, I filed with the Court and served on

all counsel through the CM/ECF system the foregoing document.

/s *Edmund G. LaCour Jr.*
Counsel for the State of Alabama